UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING COMMISSION, :

                                         :

               Plaintiff,                       :       **05-CV-8091 (LAK)**

                                           :

                 v.                          :       **ECF CASE**

                                           :

**ABBAS A. SHAH and LINUXOR ASSET**       :
**MANAGEMENT LLC.,**                       :

                                           :

              Defendants.                  :

                                           :

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS ABBAS A. SHAH AND LINUXOR ASSET MANAGEMENT, LLC

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, Plaintiff U.S. Commodity Futures Trading Commission (the "CFTC") respectfully moves for entry of summary judgment against defendants Abbas A. Shah and Linuxor Asset Management, LLC, and in favor of the CFTC.

In support of its Motion, the CFTC files herewith: (1) its Memorandum of Law; (2) its Statement of Material Facts pursuant to Local Rule 56.1; (3) Deposition Excerpts, and (4) related Exhibits.

WHEREFORE, the CFTC respectfully requests that its Motion for Summary Judgment be granted.

**Attorneys for Plaintiff**
U.S. Commodity Futures Trading Commission
Stephen J. Obie
Regional Counsel/Associate Director

Dated: September 18, 2007
     New York, N.Y.

By:   /S/ _____

David Acevedo (DA 0388)
Michael R. Berlowitz (7615)
Division of Enforcement
140 Broadway, 19th Floor
New York, NY 10005
(646) 746-9754
(646) 746-9940 (fax)
dacevedo@cftc.gov

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | 05 CV 8091 (LAK) |
| v. | ) ) | ECF Case |
| ABBAS A. SHAH and LINUXOR ASSET MANAGEMENT LLC, | ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS ABBAS A. SHAH
AND LINUXOR ASSET MANAGEMENT LLC**

U.S. COMMODITY FUTURES TRADING
COMMISSION

Stephen J. Obie [SO-5502]
David Acevedo [DA-0388]
Michael R. Berlowitz [MB-7615]
Division of Enforcement
140 Broadway, 19th Floor
New York, New York 10005
(646) 746-9754
(646) 746-9940 (facsimile)
dacevedo@cftc.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

I.      INTRODUCTION..................................................................................1

II.     SUMMARY ...........................................................................................1

III.    BACKGROUND .....................................................................................2

IV.     UNDISPUTED FACTS...........................................................................3

        A.      Defendant Shah's Financial Experience and Background.........................3

        B.      Defendant Linuxor ...................................................................3

        C.      Pool Activities.........................................................................4

V.      THE CFTC IS ENTITLED TO SUMMARY JUDGMENT .................................7

        A.      Standard for Summary Judgment ..................................................7

        B.      Count I:  Section 4b(a) of the Act.................................................9

        C.      Count II:  Section 4o(1) of the Act ..............................................12

        D.      Count III:  Section 4.7 of the Regulations - Failure to Send
                Quarterly Statements and Timely Annual Reports.................................13

        E.      Count IV: Regulation 4.20(b) – Receiving Pool Funds in Other
                Than the Pool's Name and Commingling Pool Property ..........................16

VI.     RELIEF REQUESTED ..........................................................................17

        A.      Entry of a Permanent Injunction...................................................17

        B.      Imposition of a Civil Monetary Penalty.............................................19

        C.      Restitution.............................................................................20

VII.    CONCLUSION ...................................................................................21

# TABLE OF AUTHORITIES

## Cases

*Affiliated UTE Citizens of Utah v. United States,* 406 U.S. 128 (1972)........................13

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)........................8, 9

*Balderman v. United States Veterans Admin.,* 870 F.2d 57 (2d Cir. 1989)........................8

*Bank Leumi Le-Israel B.M. v. Lee,* 928 F.2d 232, (7th Cir. 1991)........................9

*Brooklyn Navy Yard Asbestos Litigation,* 971 F.2d 831 (2d Cir. 1992)........................8

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986)........................8, 9

*CFTC ex rel. Kelley v. Skorupskas,* 605 F. Supp. 923 (E.D. Michigan 1985)........................12

*CFTC v. AVCO Financial Corp.,* 28 F. Supp.2d 104, 115 (S.D.N.Y. 1998)........................10, 20

*CFTC v. Baragosh,* 278 F.3d 319 (4th Cir. 2002), *cert. denied,* 537 U.S. 950 (2002)........................15

*CFTC v. British American Commodities Corp.,* 560 F.2d 135 (2d Cir. 1977), *cert. denied,* 438 U.S. 905 (1978)........................17

*CFTC v. Cheung,* 1994 WL 583169 (S.D.N.Y. 1994)........................17

*CFTC v. Co Petro Marketing Group, Inc.,* 680 F.2d 566 (9th Cir. 1981)........................18

*CFTC v. Hunt,* 591 F.2d 1211 (7th Cir. 1979), *cert. denied,* 442 U.S. 921........................17, 18, 19

*CFTC v. Int'l Fin. Servs., Inc.,* 323 F.Supp.2d 482 (S.D.N.Y. 2004)........................15

*CFTC v. Muller,* 570 F.2d 1296 (5th Cir. 1978)........................18

*CFTC v. Savage,* 611 F.2d 270 (9th Cir. 1979)........................13

*CFTC v. Valko,* 2006 WL 2582970 (S.D.Fla. 2006)........................11

*CFTC v. Vartuli,* 228 F.3d 94 (2d Cir. 2000)........................10

*D'Amico v. City of New York,* 132 F.3d 145 (2d Cir. 1998), *cert. denied,* 524 U.S. 911 (1998)....8

*Drexel Burnham Lambert Inc. v. CFTC* 850 F.2d 742 (D.C. Cir. 1988)........................11

*First Nat'l Monetary Corp. v. Weinberger,* 819 F.2d 1334 (6th Cir., 1987)........................11

*General Elec. Co. v. New York State Dep't of Labor*, 936 F.2d 1448 (2d Cir. 1991) .................... 8

*Hammond v. Smith Barney Harris Upham & Co.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 (CFTC March 1, 1990) ......................................................................... 11

*Hinabarger v. United Aircraft Corp.*, 262 F.Supp. 52 (D.C. Conn. 1966) ...................................... 8

*In re Apache Trading Corp.*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,251 (CFTC March 11, 1992) ................................................................................................. 15

*In re Kolter*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,262 (CFTC Nov. 8, 1994) ......................................................................................................................... 13

*In re Slusser*, [1998-1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶27, 701 (CFTC July 19, 1999), *aff'd in part, remanded in part*, 210 F. 3d 783 (7th Cir. 2000) .............................. 12

*In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 (CFTC Jan. 12, 1998) ......................................................................................................................... 15

*JCC, Inc. v. CFTC*, 63 F.3d 1557 (11th Cir. 1995) ...................................................................... 15

*Kraft General Foods, Inc. v. Cattell*, 18 F.Supp.2d 280 (S.D.N.Y. Aug. 3, 1998) ........................ 8

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348 (1989).9

*McCarthy v. Kemper Life Insurance Companies*, 924 F.2d 683 (7th Cir. 1991) ............................ 9

*Messer v. E.F. Hutton & Co.*, 847 F.2d 673 (11th Cir. 1988) ....................................................... 13

*Miller v. CFTC*, 197 F.3d 1227 (9th Cir. 1999) ........................................................................... 19

*Narumanchi v. Foster*, 2006 WL 2844184 (E.D.N.Y. 2006) ......................................................... 8

*Passo v. United States Postal Serv.*, 631 F. Supp. 1017 (S.D.N.Y. 1986) ..................................... 8

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946) .................................................................... 19

*Reddy v. CFTC*, 191 F.3d 109 (2d Cir. 1999) .............................................................................. 19

*Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105 (2d Cir. 1986) ..................................................... 10

*SEC v. Drexel Burnham Lambert*, 956 F. Supp. 503 (S.D.N.Y. 1997) .......................................... 20

*SEC v. Grossman*, 887 F.Supp. 649, 656-657 (S.D.N.Y. 1995) .................................................... 9

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1980) .......................................................................... 18

*SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975 ............................................17, 18

*SEC v. Youmans*, 729 F.2d 413 (6th Cir.), *cert. denied*, 469 U.S. 1034 (1984) ...........................18

*Stotler & Co. v. CFTC*, 855 F.2d 1288 (7th Cir. 1986) ........................................................12

*U.S. v. Sawyer*, 799 F.2d 1494 (11th Cir. 1986) ...............................................................11

*Wechsler v. Steinberg*, 733 F.2d 1054  (2d Cir. 1984) .......................................................11

*Wolfish v. U.S.*, 428 F.Supp. 333, (S.D.N.Y. 1977) ............................................................8

## Statutes

Section 1(a)(5) of the Act, 7 U.S.C. § 1a (5)........................................................................3

Section 13(b) of the Act, 7 U.S.C. §13c(b) ...................................................2, 13, 14, 15, 16

Section 1a(29) of the Act, 7 U.S.C. § 1a(29).............................................................19, 21

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(A)(1)(b) ....................................2, 12, 13

Section 4b of the Act, 7 U.S.C. § 6b ...............................................................1, 2

Section 4o of the Act, 7 U.S.C. § 6o ....................................................................1

Section 4o(1) of the Act, 6 U.S.C. § 6o(1) ...............................................2, 12, 13, 18

Section 6c of the Act, 7 U.S.C. § 13a-1................................................................17, 18

Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1)................................................19

## Rules

Federal Rule of Civil Procedure 56(e).................................................................................9

Federal Rule of Civil Procedure Rule 56(a) ....................................................................1

Local Rule 56.1.................................................................................................................1

## Regulations

CFTC Regulation 1.2, 17 C.F.R. § 1.2 ...............................................................2, 12, 13

iv

CFTC Regulation 143.8(2)(ii), 17 C.F.R. § 143.8(2)(ii) ..............................................19

CFTC Regulation Section 4.20, 17 C.F.R. 4.20 ......................................1, 2, 13, 16, 18

CFTC Regulation Sections 4.7(b), 17 C.F.R. §4.7(b) ..............................................1, 2, 4, 13, 14

## I.     INTRODUCTION

Plaintiff, the U.S. Commodity Futures Trading Commission (the "CFTC"), respectfully submits this memorandum in support of its Motion for Summary Judgment against defendants Abbas A. Shah, ("Defendant Shah" or "Shah") and Linuxor Asset Management LLC ("Defendant Linuxor" or "Linuxor") (collectively the "Defendants"), pursuant to Federal Rule of Civil Procedure Rule 56(a) and Local Rule 56.1.

## II.     SUMMARY

Defendant Shah, the sole trader and the controlling person of Defendant Linuxor, violated the Commodity Exchange Act (the "Act") and CFTC Regulations, by repeatedly lying to and misleading pool participants in his effort to conceal the rapid and near-total demise of the commodity pool Linuxor Global Macro Fund (the "pool"), managed by Defendants. Shah, acting on Linuxor's behalf, denied pool participants the quarterly and annual reports that were required by CFTC Regulation, thereby concealing millions of dollars of trading losses. Defendant Shah further deceived the pool participants by knowingly and intentionally misrepresenting the pool's net asset value. Additionally, Shah, acting on behalf of Defendant Linuxor, violated CFTC Regulations by receiving pool funds in other than the pool's name and commingled the pool's funds with the property of others.

All material facts supporting the allegations in the CFTC's complaint have been admitted by Defendants. Accordingly, Defendants Shah and Linuxor are liable, as a matter of law, for engaging in fraud in violation of Sections 4b and 4o of the Act, and for failing to send out financial reports in compliance with CFTC Regulation 4.7(b)(2) and (3) , and for commingling pool funds with the property of others in violation of CFTC Regulation 4.20(b) and (c).

The CFTC respectfully requests that the Court issue an Order that permanently enjoins Defendants' unlawful acts and practices, imposes trading and registration bans and civil monetary penalties, requires Defendants to pay restitution and imposes any other equitable relief that the Court deems appropriate. These sanctions are designed to prevent the Defendants from committing further injury to the public, deter others from committing similar violations and help compensate the victims of this fraud.

### III.    BACKGROUND

On September 19, 2005, the CFTC filed a complaint against Defendants Shah and Linuxor alleging that they violated Sections 4b(a)(2) (i)-(iii) and 4o (1) of the Act, 7 U.S.C. §§6b(a)(2)(i)-(iii) and 6o(1) (2002), by defrauding pool participants in connection with their investments in a commodity pool. Defendant Linuxor also violated CFTC Regulations for receiving pool funds in other than the pool's name and commingling pool funds with the property of others. These acts are in violation of CFTC Regulation 4.20, 17 C.F.R. §4.20. Further, Defendants' failure to provide timely financial reports violated CFTC Regulation Sections 4.7(b)(2)-(3), 17 C.F.R. §4.7(b)(2)-(3). As a controlling person of Defendant Linuxor, Shah is liable for Linuxor's violations of Section 4o(1) of the Act and CFTC Regulations 4.7(b)(2)-(3) and 4.20(b)-(c) pursuant to Section 13(b) of the Act, 7 U.S.C. §13c(b). By operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(A)(1)(b), and CFTC Regulation 1.2, 17 C.F.R. §1.2 (2004), Defendant Linuxor is vicariously liable for Shah's violations of the Act.

## IV.    UNDISPUTED FACTS

### A.    Defendant Shah's Financial Experience and Background

Defendant Shah received a Bachelor of Science degree in Biology with a concentration in Economics from Columbia University in 1985.[1]  Shah subsequently worked at various large financial institutions in New York, NY, including Lehman Brothers (1992-1995), UBS Securities (1996) and Deutche Bank (2001).  Shah managed a multi-billion dollar book of U.S. zero coupon and longer dated treasury securities.  At Lehman Brothers and UBS Securities Shah was the head of the U.S. zero strips desk.  From 1996-1997, Defendant Shah was the managing principal of InterPacific Capital Management Corp., a commodity pool.[2]

### B.    Defendant Linuxor

In the fall of 2001, Defendant Shah created Linuxor to act as the commodity pool operator ("CPO")[3] for the commodity pool Linuxor Global Macro Fund LP (the "pool").[4] Defendant Shah was the owner, principal and registered Associated Person ("AP") of Defendant Linuxor,[5] which was a registered CPO.

Defendant Linuxor is a Delaware limited liability company with its principal place of business at 20 Exchange Place, 45th Floor, New York, NY 10005.[6]  Defendant Linuxor operated the pool.[7]  Since 2001, Defendant Linuxor has been registered as a CPO and is the general partner of the pool.[8]

---

[1]    Shah Deposition ("Shah Depo.") (Exhibit D) at p. 6, line 12-25; *see also* Resume (Exhibit C).
[2]    *See* Resume.
[3]    A "commodity pool operator" is "any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or indirectly or through capital contributions, the sale of stock or other form of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility."  7 U.S.C. § 1a (5).
[4]    Complaint ¶24 (Exhibit A); Defendants' Answer (Exhibit B)  ¶24.
[5]    Complaint ¶14; Defendants' Answer ¶14.
[6]    Complaint ¶15; Defendants' Answer ¶ 15.

3

In March 2002, Defendant Shah informed the NFA that Defendant Linuxor would be operating under the exemptions of CFTC Regulation 4.7, 17 C.F.R. § 4.7.[9]  Therefore, pursuant to CFTC Regulation 4.7(b)(2), Linuxor was required to distribute quarterly statements to the pool participants setting forth the net asset value of the pool.  And, pursuant to Regulation 4.7(b)(3), Linuxor was also required to distribute to each pool participant an annual financial statement for the pool within 90 calendar days of the end of the fiscal year.  As a member of the National Futures Association ("NFA"), Shah admitted that he was required to send both quarterly and annual financial reports to pool participants.[10]

### C.    **Pool Activities**

The pool began trading commodity futures in March 2002.[11]  In the first six months of the pool's operation, Shah raised a total of $11.8 million including $11.5 million ($1.5 million in March 2002 and $10 million in May 2002) from three related entities ("McCarthey pool participants") controlled by Phillip McCarthey, and an additional $300,000 from a fourth pool participant.[12]  On behalf of Defendant Linuxor, Shah had these funds ($11.8 million) deposited in an account belonging to Linuxor Capital Management, a separate uncharged entity, rather than in the pool's account.[13]

Almost immediately, the pool began suffering devastating losses and by approximately August or September 2002, the McCarthey pool participants suffered losses of about 30 percent,

---

[7]    Complaint ¶1; Defendants' Answer ¶1.
[8]    Complaint ¶15; Defendants' Answer ¶15.
[9]    Complaint ¶24; Defendants' Answer ¶24.
[10]   Shah Depo., p. 340, lines 14-19
[11]   Complaint ¶27; Defendants' Answer ¶27.
[12]   Complaint ¶25; Defendants' Answer ¶25; Shah Depo. p. 324 line 25 and p. 325 lines 2-9.
[13]   Complaint ¶7; Defendants' Answer ¶7.

i.e. $3.5 million.[14]  Having suffered these huge losses Shah, on behalf of Linuxor, intentionally

failed to send quarterly statements to the pool participants.

The Defendants were also required by CFTC Regulation Section 4.7 to send an annual

financial report.  The 2002 annual financial report was sent late.  In fact, Defendant Shah, on

behalf of Linuxor, did not send the 2002 annual report to pool participants until August 2003,[15] a

full five months after it was due.  The 2002 annual report indicated that the pool lost

approximately $5.1 million, or about 43 percent of the pool funds by the end of 2002.[16]  In an

effort to lull the McCarthey pool participants into a false sense of security, Defendant Shah, on

behalf of Linuxor, sent them an e-mail on August 25, 2003 stating, in pertinent part,

> We have thus far recovered more than half of the capital loss and if we continue
> at this pace we hope that we will have not only recovered all of the capital loss
> but there is a good likelihood that we will be positive as far as returns since
> inception are concerned.[17]

Shah admitted to sending the August 25, 2003 e-mail and admitted that the e-mail content was

correct.[18]  Defendant Shah, however, said that the "proper context" of the e-mail was limited to

"futures and options positions that were carried from 2002 to 2003 and whether those positions

had been unwound profitably or not ..."[19]  There is no such reference in the e-mail.  When asked

whether the pool had suffered further losses since the beginning of 2002 of approximately $2.5

million, Shah never denied it and instead responded that he did not recall.[20]  In fact, the pool had

suffered further losses since the beginning of 2003.  For the period ending December 31, 2002,

---

[14]    Complaint ¶29; Defendants' Answer ¶29.
[15]    Shah Depo. p. 340 lines 23-25 and Shah Depo. p. 341 lines 2-5.
[16]    Complaint ¶30-31; Defendants' Answer ¶30-31; Shah Depo. p. 340, lines 23-25 , and Shah Depo. p. 341
        lines 2-5.
[17]    Shah Depo. p. 343-345; *see* August 25, 2003 email (Exhibit E).
[18]    Shah Depo., p. 344, lines 5-25, p.345, lines 2-24.
[19]    Shah Depo., p. 345, lines 5 – 13.
[20]    Shah Depo., p. 345, line 25, p. 346, lines 2-5.

5

the net asset value of the pool was $6,591,530.[21]  For the period ending August 31, 2003 the net

asset value of the pool was $3,754,708.[22]  Clearly, Shah's e-mail was false as the pool had lost

money, approximately $2.8 million, since the beginning of 2003 and had not recovered "more

than half of the capital loss."  Not once during the entire period of the pool's existence did Shah,

on behalf of Linuxor, send the pool participants a quarterly net asset value financial statement.[23]

On January 30, 2004 Defendant Shah, on behalf of Defendant Linuxor, sent another

fraudulent e-mail to pool participants, representing that the value of the combined interests of the

McCarthey pool participants was slightly in excess of $8 million as of December 31, 2003.[24]  In

pertinent part, the email reads:

> Your account balance as of 12/30/03 was approximately:
> $8,095,000
> Realized $6,500,000
> Unrealized $1,595,000

Once again, Shah's e-mail was false.  In point of fact, Defendant Shah admitted that he knew as

early as a few months after January 2004 that the pool was actually worth only $4 million and

not the $8 million he reported to the McCarthey pool participants in the January 2004 email, a

discrepancy of 100 percent.[25]  Defendant Shah never corrected, in writing, the $4 million

discrepancy to the McCarthey pool participants.[26]  As the sole principal of Linuxor and the sole

trader for the pool, Shah admitted that he had a firm grasp on how the pool was doing,[27] and that

---

[21]    Citco Net Asset Value Statement Ending 12/31/2002 (Exhibit F).
[22]    Citco Net Asset Value Statement Ending 8/31/2003 (Exhibit G).
[23]    Complaint ¶2, Defendants' Answer ¶2.  *See* Shah Depo. p. 310 lines 3-21; p. 339 lines 24-25; p. 340 lines 2-19.
[24]    Complaint ¶35; Defendants' Answer ¶35; Shah Depo. p. 373-377; Shah Depo. p. 387 lines 4-8.
[25]    Shah Depo. p. 399 lines 2-23; *see* Shah email dated January 30, 2004 (Exhibit H).
[26]    Shah Depo. p. 383, lines 22-25; p. 385, lines 2-10.
[27]    Shah Depo. p. 380, lines 2-16.

he knew what the fund was worth on any given day.[28]  In short, Shah's e-mails were knowingly

false, and he possessed the requisite degree of *scienter* to establish his liability for fraud.

In the spring of 2004, the McCarthey pool participants asked Defendant Shah to liquidate

their pool investment.[29]  The McCarthey pool participants were the last pool investors to receive

their distributions and received approximately $4 million.[30]

Thereafter, the NFA filed a complaint before its Business Conduct Committee against

Defendants Linuxor and Shah, both NFA members, for violations of NFA rules.[31]  The NFA also

conducted an arbitration brought by the McCarthey pool participants, as claimants, against

Defendants Shah and Linuxor which concluded on March 5, 2007 and resulted in a restitution

award of $9, 326,147 ($7,497,109 in compensatory damages and $1,829,038 in interest).[32]

## V.     THE CFTC IS ENTITLED TO SUMMARY JUDGMENT

This Court should grant the CFTC's Motion for Summary Judgment against Defendants

because both the facts and legal elements necessary to establish all of the claims alleged in the

complaint are established by the evidence presented by the CFTC in support of this motion.

Thus, there are no genuine issues of material fact, and the CFTC is entitled to judgment as a

matter of law.

### A.  Standard for Summary Judgment

The CFTC is entitled to summary judgment where the court is convinced that there are no

genuine issues of material fact and when the law, as applied to the undisputed facts, entitles the

CFTC to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct.

---

[28]     Shah Depo., p. 410, lines 3-25, p. 411, lines 2-7.
[29]     Shah Depo., p. 407, lines 14-18.
[30]     McCarthey Deposition p. 72, lines 13-25, p. 73, lines 2-3 (Exhibit I).
[31]     Shah Depo. p. 394, lines 11-13.
[32]     NFA Arbitration Award Documents (Exhibit J).

2548, 2553 (1986); *D'Amico v. City of New York,* 132 F.3d 145, 148 (2d Cir. 1998), *cert. denied,* 524 U.S. 911 (1998); *see Passo v. United States Postal Serv.,* 631 F. Supp. 1017, 1022 (S.D.N.Y. 1986). A fact is material when its resolution would "affect the outcome of the suit under the governing law," and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *General Elec. Co. v. New York State Dep't of Labor*, 936 F.2d 1448, 1452 (2d Cir. 1991) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.,* 870 F.2d 57, 60 (2d Cir. 1989).

"The liberal spirit of federal summary judgment procedure" allows the court to consider all evidence that would be usable at trial, even if it is not presently in evidentiary form. *Hinabarger v. United Aircraft Corp.,* 262 F.Supp. 52, 56 (D.C. Conn. 1966). For example, prior sworn testimony is admissible in support of a motion for summary judgment. *Kraft General Foods, Inc. v. Cattell,* 18 F.Supp.2d 280, 284 (S.D.N.Y. Aug. 3, 1998). A court can take judicial notice of its records in deciding a summary judgment motion. *Brooklyn Navy Yard Asbestos Litigation,* 971 F.2d 831, 839 (2d Cir. 1992). A court also can take judicial notice of public court documents and proceedings. *Narumanchi v. Foster,* 2006 WL 2844184 at *3 (E.D.N.Y. Sept. 29 2006). In addition, reliable materials in the court's own files may be considered on a motion for summary judgment. *Wolfish v. U.S.,* 428 F.Supp. 333, 337 at n.5 (S.D.N.Y. Jan. 5, 1977).

The movant has the burden of establishing the lack of a genuine issue of material facts. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553. In deciding whether the moving party's burden has been met, a court is not required to draw every conceivable inference from the record in favor of the non-moving party - only those inferences that are reasonable. *Bank Leumi Le-Israel B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir. 1991).

Assuming the moving party has met its burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the facts are not legitimately controverted, the moving party is entitled, as a matter of law, to judgment on undisputed facts. The opposing party may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 256-57 (citations omitted); *Bank Leumi Le-Israel, B.M.*, 928 F.2d at 236; *McCarthy v. Kemper Life Insurance Companies*, 924 F.2d 683, 687 (7th Cir. 1991). If the evidence submitted by the opposing party is "merely colorable, conclusory, speculative or not significantly probative" summary judgment is appropriate. *SEC v. Grossman*, 887 F.Supp. 649, 656-657 (S.D.N.Y. 1995). Thus, mere disagreement, bald assertions, allegations in pleadings, and legal conclusions are all insufficient to defeat a summary judgment motion. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 1355-56 (1989) (mere "metaphysical doubt" insufficient to defeat summary judgment motion).

### B. Count I: Section 4b(a) of the Act

Count I of the CFTC's complaint charges that Defendants committed fraud and thus violated Section 4b(a) of the Act, 7 U.S.C. § 6b(a). To establish fraud under Section 4b(a) of the Act, the defendant must have made (1) a false or misleading representation or omission, (2) of a material fact, (3) with scienter, and (4) in connection with a futures transaction. *See CFTC v. AVCO Financial Corp.*, 28 F. Supp.2d 104, 115 (S.D.N.Y. 1998), *aff'd in relevant part sub nom, CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000).

As discussed above, Defendant Shah, on behalf of Defendant Linuxor, lost millions of dollars while trading on behalf of pool participants and Shah intentionally hid these losses from pool participants by refusing to send quarterly net asset value statements and sending the 2002

9

annual report in August 2003, five months late.  Furthermore, Defendant Shah intentionally

deceived the McCarthey pool participants in the August 2003 and January 2004 e-mails as

discussed above.  Regarding the January 2004 e-mail, Defendant Shah has admitted that the net

asset value was not the $8 million he reported in the e-mail but instead approximately $4 million.

Shah has admitted that as the sole trader of the pool, he knew on any given day the value of the

pool.  It was his job to know this.  It defies credibility, then, that he did not know the

approximate net asset value of the McCarthey pool participants' investment in the pool or that he

would be off in his approximation by 100 percent.

  These misrepresentations and omissions made by Defendant Shah are material.  "A

statement is material if there is a substantial likelihood that a reasonable investor would consider

it important in making an investment decision."  *AVCO*, 28 F. Supp. 2d at 115  (quoting *Saxe v.

E.F. Hutton & Co., Inc.,* 789 F.2d 105, 111 (2d Cir. 1986)).  In his deposition, Shah admitted that

the required quarterly reports were never sent to the pool participants, and that the pool's annual

financial statement was not sent to the pool participants until many months after the regulatory

deadline.  There is, therefore, no genuine issue of material fact as to the issue of whether the

defendants made false statements and deceptive omissions.

  Shah's misrepresentations and omissions were with respect to the value of the pool's net

asset value.  Such information is material as a matter of law. *U.S. v. Sawyer*, 799 F.2d 1494 (11th

Cir. 1986) (concealment of pool's severe losses was "[c]oncealment of …. material information

from investors [that] constitutes fraud."); *CFTC v. Valko*, 2006 WL 2582970 (S.D.Fla. 2006)(

"[a]ccount statements that falsely represent the value of a customer's account and performance of

accounts constitute false statements…. and are material and constitute fraud"); *First Nat'l

Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1341 (6th Cir., 1987) (lulling conduct that

induced customer to remain in the market while undisclosed losses were accruing constituted a material misrepresentation that proximately caused victim's harm). Thus, there is no genuine issue as to the element of materiality.

Defendant Shah made these material misrepresentations with scienter. Scienter requires proof that the defendant committed the alleged wrongful acts "intentionally or with reckless disregard for his duties under the Act." *Hammond v. Smith Barney, Harris Upham & Co.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 at 36,657-59 (CFTC March 1, 1990) (scienter is a necessary element to establish futures fraud); *see also Drexel Burnham Lambert Inc. v. CFTC* 850 F.2d 742, 748 (D.C. Cir. 1988) (holding that "recklessness is sufficient to satisfy section 4b's scienter requirement").

Shah knew that the pool had suffered severe losses in 2002 and 2003, contrary to the assertions in his e-mails. Moreover, Shah knew that the January 2004 e-mail he sent indicating that the McCarthey pool participants' share of the pool was worth more than $8 million was outrageously false and that, in fact, the pool's net asset value was only $4 million. Shah's misrepresentation in the August, 2003 e-mail also satisfies the *scienter* element of fraud which "need not be direct, but may be a matter of inference from circumstantial evidence" *Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir. 1984). Thus, Shah and his company, Linuxor, (through Shah) knowingly made repeated misrepresentations and omissions about the success of the pool. Defendant Shah admitted that the material misrepresentations were in connection with futures transactions.[33] Accordingly, Defendant Shah's misrepresentations violated Section 4b(a) of the Act.

---

[33]    Complaint ¶ 27; Defendants' Answer ¶27

11

Defendant Linuxor is vicariously liable for Defendant Shah's violation of Section 4b(a) by operation of Section 2(a)(1)(B) of the Act, and CFTC Regulation 1.2. *Stotler & Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1986) ("[I]t does not matter if the principal knew about the agent's acts; he is strictly liable for them.")  In this case, of course, Shah is and agent of Linuxor as well as its owner and only principal.

## C. **Count II:  Section 4o(1) of the Act**

Count II of the complaint charges that Defendant Linuxor, while acting as a CPO, and Defendant Shah, an AP of Linuxor, violated section 4o(1)(A) and (B) of the Act.

As discussed, Defendant Shah's conduct, on behalf of Linuxor, that violated Section 4b(a) of the Act necessarily establishes that Defendant Shah also violated Section 4o(1) of the Act because he engaged in that conduct in his capacity as the registered AP of a CPO, Defendant Linuxor. *See CFTC ex rel. Kelley v. Skorupskas*, 605 F. Supp. 923, 932-33 (E.D. Michigan 1985) (the same conduct that violates Section 4b can violate Section 4o(1)); *In re Slusser*, [1998-1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶27, 701 at 48, 315 (CFTC July 19, 1999), *aff'd in part, remanded in part*, 210 F. 3d 783 (7th Cir. 2000) ("[w]here the record establishes that the respondents engaged in fraudulent conduct in violation of Section 4b the Division has ... surpassed its burden of proof with respect to section 4o").

Section 4o(1)(A) of the Act, 7 U.S.C. § 6o(1) (A), makes it unlawful for a CPO to directly or indirectly employ any device, scheme or artifice to defraud any participant or client. Liability under Section 4o(1)(A) of the Act, requires proof of scienter, *i.e.*, proof that the respondent committed the alleged wrongful acts "intentionally or with reckless disregard for [his] duties under the Act." *See CFTC v. Savage*, 611 F.2d 270, 283 (9th Cir. 1979).

12

Section 4$o$(1)(B) of the Act, 7 U.S.C. § 6$o$(1)(B), makes it unlawful for a CPO to engage in any transaction, practice or course of business that operates as a fraud or deceit upon any participant or client. Although Section 4$o$(1)(A) of the Act requires proof of scienter, Section 4$o$(1)(B) does not, provided the conduct operated as a fraud. *Savage*, 611 F.2d 270, *In re Kolter*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,262 at 42,198 (CFTC Nov. 8, 1994) (citing *Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 678-79 (11th Cir. 1988)).

The Defendants' failure to send out required quarterly net asset value statements and their failure to timely send out the 2002 annual report operated as a fraud or deceit on the pool participants in violation of Section 4$o$(1)(B). If sent, the quarterly statements and annual report would have contained, among other material information, the pool's net asset value. Reliance by the investors on this omission may be presumed. *Affiliated UTE Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972) ("All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision").

In short, the Defendants violated Section 4$o$(1)(A), which requires proof of scienter, and Section 4$o$(1)(B), which does not.

As a controlling person of Defendant Linuxor, Shah is liable for Linuxor's violations of Section 4$o$(1) of the Act and CFTC Regulations 4.7(b)(2)-(3) and 4.20(b)-(c) pursuant to Section 13(b) of the Act, 7 U.S.C. §13c(b). By operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(A)(1)(b), and CFTC Regulation 1.2, 17 C.F.R. §1.2 (2004), Defendant Linuxor is vicariously liable for Shah's violations of the Act.

### D. Count III: Section 4.7 of the Regulations - Failure to Send Quarterly Statements and Timely Annual Reports

13

Count III of the complaint charges that Defendant Linuxor, a registered CPO and subject to the reporting requirements of CFTC Regulation 4.7(b)(2), 17 C.F.R. § 4.7(b)(2), violated this regulation by failing to send out quarterly net asset value statements to pool participants that indicated the pool's net asset value, the change in net asset value from the last reporting period and the net asset value per outstanding unit. Also, Defendant Linuxor is charged with failure to timely send out the annual report for 2002 within 90 days of the end of the fiscal year, all in violation of CFTC Regulation 4.7(b)(3), 17 C.F.R. § 4.7 (b)(3). Shah admitted in his deposition that his company satisfied neither of these regulatory requirements. Accordingly, Defendant Linuxor is liable for violating Regulation 4.7(b)(2) and (3) .

Furthermore, the count charges that Defendant Shah, as the sole owner and principal of Defendant Linuxor, directly or indirectly controlled Defendant Linuxor, its employees and others and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in Count II and thus, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b). As the controlling person of Linuxor, Defendant Shah is liable for the violations described in Count III.

The reporting requirements of Regulation 4.7(b) apply directly only to the CPO itself. Accordingly, only Defendant Linuxor may be held directly liable for violating the regulation. However, Defendant Shah may be held indirectly liable as a "controlling person" pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b)(2002).

To be liable as a controlling person under Section 13(b), a person must possess the requisite degree of control and either: (1) knowingly induce, directly or indirectly, the acts constituting the violation; or (2) fail to act in good faith. *In re Apache Trading Corp.*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,251 at 38,794 (CFTC March 11, 1992).

14

To establish a defendant's control over a corporation, "the Commission must show that the defendant exercised general control over the operation of the entity principally liable *and* possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised." *CFTC v. Int'l Fin. Servs., Inc.*, 323 F.Supp.2d 482, 504 (S.D.N.Y. 2004) *quoting CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002), *cert. denied*, 537 U.S. 950 (2002) (emphasis in original). "[C]ontrolling person liability reaches those who actually direct a corporation or cause it to act, but would otherwise hide behind formalities of ownership or title." *Baragosh*, 278 F.3d at 330-331 (4th Cir. 2002).

To establish the "knowing inducement" element of the controlling person violation, Plaintiff must show that "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1998). Controlling persons cannot avoid liability by deliberately or recklessly avoiding knowledge about potential wrongdoing. *Id.* Indeed, constructive knowledge of wrongdoing is sufficient for a finding of knowing inducement. *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1570 (11th Cir. 1995).

Defendant Shah meets both tests for controlling person liability – he had the requisite degree of control over Defendant Linuxor and he knowingly induced its regulatory violations. He admitted in his deposition that he knew that the quarterly and annual reports were required by regulation to be sent out, and he was clearly in a position to ensure that they were sent out. Shah was the sole principal and registered AP of Defendant Linuxor. He was responsible for Defendant Linuxor's overall day-to-day operations and he was the sole trader for the pool that

Defendant Linuxor operated.  Thus, pursuant Section 13(b) of the Act, 7 U.S.C. §13c(b),

Defendant Shah is liable for the violations described in Count III to the same extent as Defendant

Linuxor.

Thus, there is no triable issue of fact as to Defendant Shah's liability as a controlling

person for Defendant Linuxor's regulatory violations.

### E. **Count IV: Regulation 4.20(b) – Receiving Pool Funds in Other Than the Pool's Name and Commingling Pool Property**

Count IV charges that Defendant Linuxor, the CPO, received pool participants' funds in

its own name and the name of Linuxor Capital Management, a separate, uncharged entity, and

not in the pool's name, all in violation of CFTC Regulation 4.20(b), 17 C.F.R. § 4.20(b) and that

Defendant Linuxor, the CPO, commingled pool funds in the bank accounts of Defendant Linuxor

and Linuxor Capital Management, all in violation of CFTC Regulation 4.20(c), 17C.F.R. §

4.20(c).

The count further charges that Defendant Shah, as the owner and principal of Defendant

Linuxor, directly or indirectly controlled Defendant Linuxor, its employees and others and did

not act in good faith or knowingly induced , directly or indirectly, the acts constituting the

violations in this count. Thus, pursuant, Section 13(b) of the Act, 7 U.S. C. S 13c(b), Defendant

Shah is liable for the violations described in Count IV to the same extent as Defendant Linuxor.

As discussed above, Defendant Shah admits that he received that pool funds in the name

of Linuxor Capital Management.

## VI.    RELIEF REQUESTED

### A.    <u>Entry of a Permanent Injunction</u>

The CFTC is entitled to injunctive relief upon a showing that a violation of the Act has occurred and that there is a reasonable likelihood of future violations. *See CFTC v. Cheung*, 1994 WL 583169 at *2 (S.D.N.Y. 1994) (citing *CFTC v. British American Commodities Corp.*, 560 F.2d 135, 141 (2d Cir. 1977), *cert. denied*, 438 U.S. 905 (1978)). Unlike private actions, which are rooted in the equity jurisdiction of the federal court, CFTC actions for injunctive relief are creatures of statute. *British American Commodity Options Corp.* 560 F.2d at 1142 (quoting *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975)) ("SEC appears in these proceedings not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the [federal] laws. Hence, by making the showing required by statute that the defendant 'is engaged or about to engage' in illegal acts, the Commission is seeking to protect the public interest, and 'the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief'") (*internal citation omitted*).

The injunctive relief contemplated in Section 6c of the Act, 7 U.S.C. § 13a-1, is remedial in nature, and is designed to prevent injury to the public and to deter future illegal conduct. Restrictive concepts ordinarily associated with private litigation, such as proof of irreparable injury or inadequacy of other remedies, are inapplicable to statutory actions brought by the CFTC for injunctive relief. *See CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979), *cert. denied*, 442 U.S. 921; *British American Commodity Options Corp.*, 560 F.2d at 141-142; *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978) (upholding imposition of a preliminary judgment); *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir.), *cert. denied*, 469 U.S. 1034 (1984)

17

(availability of injunctive relief by statute eliminates the need for traditional equitable prerequisites in SEC actions).

In determining whether a "reasonable likelihood" of future violations exists, courts generally have considered the egregiousness of the defendant's actions, the isolated, recurrent or systematic nature of the violations, the degree of scienter involved, the defendant's recognition of the wrongfulness of the conduct, and the likelihood that the defendant's customary business activities will present opportunities for future violations. *Hunt,* 591 F.2d at 1220; *SEC v. Holschuh,* 694 F.2d 130, 144 (7th Cir. 1980). The likelihood of future violations of law can be inferred from a defendant's past illegal conduct. *Hunt,* 591 F.2d at 1220 (past misconduct is "highly suggestive of the likelihood of future violations") (quoting *SEC v. Management Dynamics, Inc.*, 515 F.2d at 807). Further, the "totality of circumstances and factors suggesting that the infraction might not have been an isolated occurrence are always relevant." *Id.* at 1220, quoting *SEC v. Management Dynamics, Inc., supra*, 515 F.2d at 807.

The Defendants' were not isolated instances but a pattern of fraudulent behavior over the course of two years which indicates the likelihood of future violations of the Act and CFTC Regulations.

Once the CFTC makes its showing of illegality and establishes a reasonable likelihood of future violations, Section 6c(c) of the Act empowers the District Court to enforce compliance with the Act by taking "such action as is necessary to remove the danger of violation…" *CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 566, 583 (9th Cir. 1981). In sum, based on Defendants' egregious fraud in this matter, the CFTC respectfully requests that this Court issue a permanent injunction prohibiting Defendants from (a) violating Sections 4b, and 4o(1) of the Act, and CFTC Regulations 4.7 and 4.20, and (b) trading directly or indirectly for themselves or

18

others on or subject to the rules of any registered entity, as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29) and (c) acting in any capacity that requires registration with the CFTC.

**B.    Imposition of a Civil Monetary Penalty**

Because enforcement proceedings under Section 6c of the Act involve the public interest rather than a private controversy, the equitable jurisdiction of the district court is very broad. *Hunt*, 591 F.2d at 1223 (citing *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)).

A civil monetary penalty should be assessed against Defendant Shah and Linuxor pursuant to Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), which provides that this Court may impose a civil penalty in the amount of "not more than the higher of $120,000 or triple the monetary gain to the person for each such violation."[34]  "The purpose of sanctions under the Act is twofold: 'to further the [Act]'s remedial policies and to deter others in the industry from committing similar violations.'" *Reddy v. CFTC*, 191 F.3d 109, 123 (2d Cir. 1999).  This Court should assess a civil monetary penalty that is appropriate to the gravity of Defendants' offenses and sufficient to act as a deterrent.  *Miller v. CFTC*, 197 F.3d 1227, 1236 (9th Cir. 1999).

A civil monetary penalty against Defendants is warranted because their conduct was intentional.  The CFTC, therefore, seeks a civil monetary penalty in the amount of $480,000, which is equal to $120,000 per count.

---

[34]    Pursuant to CFTC Regulation 143.8(2)(ii), 17 C.F.R. § 143.8(2)(ii), the amount of the maximum civil monetary penalty assessed for each violation of the Act or CFTC Regulations adjusted for inflation is $120,000 or triple the monetary gain for each violation committed.

C.    <u>**Restitution**</u>

Restitution is intended "to make the damaged persons whole and compensate them for a defendant's wrongful acts." *AVCO,* 28 F.Supp.2d at 121 (citing *SEC v. Drexel Burnham Lambert*, 956 F. Supp. 503, 507 (S.D.N.Y. 1997)).  In this matter, the objectives of the Act are best served by ordering restitution to the McCarthey pool participants whose funds were received by Defendants in violation of the Act and CFTC Regulations.  Restitution is appropriate here because, at a minimum, Defendant Shah has conceded the losses.  Thus, the CFTC requests that the Court order Defendants to pay restitution in the amount of $7,497,109, plus interest.

## VII.    CONCLUSION

As there are no genuine issues of material fact and the CFTC is entitled to summary judgment against Defendants Shah and Linuxor, the CFTC respectfully requests that the Court grant its Motion for Summary Judgment and impose (1) a permanent injunction prohibiting Defendants from committing future violations of the Act, trading directly or indirectly for themselves or others on or subject to the rules of any registered entity, as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29) and acting in any capacity that requires registration with the CFTC; (2) a $480,000 civil monetary penalty; and (3) a restitution order requiring Defendants to pay $7,497,109 to the defrauded McCarthey pool participants.

Dated:          New York, New York
                September 18, 2007

                                   U.S. COMMODITY FUTURES TRADING
                                   COMMISSION, Plaintiff


                                   _____/s/_____
                                   David Acevedo [DA-0388]
                                   Michael R. Berlowitz [MB 7615]
                                   Stephen J. Obie [SO-5502]
                                   Division of Enforcement
                                   U.S. Commodity Futures Trading Commission
                                   140 Broadway, 19th Floor
                                   New York, New York  10005
                                   (646) 746-9754
                                   (646) 746-9940 Fax
                                   dacevedo@cftc.gov

Exhibit "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE KAPLAN

05 CIV    05 CV    8091

Commodity Futures Trading Commission,    )
)
                Plaintiff,    )    COMPLAINT FOR INJUNCTIVE
)    AND OTHER EQUITABLE
)    RELIEF AND FOR PENALTIES
              v.    )    UNDER THE COMMODITY
)    EXCHANGE ACT, AS
Abbas A. Shah and Linuxor Asset Management    )    AMENDED, 7 U.S.C. §§ 1 *et seq.*
LLC,    )
)
            Defendants.    )
)

RECEIVED
SEP 19 2005
U.S.D.C. S.D. N.Y.
CASHIERS

## I. SUMMARY

1.    From at least Fall 2001 through July 2004 (the "relevant time period"), Defendant

Abbas A. Shah ("Shah") was the principal, owner  and registered Associated Person ("AP") of

Defendant Linuxor Asset Management LLC ("LAM"), a registered commodity pool operator

("CPO"), that operated Linuxor Global Macro Fund LP, a commodity pool (the "pool").

2.    LAM failed to timely disclose to pool participants the trading losses for the pool

for the period ending 2002.  LAM also failed to send pool participants the requisite quarterly

reports and failed to send out annual reports in a timely fashion.

3.    Shah sent pool participants at least two fraudulent emails, in August 2003 and

January 2004, in which he knowingly misrepresented the net asset value ("NAV") of the pool

and his success in recovering losses.

4.    Through the conduct described above, Shah and LAM violated Sections

4b(a)(2)(i)-(iii) and 4o(1) of the Commodity Exchange Act, as amended (the "Act"), 7 U.S.C. §§

6b(a)(2)(i)-(iii) and 6o(1) (2002).  By operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. §

2(a)(1)(B), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2004), LAM is vicariously liable for

Shah's violations of the Act, and by operation of Section 13(b) of the Act, 7 U.S.C. 13c(b), Shah

is liable as the controlling person for LAM's violations of the Act.

5.    By the conduct described above, Shah and LAM violated § 4o(1) of the Act.

6.    By failing to send pool participants the requisite quarterly reports and failing to

send out annual reports in a timely fashion, LAM also violated CFTC Regulations 4.7(b)(2)-(3),

17 C.F.R. § 4.7(b)(2)-(3).

7.    LAM received pool funds in other than the pool's name and commingled pool

funds with the property of others.

8.    By the conduct described above, LAM violated CFTC Regulations 4.20(b)-(c), 17

C.F.R. §§ 4.20(b)-(c).  As a controlling person of LAM, Shah is liable for LAM's violations of

Section 4o(1) of the Act and Regulations 4.7(b)(2)-(3) and Regulation 4.20(b)-(c) pursuant to

Section 13(b) of the Act, 7 U.S.C. § 13c(b).

9.    Unless enjoined by this Court, Defendants are likely to continue to engage in acts

and practices alleged in this Complaint and similar acts and practices, as more fully described

below.

10.    Accordingly, pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1, Plaintiff

Commodity Futures Trading Commission ("CFTC") brings this action to enjoin the unlawful

acts and practices of Defendants Shah and LAM, and to compel their compliance with the

provisions of the Act and Regulations thereunder.  In addition, the CFTC seeks civil penalties

and such other equitable relief as the Court may deem necessary and appropriate.

## II. JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7

U.S.C. § 13a-1, which provides that whenever it shall appear to the CFTC that any person has

engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the CFTC may bring an action against such person to enjoin such practice or to enforce compliance with the Act.

12.     Venue lies properly with this Court, pursuant to Section 6c(c) of the Act, 7 U.S.C. § 13a-1(c), in that the Defendants are found in, inhabit, or transact business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur in this District.

### III. THE PARTIES

**A.     Plaintiff**

13.     The **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged with responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.*

**B.     Defendants**

14.     **Abbas A. Shah** is a resident of New York, New York, and is the owner, principal and a registered Associated Person ("AP") of LAM. Shah managed the pool and acted as its trading advisor.

15.     **Linuxor Asset Management LLC** is a Delaware limited liability company with its principal place of business at 20 Exchange Place, 45th FL, New York, NY, 10005. LAM has been registered as a commodity pool operator ("CPO") since December 2001 and is the general partner of the pool.

3

## IV.  STATUTORY BACKGROUND

16.    Section 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i)-(iii), provides that it is unlawful for any person in connection with any commodity futures contract sale or purchase, for or on behalf of any other person, to (i) cheat or defraud or attempt to cheat or defraud such other person; (ii) willfully make or cause to be made to such other person any false report or statement thereof, or willfully enter or cause to be entered for such person any false record thereof; or (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person.

17.    A CPO is any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or indirectly or through capital contributions, the sale of stock or other form of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility.  7 U.S.C. § 1a(5).

18.    Section 4o(1) of the Act, 7 U.S.C. § 6o(1), makes it illegal for any CPO, or Associated Person of a CPO,  by use of the mails or any means or instrumentality of interstate commerce directly or indirectly a) to employ any device, scheme or artifice to defraud any client or participant or prospective client or participant, or b) to engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

19.    CFTC Regulation 4.7, 17 C.F.R. § 4.7, exempts CPOs from certain requirements of Part 4 of the Regulations with respect to offerings to qualified eligible persons, provided that

4

written notice is given to the National Futures Association ("NFA"). Regulation 4.7(b)(2), 17

C.F.R. § 4.7(b)(2), requires such exempt CPOs to issue quarterly statements to pool participants

that indicate the pool's NAV, the change in NAV from the last reporting period, and the NAV

per outstanding unit. CFTC Regulation 4.7(b)(3), 17 C.F.R. § 4.7(b)(3), requires such exempt

CPOs to send pool participants an annual financial report within 90 days of the end of each fiscal

year.

     20.    CFTC Regulation 4.20(b), 17 C.F.R. § 4.20(b), requires CPOs to receive pool

funds in the name of the pool.

     21.    CFTC Regulation 4.20(c), 17 C.F.R. § 4.20(c), prohibits CPOs from commingling

pool property with the property of others.

     22.    Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and CFTC Regulation 1.2, 17

C.F.R. § 1.2, provide that the act, omission, or failure of any official, agent, or other person

acting for any individual, association, partnership, corporation, or trust within the scope of his

employment or office shall be deemed the act, omission, or failure of such individual,

association, partnership, corporation, or trust, as well as of such official, agent or other person.

     23.    Section 13(b) of the Act, 7 U.S.C. § 13c(b), provides that any person who,

directly or indirectly, controls any person who has violated any provision of the Act may be held

liable for such violation in any action brought by the Commission to the same extent as the

controlled person. The Commission has the burden of proving the controlling person did not act

in good faith or knowingly induced, directly or indirectly, the act or acts constituting the

violation.

5

## V. FACTS

24.     In the fall of 2001, Shah formed LAM to act as the CPO of the commodity pool. LAM was registered as a CPO in December 2001.  In March 2002, Shah sent written notice to the NFA that LAM would be operating under the exemptions of CFTC Regulation 4.7, 17 C.F.R. § 4.7.

25.     On behalf of LAM, Shah initially solicited four pool participants, one individual pool participant who invested $300,000 and three affiliated pool participants that shared a common representative (the "McCarthey pool participants") who invested $11.5 million, making the total invested for all pool participants $11.8 million .

26.     On behalf of LAM, Shah instructed the pool participants to send their funds to a bank account in the name of Linuxor Capital Management ("LCM"), an entity owned by Shah.

27.     The pool began trading commodity futures in March 2002.

28.     Shah, on behalf of LAM, promised to send the pool participants quarterly reports about the pool's trading results, as required by Commission regulation, but LAM failed to do so.

29.     In August or September 2002, Shah advised the McCarthey pool participants' representative that the pool had recently suffered losses of approximately 30 percent, i.e., approximately $3.5 million.  The pool participants soon met with Shah, at which time Shah reiterated the level of losses and promised to try to recoup those losses.  The pool participants determined to remain invested in the pool and to review the year-end results before deciding whether to withdraw their funds from the pool.

30.     By the end of 2002, approximately 43 percent of the pool funds, or approximately $5.1 million, had been lost in trading.  However, LAM and Shah failed to disclose these trading results to the pool participants, despite numerous requests from them for year-end results, until

6

August 2003. LAM also failed to provide required quarterly reports. By failing to provide a timely 2002 annual report and any quarterly reports, LAM and Shah knew that LAM was failing to disclose the pool's mounting losses.

31.    The 2002 annual report, which LAM did not provide until August of 2003, showed that the pool had lost approximately $5.1 million by the end of 2002.

32.    After the pool participants received their annual reports in August 2003, they contacted Shah and inquired about the losses. Shah verbally assured them that he would be able to recover their principal if given a few more months. On August 25, 2003, Shah sent an e-mail to the representative for the McCarthey pool participants in which he falsely represented that "we have thus far recovered more than half of the capital loss and if we continue at this pace we hope that we will have not only recovered all of the capital loss but there is a good likelihood that we will be positive as far as returns since inception are concerned." In fact, the pool had suffered further losses since the beginning of 2002 of approximately $2.5 million. Shah knew that the pool had not recouped more than half of the losses suffered in 2002, and that, in fact, the pool had suffered further losses since the beginning of 2003. By knowingly making these false statements, Shah defrauded and deceived the pool participants.

33.    In October 2003, a fifth pool participant invested $2 million in the pool.

34.    On behalf of LAM, Shah instructed this fifth pool participant to send his funds to a bank account in the name of LAM.

35.    In January 2004, Shah sent the McCarthey pool participants' representative an e-mail falsely representing that the value of the combined interests of the three pool participants on whose behalf he had invested was slightly in excess of $8 million as of December 31, 2003. In fact Shah knew when he sent this e-mail that the value of those interests was only approximately

7

$3 million. By knowingly making these false statements Shah defrauded and deceived the pool

participants.

36.    In April 2004, the fifth pool participant, who had invested $2 million, received

back $2.1 million dollars from the pool.

37.    In July 2004, Shah closed all trading positions in the pool's name and returned

approximately $4.2 million to the remaining pool participants.

## VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT I

### Fraud In Connection with Sale or Purchase Futures Contracts

38.    Paragraphs 1 through 37 are re-alleged and incorporated herein.

39.    During the relevant period, Shah cheated or defrauded or attempted to cheat or

defraud other persons and willfully made or caused to be made to such other persons false

reports or statements, or willfully entered or caused to be entered for such other persons false

records in connection with commodity futures contract sales or purchases, for or on behalf of

such other persons, all in violation of Section 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i)-

(iii). Shah's misrepresentations were material and made with scienter.

40.    During the relevant period, LAM cheated or defrauded or attempted to cheat or

defraud other persons in connection with commodity futures contract sales or purchases, for or

on behalf of such other persons, in violation of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §

6b(a)(2)(i) and (iii). LAM's failures to provide quarterly reports and to provide timely annual

reports were material and made with scienter.

41.    Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and CFTC

Regulation 1.2, 17 C.F.R. § 1.2, LAM is liable for any violations of the Act or Regulations by

8

Shah, in that all such violations were within the scope of Shah's office or employment with

LAM.

42.    During the relevant period, Shah, as the sole owner and principal of LAM,

directly or indirectly controlled LAM, its employees and others and did not act in good faith or

knowingly induced, directly or indirectly, the acts constituting the violations described in this

Count I. Thus, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Shah is liable for the

violations described in this Count I to the same extent as LAM.

43.    Each material misrepresentation or omission made during the relevant period,

including but not limited to those alleged herein, is alleged as a separate and distinct violation of

Section 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i)-(iii).

## COUNT II

### Fraud and Deceit

44.    Paragraphs 1 through 43 are re-alleged and incorporated herein.

45.    During the relevant period, LAM, a CPO, and Shah, an AP of LAM, used the

mails or other means or instrumentality of interstate commerce directly or indirectly a) to employ

a device, scheme or artifice to defraud pool participants, or b) engaged in transactions, practices

or courses of business which operated as a fraud or deceit upon pool participants, all in violation

of Section 4o(1) of the Act, 7 U.S.C. § 6o(1).  Shah and LAM acted with scienter when

employing a device, scheme or artifice to defraud.

46.    Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and CFTC

Regulation 1.2, 17 C.F.R. § 1.2, LAM is liable for any violations of the Act or Regulations by

Shah, in that all such violations were within the scope of Shah's office or employment with

LAM.

47.    During the relevant period, Shah, as the sole owner and principal of LAM, directly or indirectly controlled LAM, its employees and others and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count II.  Thus, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Shah is liable for the violations described in this Count II to the same extent as LAM.

48.    Each act constituting a violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1), is alleged as a separate and distinct violation.

## COUNT III

### Failure to Send Quarterly Statements and Timely Annual Reports

49.    Paragraphs 1 through 48 are re-alleged and incorporated herein.

50.    During the relevant period, LAM was registered as a CPO and subject to reporting exemptions in Section 4.7 of the Commission Regulations, 17 C.F.R. § 4.7, CPO.

51.    During the relevant period, LAM failed to send out quarterly reports to pool participants that indicated the pool's NAV, the change in NAV from the last reporting period, and the NAV per outstanding unit, all in violation of CFTC Regulation 4.7(b)(2), 17 C.F.R. § 4.7(b)(2).

52.    During the relevant period, LAM failed to send out the annual reports for 2002 and 2003 within 90 days of the end of each fiscal year, all in violation of CFTC Regulation 4.7(b)(3), 17 C.F.R. § 4.7(b)(3).

53.    During the relevant period, Shah, as the sole owner and principal of LAM, directly or indirectly controlled LAM, its employees and others and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this

Count III. Thus, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Shah is liable for the

violations described in this Count III to the same extent as LAM.

## COUNT IV

### Receiving Pool Funds in Other Than the Pool's Name and Commingling Pool Property

54.    Paragraphs 1 through 53 are re-alleged and incorporated herein.

55.    During the relevant period, LAM, the CPO, received pool participants' funds in

its own name and the name of LCM, all in violation of CFTC Regulation 4.20(b), 17 C.F.R. §

4.20(b).

56.    During the relevant period, LAM, the CPO, commingled pool funds in the bank

accounts of LAM and LCM, all in violation of CFTC Regulation 4.20(c), 17 C.F.R. § 4.20(c).

57.    During the relevant period, Shah, as the sole owner and principal of LAM,

directly or indirectly controlled LAM, its employees and others and did not act in good faith or

knowingly induced, directly or indirectly, the acts constituting the violations described in this

Count IV. Thus, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Shah is liable for the

violations described in this Count IV to the same extent as LAM.

## VII. RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by

Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), and pursuant to the Court's own equitable

powers:

A.    Find that Defendants Shah and LAM violated Sections 4b(a)(2)(i)-(iii) and 4o(1)

of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) and 6o(1), and CFTC Regulations 4.7(b)(2)-(3), 4.20(b)-

(c), 17 C.F.R. §§ 4.7(b)(2)-(3), 4.20(b)-(c);

11

B.    Enter an order of permanent injunction against Defendants and any of their affiliates, servants, employees, successors, assigns, attorneys, and persons in active concert with them who receive actual notice of such order by personal service or otherwise, from directly or indirectly violating Sections 4b(a)(2)(i)-(iii) and 4o(1) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) and 6o(1), and CFTC Regulations 4.7(b)(2)-(3), and 4.20(b)-(c), 17 C.F.R. §§ 4.7(b)(2)-(3), and 4.20(b)-(c);

C.    Enter an order of permanent injunction directing Defendants to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the higher of $120,000 for each violation of the Act, or triple the monetary gain to each Defendant as described herein; and

D.    Enter an order providing for further remedial and ancillary relief including, but not limited to, disgorgement, restitution and any other equitable relief which this Court may deem necessary and appropriate.

Dated:  9/19/05

Respectfully submitted,

Stephen J. Obie
Regional Counsel

By
David Acevedo (DA0388)
Chief Trial Attorney
U.S. COMMODITY FUTURES
    TRADING COMMISSION
140 Broadway, 19th Floor
New York, New York 10005
(646) 746-9700
(646) 746-9940 (facsimile)

12

Exhibit "B"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Commodity Futures Trading Commission, | ) | 05 CIV 8091 LAK |
| | ) | ECF CASE |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ANSWER** |
| | ) | |
| Abbas A. Shah and Linuxor Asset Management, LLC | ) | Judge Kaplan |
| | ) | |
| Defendants. | ) | |

Defendants, ABBAS A. SHAH and LINUXOR ASSET MANAGEMENT, LLC (collectively "Defendants"), by their attorneys, Hartman & Craven LLP, as and for their Answer to the Complaint of Plaintiff, COMMODITY FUTURES TRADING COMMISSION:

       1.     Admit the allegations contained in paragraph 1, except deny that the relevant time period began in at least Fall 2001.

       2.     Deny the allegations contained in paragraph 2, except admit that quarterly reports in the form prescribed by 17 C.F.R. § 4.7(b)(2) were inadvertently not sent and the annual reports were sent out late after good-faith extension requests were made to the National Futures Association. However, Defendants regularly disclosed relevant pool financial information to pool participants or their appointed investment adviser.

       3.     Deny the allegations contained in paragraph 3, except admit that Mr. Shah sent emails to some of the pool participants or their appointed investment adviser in August 2003 and January 2004.

       4.     Deny the allegations contained in paragraph 4.

       5.     Deny the allegations contained in paragraph 5.

6.      Deny the allegations contained in paragraph 6.

7.      Deny the allegations contained in paragraph 7, except admit that pool funds were initially mistakenly directed to LCM, and aver that this mistake of fact was promptly corrected and all funds transferred to the proper account.

8.      Deny the allegations contained in paragraph 8.

9.      Deny the allegations contained in paragraph 9.

10.     Paragraph 10 appears to be a statement of Plaintiff's goals in this proceeding, which does not lend itself to admission or denial.  To the extent paragraph 10 contains allegations of fact, the allegations are denied.

11.     Admit the subject matter jurisdiction of this Court, and respectfully refer the Court to the provision of the United States Code referred to for its content thereof.

12.     Admit that Defendants are found in, inhabit or transact business in this District, deny the other factual allegations of paragraph 12, and respectfully refer the Court to the provision of the United States Code referred to for its content thereof.

13.     Admit the allegations in paragraph 13.

14.     Deny the allegations contained in paragraph 14, except admit that Mr. Shah is a resident of New York, New York, and is the principal and a registered Associated Person of LAM.

15.     Admit the allegations contained in paragraph 15.

16.     Responding to the allegations contained in paragraph 16, respectfully refer the Court to the provision of the United States Code referred to for its content thereof.

17.     Responding to the allegations contained in paragraph 17, respectfully refer the Court to the provision of the United States Code referred to for its content thereof.

18.     Responding to the allegations contained in paragraph 18, respectfully refer the Court to the provision of the United States Code referred to for its content thereof.

19.     Responding to the allegations contained in paragraph 19, respectfully refer the Court to the provisions of the Code of Federal Regulations referred to for its content thereof.

20.     Responding to the allegations contained in paragraph 20, respectfully refer the Court to the provision of the Code of Federal Regulations referred to for its content thereof.

21.     Responding to the allegations contained in paragraph 21, respectfully refer the Court to the provision of the Code of Federal Regulations referred to for its content thereof.

22.     Responding to the allegations contained in paragraph 22, respectfully refer the Court to the provisions of the United States Code and the Code of Federal Regulations referred to for its content thereof.

23.     Responding to the allegations contained in paragraph 23, respectfully refer the Court to the provision of the United States Code referred to for its content thereof.

24.     Admit the allegations contained in paragraph 24.

25.     Deny the allegations contained in paragraph 25, except admit that there were four original pool participants, one individual who invested $300,000 and three affiliated pool participants that shared a common representative who invested $11.5 million, making the total invested for all pool participants $11.8 million from May through October 2003.

26.     Deny the allegations contained in paragraph 26.

27.     Admit the allegations contained in paragraph 27.

28.     Deny the allegations contained in paragraph 28, except admit that quarterly reports in the form prescribed by 17 C.F.R. § 4.7(b)(2) were inadvertently not sent and the annual reports were sent out late after good-faith extension requests were made to the

National Futures Association. However, Defendants regularly disclosed relevant pool financial information to pool participants or their appointed investment adviser.

29.    Admit the allegations contained in paragraph 29.

30.    Deny the allegations contained in paragraph 30, except admit that by the end of 2002 approximately 43 percent of the pool funds, or $5,058,709, was lost in trading, that quarterly reports in the form prescribed by 17 C.F.R. § 4.7(b)(2) were inadvertently not sent, and that the annual reports were sent out late after good-faith extension requests were made to the National Futures Association. However, Defendants regularly disclosed relevant pool financial information to pool participants or their appointed investment adviser.

31.    Admit the allegations contained in paragraph 31, except that the report showed the pool's losses for 2002 amounted to $5,058,709.

32.    Deny the allegations contained in paragraph 32, except admit that Mr. Shah sent an email to the representative of the McCarthey pool participants on August 25, 2003.

33.    Admit the allegations contained in paragraph 33.

34.    Deny the allegations contained in paragraph 34.

35.    Deny the allegations contained in paragraph 35, except admit that Mr. Shah sent an email to the appointed investment adviser of the McCarthey pool participants in January 2004.

36.    Admit the allegations contained in paragraph 36.

37.    Admit the allegations contained in paragraph 37.

38.    Repeat and reallege their answers to the allegations contained in the paragraphs referred to therein with the same force and effect as if herein set forth at length.

39.    Deny the allegations contained in paragraph 39.

40.     Deny the allegations contained in paragraph 40.

41.     Deny the allegations contained in paragraph 41.

42.     Deny the allegations contained in paragraph 42.

43.     Paragraph 43 appears to be an explanation of Plaintiff's complaint, which does not lend itself to admission or denial.  To the extent paragraph 43 contains allegations of fact, the allegations are denied.

44.     Repeat and reallege their answers to the allegations contained in the paragraphs referred to therein with the same force and effect as if herein set forth at length.

45.     Deny the allegations contained in paragraph 45.

46.     Deny the allegations contained in paragraph 46.

47.     Deny the allegations contained in paragraph 47.

48.     Paragraph 48 appears to be an explanation of Plaintiff's complaint, which does not lend itself to admission or denial.  To the extent paragraph 48 contains allegations of fact, the allegations are denied.

49.     Repeat and reallege their answers to the allegations contained in the paragraphs referred to therein with the same force and effect as if herein set forth at length.

50.     Admit the allegations contained in paragraph 50, except deny that the relevant time period began in at least Fall 2001.

51.     Deny the allegations contained in paragraph 51, except admit that quarterly reports in the form prescribed by 17 C.F.R. § 4.7(b)(2) were inadvertently not sent. However, Defendants regularly disclosed relevant pool financial information to pool participants or their appointed investment adviser.

52.     Deny the allegations contained in paragraph 52, except admit that the annual reports were sent late after good-faith extension requests were made to the National Futures Association.

53.     Deny the allegations contained in paragraph 53.

54.     Repeat and reallege their answers to the allegations contained in the paragraphs referred to therein with the same force and effect as if herein set forth at length.

55.     Deny the allegations contained in paragraph 55, except admit that funds were wired to LCM until May 2004.

56.     Deny the allegations contained in paragraph 56.

57.     Deny the allegations contained in paragraph 57.

## First Affirmative Defense

The Complaint fails to state a claim upon which relief may be granted and fails to state facts that support the claims set forth therein.

## Second Affirmative Defense

Plaintiff's action should be dismissed as it has failed to plead the elements of fraud or deceit with sufficient particularity.

## Third Affirmative Defense

At all times relevant, Defendants acted in good faith, exercised reasonable diligence, and did not knowingly or recklessly commit any fraudulent act or scheme or otherwise shirk their responsibilities under the Commodity Exchange Act or the regulations promulgated thereunder. At no time did Defendants seek to conceal losses. Plaintiff has failed to provide sufficient evidence to give rise to a strong inference that Defendants acted recklessly or with the willful intent to defraud pool participants.

G:\30002\300\CFTC\Answer 12.7.05.doc

**Fourth Affirmative Defense**

All or some of the allegedly false and misleading statements of material fact made by Defendants were statements of opinion which had a reasonable basis in fact, were immaterial, or were factually accurate. The alleged representations in the emails referred to by Plaintiff have been taken entirely out of the context of the dialogue of which they were part.

**Fifth Affirmative Defense**

The annual audited financial statements were issued late following good-faith requests for extensions to the National Futures Association. However, there were no damages to investors. Defendants engaged in constant oral and email communications with pool participants or their appointed investment adviser in which they regularly disclosed relevant pool financial information.

**Sixth Affirmative Defense**

The pool participants never relied to their detriment on any matters, statements or omissions attributable to Defendants. Defendants' frequent communications with pool participants or their appointed investment adviser made their alleged failure to send timely formal reports irrelevant in terms of causing any losses to pool participants.

**Seventh Affirmative Defense**

The complaint is barred in whole or in part because any and all losses sustained by pool participants were due to market forces.

**Eighth Affirmative Defense**

No investors suffered any legally cognizable damages as a result of any of Defendants' allegedly fraudulent acts or omissions. There is no connection alleged or provable between the purported fraudulent statements and any losses by investors.

### Ninth Affirmative Defense

The complaint is barred in whole or in part by the doctrines of laches, waiver, ratification and estoppel.

### Tenth Affirmative Defense

The alleged technical violations, including commingling of funds and the alleged lateness of the annual statements, have been promptly and wholly rectified with no resulting losses to any members of the pool.

### Eleventh Affirmative Defense

Without admitting that any violations occurred, Defendants contend that any violations by them of the Commodity Exchange Act or the regulations promulgated thereunder, if any such violations occurred, did not rise to the level of demonstrating a likelihood of repetition required to support injunctive relief.

### Twelfth Affirmative Defense

Without admitting that any violations occurred, Defendants contend that any violative statements and activities alleged in the Complaint, if any such acts occurred, were sporadic, aberrational and not part of Defendants' regular course of doing business.

### Thirteenth Affirmative Defense

The relevant time period for this cause of action does not begin until March 2002. LAM was not even registered as a CPO until December 2001, there were no pool participants until February 2002, and the pool did not begin trading until March 2002.

### Fourteenth Affirmative Defense

The alleged commingling of funds in other than the pool's name was the result of an inadvertent error made by the Defendants' prior attorney in the subscription documents

causing funds to be wired to LAM rather than to the pool's account.  This oversight was rectified immediately when it was brought to Defendants' attention by the National Futures Association Audit Team.  All transactions since May 2004 were conducted through a separate account in the pool's name.  Any funds previously deposited into the LAM account were immediately transferred to the pool account and any interest which accrued was properly transferred to the pool account as well.

### DEMAND FOR A JURY TRIAL

Defendants respectfully request a trial by jury in this matter as to all matters so triable as a matter of right.

WHEREFORE, Defendants, ABBAS A. SHAH and LINUXOR ASSET MANAGEMENT, LLC, demand judgment dismissing the complaint of Plaintiff, together with such other and further relief as to the Court may deem just and proper, including attorneys' fees and the costs and disbursements of this action.

Dated: New York, New York
        December 8, 2005

**HARTMAN & CRAVEN LLP**
Attorneys for Defendants

By: _Edward White_
    Edward A. White (EW 0368)

A Member of the Firm
488 Madison Avenue
New York, New York  10022
Tel. No. 212/753-7500

# Exhibit "C"

# ABBAS SHAH

20 Exchange Place, 45th Floor
New York, NY 10005
U.S.A.
Tel. # 212.269.2412/Fax # 212.269.1891

## EXPERIENCE

| | | |
|---|---|---|
| Feb 2002 – July 2004 | Linuxor Global Macro Fund, Ltd., <u>Managing Principal</u><br>Executed Global Macro Strategy involving trading of<br>Global Fixed Income, Equities and Fx markets. | New York, NY |
| 2001 | Deutsche Bank,, Global Macro Strategies<br>Responsible for establishing and building the infrastructure<br>for a Global Macro Trading Desk. | New York, NY |
| 1998 - 2000 | Isospace, Inc., <u>Chairman and CEO</u><br>Founded and managed a company that developed world-class<br>software, used by major institutions, incl. U.S. Defense Dept. | New York, NY |
| 1996 - 1997 | InterPacific Capital Management Corp., <u>Managing Principal</u><br>Executed Global Macro Strategy involving trading of<br>Global Fixed Income, Equities and Fx markets. | New York, NY |
| 1996 | UBS Securities, <u>Head</u>, U.S. Zero Strips Desk<br>Responsible for managing a multi-billion dollars book of<br>Zero Coupon and longer-dated U.S. Treasury Securities. | New York, NY |
| 1992- 1995 | Lehman Brothers, <u>Head</u>, U.S. Zero Strips Desk<br>Responsible for managing a multi-billion dollars book of<br>Zero Coupon and longer-dated US Treasury Securities.<br>- Traded all sectors of the U.S. Treasury Curve. | New York, NY |
| 1987-1991 | Lehman Brothers:<br>Developed trading systems and risk management platforms for<br>Fixed Income Trading Desk.<br>Provided analytical and research support to the Fixed Income<br>trading desk. | New York, NY |

## EDUCATION

| | | |
|---|---|---|
| 1981-85 | <u>B.S</u>, Columbia University | New York, NY |


PLAINTIFF'S
EXHIBIT 1
for ID
6-26-06

Exhibit "D"

6

Shah

1

2      Q    Also, you cannot answer by shaking or

3  nodding your head or giving any non-verbal

4  responses.  Do you understand?

5      A    Yes.

6      Q    And if at any time you need to take a

7  break, just ask us, and we will try to

8  accommodate you, as the court reporter will only

9  go off the record at our direction.

10         Do you understand that?

11      A    Yes.

12      Q    I would like to begin this morning,

13  Mr. Shah, just by asking you some background

14  information, background questions regarding

15  yourself.  What is your educational background?

16      A    I have a B.S. from Columbia

17  University.

18      Q    And what years did you attend

19  Columbia University?

20      A    I think it was '81 to -- I'm sorry,

21  '82 to '86, something like that.

22      Q    And you said you have a B.S. In what

23  area?

24      A    Biology with a concentration also in

25  economics.

14

1                       S h a h

2       A       She has not earned any income.

3       Q       Just going back to Lehman Brothers if

4  we could, how long did you work at Lehman

5  Brothers?

6       A       Until '95, early '95.

7       Q       By the way, I am going to show you

8  what we have had marked as Plaintiff's Exhibit

9  1.  Just take a look at that.

10              Do you recognize that, that document?

11      A       Yes, I do.

12      Q       Is that your resume?

13      A       I was asked to put together a resume,

14  and this is my resume.

15      Q       You were asked to put your resume

16  together by Mr. White?

17      A       Yes.

18      Q       For the record, this is a resume that

19  we requested from Mr. White.

20      A       Yes.

21      Q       He made it available to us last

22  week.

23      A       Yes.  I was told a day ago, I mean

24  two days ago, and I prepared one.

25      Q       So you prepared it some time last

15

Shah

1

2    week?

3        A    Yes.

4        Q    Looking at that document, is that

5    document accurate?  Is there anything that you

6    would like to change?

7        A    Well, at present I am trying to

8    resurrect a company that I started, Isospace, so

9    I am doing some work for them which is not on

10   there.

11       Q    Anything else you would like to

12   change on that?

13       A    Not that I can think of for now.

14       Q    That's fine.  If you can think of

15   anything else and you want to look at it let me

16   know.  It will be here, okay?

17       A    Yes.

18       Q    So you started at Lehman Brothers.

19   What was your position at Lehman when you first

20   began?

21       A    I was a business analyst.

22       Q    And as a business analyst, what were

23   you hired to do?

24       A    I was hired to basically work on

25   specifications for putting together a part -- I

63

Shah

1

2      Q      By different what do you mean?

3      A      In the same industry, but do my own

4  thing.

5      Q      And what --

6      A      Take a break from big companies.

7      Q      Why did you feel you needed a break

8  from the big companies?

9      A      I just felt that I had learned a lot

10  and I could establish my own business.

11      Q      So you thought you were ready to take

12  that step?

13      A      Yes.

14      Q      Did you also feel that you could do a

15  better job on your own than working with a big

16  company?

17      A      I thought so, and I thought I could

18  be more creative also without the bureaucracy.

19      Q      Then take us through the steps.  What

20  were you thinking of starting?  What did you have

21  in mind at that time?

22      A      I just wanted to start a small, you

23  know, global macro trading fund.

24      Q      When you say global macro trading

25  fund, what were you thinking?  What do you mean by

64

Shah

2   that?

3       A    I was thinking that I learned a lot

4   about how the markets functioned, relationships

5   between different markets and from risk

6   evaluation to relative value and all of that

7   across different asset classes, fixed income,

8   equities, foreign exchange, and I thought that I

9   could do it myself.

10      Q    Tell me what you did.

11      A    What I did?

12      Q    Yes.  What did you do to get this

13  idea making it something real?

14      A    You set up a prime brokerage account

15  with who can give you the lines with the -- first

16  of all you have to raise money.

17      Q    By the way, did this fund have a

18  name?

19      A    Yes.

20      Q    What was the name?

21      A    InterPacific Capital.

22      Q    And how did you pick that name?  What

23  was your thinking?

24      A    There was no particular thing at

25  all.  It was just something I thought of.

310

                    Shah

1

2   That's exactly what Mr. Phil McCarthey said.

3       Q    But you were registered with the NFA

4   as an associated person --

5           MR. WHITE:  Objection.

6       Q    -- of Linuxor Asset Management,

7   correct?

8       A    Yes.

9           MR. WHITE:  Objection.

10      Q    And you knew that your obligation

11  regardless of what you say McCarthey told you,

12  you knew that your obligation was to get

13  quarterly net asset value reports to your pool

14  participants, correct?

15          MR. WHITE:  Objection.

16      Q    You knew that?

17      A    Yes.

18      Q    And you never did that; isn't that a

19  fact?

20          MR. WHITE:  Objection.

21      A    I never did, yes.

22      Q    By the way, at this meeting at the

23  steak house, did you tell anyone ever that Tydus

24  Richards was going to be compensated for bringing

25  Mr. McCarthey as a pool participant?

339

                              Shah

1

2    you called Phil McCarthey?

3        A    Yes.

4        Q    Going back to this issue about the

5    fund being down 43 percent or approximately $5.1

6    million at the end of 2002, did you give the pool

7    participants a written NAV?

8        A    No, I didn't.

9        Q    The next sentence is Linuxor Asset

10   Management also failed to provide required

11   quarterly reports.  Is that accurate?

12       A    Yes.

13       Q    By failing to provide timely 2002

14   annual reports and any quarterly reports Linuxor

15   Asset Management and you, Abbas Shah, knew that

16   Linuxor Asset Management was failing to disclose

17   the pool's mounting losses.

18            MR. WHITE:  Is that a question?

19            MR. BERLOWITZ:  Yes.

20            MR. WHITE:  It wasn't phrased as

21       one.

22       Q    The question is is that accurate?

23       A    Could you repeat that, the question.

24       Q    By failing to provide a timely 2002

25   annual report and any quarterly reports Linuxor

340

Shah

1

2  Asset Management and you, Abbas Shah, knew that

3  Linuxor Asset Management was failing to disclose

4  the pool's mounting losses.

5      A    No, I didn't.

6      Q    No, you didn't what?

7      A    I had not failed to disclose.  I did

8  not give them the quarterly statement, but they

9  were being informed almost on a daily basis as to

10  the value of their investment.

11      Q    But you didn't give it to them in

12  writing?

13      A    No, I did not.

14      Q    And you know as somebody who is

15  registered with the NFA that you were required to

16  give annual reports in writing?

17      A    Yes.

18      Q    And quarterly reports in writing?

19      A    Yes.

20      Q    So your issue is that whether or not

21  it was in writing or whether you did this orally;

22  is that correct?

23      A    Yes.

24      Q    The next statement, the 2002 annual

25  report with which Linuxor Asset Management did

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

341

Shah

1

2      not provide until August of 2003 showed that the

3      pool had last approximately $5.1 million by the

4      end of 2002.

5         A     As I recall, yes.

6         Q     After the pool participants received

7      their annual reports in August, 2003 they

8      contacted Shah and inquired about the losses,

9      Shah being you, Abbas Shah.

10        A     I remember having a conference call

11     with them, but very little was discussed in the

12     way of they had some questions regarding the

13     K-1's.

14        Q     What was one of the issues discussed

15     of the loss?

16        A     Basically they just wanted to know

17     what had happened to the positions, futures and

18     options positions that were brought forward from

19     last year into 2003, and the same question had --

20     they had asked earlier in July of '03 with

21     respect to the futures and options positions,

22     whether they were closed or whether they were

23     closed profitably or not.

24        Q     I don't want to belabor this, but

25     here it specifically talks about losses.  Would

343

Shah

2          A     No, I don't.

3          Q     Next thing, Abbas Shah verbally

4     assured them, that would be the pool

5     participants, that he would be able to recover

6     their principal if given a few more months.

7          A     No, I never committed.

8          Q     I didn't ask you if you committed.  I

9     asked you if you made some assurances or

10    statements to the effect that you would recover

11    the monies.

12         A     There were no assurances given.

13         Q     No statements?

14         A     No statements.

15         Q     I didn't say promises.

16         A     No assurances.

17         Q     On August 25, 2003, Shah sent an

18    e-mail to the representative for the McCarthey

19    pool participants in which he, that's you, Abbas

20    Shah, falsely represented that, and this is a

21    quotation, "We have thus far recovered more than

22    half of the capital loss, and if we continue at

23    this pace we hope that we will have not only

24    recovered all of the capital loss, but there is a

25    good likelihood that we will be positive as far

344

Shah

1

2    as returns since inception are concerned." Period

3    end of quotation. Is that correct?

4         A    Could you repeat that again, please.

5         Q    On August 25, 2003, you, Abbas Shah,

6    sent an e-mail to a representative of the

7    McCarthey pool participants, in which he,

8    actually you, Abbas Shah, falsely represented

9    that, and I am going to read the quotation, "We

10   have thus far recovered more than half of the

11   capital loss, and if we continue at this pace we

12   hope that we will have not only recovered all of

13   the capital loss, but there is a good likelihood

14   that we will be positive as far as returns since

15   inception are concerned."

16              MR. WHITE: Is the question did he

17         send such an e-mail?

18         Q    The question is is that statement I

19   just read accurate?

20         A    Is the question that I sent the

21   e-mail?

22         Q    The question is I read a sentence to

23   you, in fact, I read it a second time.

24         A    You did.

25         Q    Is that accurate?

345

1                                     Shah

2          A      Well, an e-mail was sent, but it has

3    to be put in the proper context.

4          Q      What is the proper context?

5          A      As I recall, it was with respect to

6    the options and futures positions that were

7    carried forward in 2003 and whether the -- as I

8    had been asked in July about those positions and

9    that e-mail referred to options and futures

10   positions that were carried forward from the end

11   of '02 into '03 and whether those positions had

12   been unwound profitably or not, and that is the

13   context issue.

14         Q      I read this statement twice, so I am

15   going to ask you this question:  Is it accurate,

16   and you seem to say only in some context, so I

17   will ask you the next question, what if anything

18   is inaccurate about the statement I have read

19   twice?

20         A      It just has to be read in the proper

21   context.

22         Q      I am asking you specifically what's

23   inaccurate about it?

24         A      The statement is correct, yes.

25         Q      The next question, in fact, the pool

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

346

                              Shah

1

2    had suffered further losses since the beginning

3    of 2002 of approximately $2.5 million.  Is that

4    accurate?

5         A    I don't recall.

6         Q    Next statement, Abbas Shah knew that

7    the pool had not recouped more than half of the

8    losses suffered in 2002, and that in fact the

9    pool had suffered further losses since the

10   beginning of 2003.  Is that accurate?

11        A    Once again, it has to be --

12        Q    Do you want me to read it again?

13        A    Yes.

14        MR. WHITE:  Could you please.

15        Q    Sure.

16             It says, "Shah knew that the pool had

17   not recouped more than half of the losses

18   suffered in 2002, and that in fact the pool had

19   suffered further losses since the beginning of

20   2003."

21        A    My recollection is that the pool was

22   up on the year in September and October of '03.

23        MR. WHITE:  Try to listen very

24        carefully to the question.

25        Q    Just listen to my question.  The

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

373

                                Shah

1

2    McCarthey fax machine, and I sent them an e-mail

3    saying that the K-1's, in case they didn't

4    receive them directly from Rothstein Kass,

5    because I had been away for a few days, they were

6    at the fax machine.

7         Q    I am looking at an e-mail from you to

8    Todd Brashear, and you knew Todd represented the

9    McCarthey interests certainly in January of '04,

10   correct?

11        A    Yes.

12        Q    And the e-mail was sent on January

13   30, 2004, subject account status.  Are you

14   familiar with this e-mail?

15        A    The January e-mail that we spoke

16   about, yes.

17        Q    "Dear Todd." By Todd you meant Todd

18   Brashear?

19        A    Yes.

20        Q    "Please accept my thanks for being

21   patient."  And that's because you were late,

22   right?

23        A    I was just being polite.

24        Q    You were polite because you were late

25   in getting back to him, right?

374

Shah

2    A    Yes.  I was traveling.  I was not in

3  the city.

4    Q    You were late in getting back to him,

5  right?

6    A    I got back to him when I found out

7  that he was looking for me.

8    Q    "I appreciate your understanding and

9  cooperation.  Listed below is your account

10  balance and a summary of the P/L," P/L stands for

11  profit and loss?

12    A    Yes.

13    Q    "Performance for the week ending

14  January 31, 2004."  You are familiar with this?

15    A    I sent numerous e-mails to them, so

16  if we take a couple of them that sounds like my

17  e-mail.

18    Q    This is your e-mail, isn't it?

19    A    Yes, yes.

20    Q    And you are referring to the

21  performance for the week ending January 31,

22  2004.

23    A    Okay.

24    Q    The next line says, "Your account

25  balance as of 12/30/03," that would be December

1                      Shah

2       30, '03, "was approximately," and I am reading

3       from your e-mail, "$8,095,000."

4              A      Okay.

5              Q      Did you write that?

6              A      Yes.

7              Q      And was their account balance as of

8       12/30/03, approximately $8,095,000?

9              A      Is that the entire e-mail?

10             Q      If you want I will read more of the

11      e-mail in.

12             A      Yes, please.

13             Q      "Realized 6,500,000, unrealized

14      1,595,000." I believe if you add the two numbers

15      together it will come up to $8,095,000.

16                    It goes on to say, "For the week

17      ending January 31, 2004, the P/L," profit and

18      loss, "was: $89,000."

19                    I'm not going to concentrate on that

20      week. I am going to concentrate on the

21      information that's before that.

22             A      Okay.

23             Q      Which talks about the net asset

24      value, correct?

25             A      Yes.

1                    Shah

2        Q    We agree that this was a reference to

3   net asset value?

4        A    Yes.

5        Q    And you sent this on January 30,

6   2004?

7        A    Yes.

8        Q    And you sent it to Todd Brashear, who

9   is the McCarthey representative, correct?

10        A    Yes.

11        Q    And you knew that?

12        A    At that time, yes.

13        Q    And the information was, "Your

14   account balance as of 12/30/03, was approximately

15   $8,095,000."  Was it $8,095,000?

16        A    That's what I thought at the time.

17        Q    You put down the $8,095,000 number,

18   you acknowledge that?

19        A    Yes, that's my e-mail.

20        Q    There is no issue.  But you also

21   broke it out realized and unrealized, but you

22   told them that their NAV at that time as of

23   December 30, '03, was $8,095,000.

24        A    Yes.

25        Q    Was it $8,095,000?

377

Shah

2      A    At the time I thought that was the

3  case, and --

4           MR. WHITE:  The question is --

5      Q    Answer my question.

6           MR. WHITE:  -- was it.

7      Q    Was it $8,095,000?

8      A    The question is again, I'm sorry.

9      Q    Was the NAV for the McCarthey

10  interest as of December 30, 2003, $8,095,000?

11     A    No.

12     Q    It wasn't?

13     A    No.

14     Q    You misstated it?

15     A    I thought that was the case.

16     Q    I asked you if you misstated it.

17     A    I -- yes.

18     Q    And you knew that the number was not

19  $8,095,000?

20     A    I know it now, not then.

21     Q    Well, as of the e-mail of December

22  30, '03, excuse me, January 30, '04, you put down

23  $8,095,000?

24     A    Yes.

25     Q    What was the basis for putting down

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

380

                            Shah

1

2          A      Yes.

3          Q      It's correct to say that you did the

4    trading for Linuxor on a daily basis, right?

5          A      Yes, sir.

6          Q      And it's correct to say that you knew

7    through all these positions, options, futures,

8    did you do derivatives, too?

9          A      Primarily options, futures, cash.

10         Q      Options, futures and cash, you knew

11   on a daily basis how the fund was doing, right?

12         A      Not always.

13         Q      I didn't say second to second, but

14   you had a firm grasp of how the fund was doing,

15   right?

16         A      Yes.

17         Q      And you knew that when you wrote

18   this, the e-mail on January 30, 2004, that the

19   fund, that is the Linuxor fund, LAM, was nowhere

20   near $8,095,000?

21         A      I didn't know it at that time.

22         Q      Well, you certainly acknowledge

23   putting down $8,095,000 for the NAV, right?

24         A      Yes.

25         Q      And you got these numbers from

382

1                          Shah

2        Q    And it's inaccurate because it's

3   millions of dollars higher than the actual NAV

4   back in that period of December 30, '03, correct?

5        A    Yes.

6        Q    How many millions of dollars off is

7   it from $8,095,000?

8        A    I don't remember exactly.

9        Q    Well, approximately, how many

10  millions of dollars off is it from $8,095,000?

11       A    Based on the reference number of

12  October 30 from Citco, it's off by a million.

13       Q    I didn't ask for the reference number

14  because I see no reference on this piece of paper

15  in front of me, which is your e-mail, to anything

16  dealing with Citco.

17            Do you see anything on here about

18  Citco?

19       A    No.

20       Q    How many millions of dollars off is

21  it from $8,095,000?  What was the NAV to put it

22  another way on or about December 30, '03?

23       A    I don't remember.

24       Q    Approximately what is it?

25       A    I don't know.

1                         S h a h

2        Q     Now, every day you are sitting at the

3    trading desk, correct?

4        A     Yes.

5        Q     Every day you are dealing with what,

6    thousands of dollars, millions of dollars of

7    their money?

8        A     Yes.

9        Q     What percentage of that fund was

10   McCarthey's money at that time?

11       A     It was most of it.

12       Q     Almost all of it?

13       A     Yes.

14       Q     Correct?

15       A     Yes.

16       Q     So even if you don't consider the

17   Egger money at that time, if all you're thinking

18   about is the McCarthey money at that time, you

19   had to know on a daily basis how much money was

20   the approximate value of that fund, correct?

21       A     Yes.

22       Q     Now, as you sit here before us under

23   oath, what was the approximate value, because you

24   were the trader of that fund, on December 30,

25   '03?

384

1                        Shah

2        A    I am trying to remember.

3        Q    And I am asking you to remember.

4        A    I think it was $4 million, now I

5    remember.

6        Q    $4 million would make that

7    approximately you overestimated the fund to the

8    McCarthey's on December 30, '03, of 100 percent,

9    correct? The difference between four and eight

10   is 100 percent.  It's actually a little more

11   because you put down 8,095,000, correct?

12       A    Based on these numbers, yes.

13       Q    You said there was some confusion in

14   your mind, right?

15       A    Yes.

16       Q    Did you send a subsequent e-mail to

17   the McCartheys correcting this number?

18       A    No, I did not.

19       Q    Did you send them a letter correcting

20   this number?

21       A    No, I didn't.

22       Q    Did you send them a wire correcting

23   this number?

24       A    No, I didn't.

25       Q    Did you send them any document

385

```
1                    Shah
2  whatsoever correcting this number?
3        A    No, I didn't.
4        Q    When I say "this number" this
5  $8,095,000 number.
6        A    I did not.
7        Q    And you acknowledge that freely?
8        A    I'm sorry?
9        Q    And you acknowledge that freely?
10       A    Yes.
11       Q    You know that to be the case?
12       A    As far as I remember, yes.
13       Q    And your memory is good on this?
14       A    Sometimes, yes.
15       Q    Would you agree with me that the
16  $8,095,000 representation as of December 30, '03,
17  was erroneous?
18            MR. WHITE:  Objection.  Asked and
19       answered.
20       Q    You may answer.
21            MR. WHITE:  You can answer.
22       A    Yes.
23       Q    It was erroneous?
24       A    Yes.
25       Q    And would you agree with me that you
```

387

                        Shah

1

2       Q      Never?

3       A      Never.

4       Q      And you freely acknowledge that you

5   sent this to them and that you represented that

6   their value of their fund was on or about

7   December 30, '03, $8,095,000?

8       A      That's my e-mail.

9       Q      That's your what?

10      A      That is my e-mail.

11      Q      You blamed Citco for this error?

12      A      No, I don't.

13      Q      You blame yourself, don't you?

14      A      Absolutely.

15      Q      You take responsibility for it?

16      A      I take responsibility for the

17  confusion, yes.

18      Q      I didn't ask for the confusion.  You

19  take responsibility and you acknowledge that it

20  was 100 percent in error, right?

21      A      It was in error.

22      MR. BERLOWITZ:  Excuse me, let's

23  take a brief break.

24      (Whereupon, a recess was taken.)

25      MR. BERLOWITZ:  Can you mark that.

394

Shah

2  to answer.  Did you check the numbers?

3       A    Not personally.

4       Q    Never?

5       A    Never.

6       Q    So you don't know whether the NFA's

7  audit was accurate?

8       A    I don't know.

9       Q    You have no clue whatsoever?

10      A    Somebody from my company checked it.

11      Q    Mr. Shah, you know that the NFA has

12  brought a suit against you, right?

13      A    Yes.

14      Q    And you know that they did an audit?

15      A    Yes.

16      Q    And you know that the audit points

17  its finger against what you did with respect to

18  the Linuxor fund, you know that, right?

19      A    Yes.

20      Q    And you know that the audit shows

21  some problems with what you were doing, right?

22      A    They indicated some problems, yes.

23      Q    And you know that the NFA's audit

24  would be something important for you to review,

25  right?

399

1                           Shah

2          A    I looked at the numbers, yes.

3          Q    And that was a few months after

4    January 30, '04?

5          A    Yes.

6          Q    And you said that some few months

7    after January 30, '04, you knew that the NAV of

8    $8,095,000 for the period 12/30/03, was in error,

9    correct?

10         A    Yes.

11         Q    That it was something in the vicinity

12   of four million or four plus million dollars,

13   right?

14         A    Something like that.

15         Q    Did you at that time notify the

16   McCartheys in writing that you had overstated,

17   grossly overstated their NAV's?

18         A    Can you repeat that again.

19              (Whereupon, the record was read as

20         requested.)

21         A    At any time?

22         Q    For December 30, '03.

23         A    Not in writing.

24         Q    No?

25         A    No.

407

                                Shah

1

2      question.

3          Q      When did you know it was deceptive

4   for the first time?

5              MR. WHITE:  Objection.

6      A      I didn't know it was deceptive.

7          Q      Do you think this number is accurate?

8      A      It's not accurate.

9          Q      Do you think you misled the

10  McCartheys?

11             MR. WHITE:  Objection.

12     A      No, I had no intention to mislead

13  them.

14         Q      When the McCartheys did pull out, at

15  what point did they pull out?

16     A      They had requested redemption in June

17  of '04, and we liquidated it by July, you know,

18  right around July 1 and 2 of 2004.

19         Q      How many days after their request

20  until the time that you liquidated?

21     A      25, 30 days.

22         Q      You didn't liquidate it immediately,

23  did you?

24     A      No.

25         Q      In fact, you were still doing active

410

                            Shah

1

2          A    It was my error.

3          Q    You who do the fund every single day

4    made a $4 million error?

5          A    I made that error.

6          Q    You who do the fund trading every day

7    made a $4 million error, is that what you are

8    saying?

9          A    It was my e-mail, and it was the

10   error made by me.

11         Q    You who did the trading every day

12   knew that the fund wasn't anywhere near $8

13   million, you knew on a daily basis what that fund

14   was worth, didn't you?

15              MR. WHITE:  Objection as to form.

16         A    Mostly, yes.

17         Q    And you would know within $1 million

18   what that fund was worth, wouldn't you?

19         A    Yes.

20         Q    You would know whether it was worth

21   $4 million or $5 million on any given day,

22   wouldn't you?

23         A    Yes.

24         Q    You would know whether it was worth

25   $5 million or $6 million on any given day,

411

                                Shah

1
2   wouldn't you?

3        A    Yes.

4        Q    You would know whether it was worth

5   $6 million or $7 million on any given day, that

6   NAV, you would know that, wouldn't you?

7        A    I would know that.

8        Q    So when you put down that it was

9   worth $8,095,000, you knew and had to know that

10  was a wrong number.

11            MR. WHITE:  Objection.

12       Q    Didn't you?

13            MR. WHITE:  Objection.

14       A    It was the wrong date.

15       Q    The wrong date.  Well, the date says

16  here it was sent January 30, '04.  Is that the

17  right date?

18       A    No, as of December 30.

19       Q    I am reading it was sent on December

20  30, '04.  Is that the right date?

21       A    I'm not talking about the date of the

22  e-mail.

23       Q    Answer my question.  Is that the

24  right date it was sent, January 30, '04?

25       A    Yes, that is.

# Exhibit "E"

----- Original Message -----
From: "abbas shah" <ashah@isospace.com>
To: <toddb@mccunemansion.com>
Sent: Monday, August 25, 2003 9:43 AM
Subject: K1s

Todd,

My apologies for the delay. You have been more than kind to allow us the
time it has taken to make sure the k-1s and the audit were done right.
Please note that the capital invested through the end of the year in some
options and futures position is shown as an unrealized loss which was
completely reversed in the first week of January. As you know we are
approaching our trading and investment of your capital very cautiously.
Despite that we have been able to outperform most global market indices
(fixed income or equities). We have thus far recovered more than half of
the
capital loss and if we continue at this pace we hope that we will have not
only recovered all the capital but there is a good likelihood that we will
be   positive as far as returns since inception are concerned. I once
again
appreciate yours and Phil patience. Please rest assured that we are
putting
in 110% effort to make sure that the worst is behind us. Please check your
fax for a hardcopy of you K1s.

I will call you shortly to answer any question that you might have
regarding
your k-1s.
thanks.


Sincerely,

Abbas Shah

7/13/2004



# Exhibit "F"

# LINUXOR GLOBAL MACRO FUND, L.P.

NET ASSET VALUE STATEMENTS

PERIOD MARCH 1, 2002 THRU AUGUST 31, 2002

(In U.S. Dollars)

| STATEMENT OF ASSETS AND LIABILITIES ** ASSETS ** | | August 31, 2002 Unaudited | | | July 31, 2002 Unaudited | |
|---|---|---|---|---|---|---|
| | | cost | market value | | cost | market value |
| *Investments, at value:* | | | | | | |
| Equities | B-2 | 50,887 | 24,750 | B-2 | 50,887 | 40,150 |
| Bonds | B-2 | 0 | 0 | B-2 | 0 | 0 |
| Discount papers | B-2 | 0 | 0 | B-2 | 0 | 0 |
| Options | B-2 | 817,500 | 665,000 | B-2 | 2,391,650 | 1,605,763 |
| | | 868,387 | 689,750 | | 2,442,537 | 1,645,913 |
| *Unrealized gain on financial instruments:* | | | | | | |
| Futures contracts | | | 0 | | 626,160 | |
| Forward contracts | B-2 | | 0 | B-2 | | 0 |
| Contract For Differences | B-2 | | 0 | B-2 | | 0 |
| | | | 0 | | | 626,160 |
| *Cash and cash equivalents:* | | | | | | |
| Cash at banks | | | 0 | | | 0 |
| Deposits | B-1 | | 0 | B-1 | | 0 |
| | | | 0 | | | 0 |
| Reverse repurchase agreements | B-4 | | 0 | B-4 | | 0 |
| *Due from brokers:* | | | | | | |
| Balances according to statements | B-1 | 4,833,499 | | B-1 | 5,984,113 | |
| Receivable gains on forward contracts, expiring after reporting date | B-3 | 0 | | B-3 | 24,665 | |
| | | | 4,833,499 | | | 6,008,778 |
| able for investments sold | B-3 | | 12,500 | B-3 | | 313,500 |
| Accrued interest on bonds | B-5 | | 0 | B-5 | | 0 |
| Overdue coupon interest receivable | B-5 | | 0 | B-5 | | 0 |
| Interest paid in advance on bonds purchased | B-3 | | 0 | B-3 | | 0 |
| Accrued interest on reverse repurchase agreements | B-4 | | 0 | B-4 | | 0 |
| Interest receivable on bank, broker and other balances | B-7 | | 0 | B-7 | | 0 |
| Dividends receivable on shares | B-6 | | 0 | B-6 | | 0 |
| Other receivables and prepaid expenses | B-7 | | 50,000 | B-7 | | 50,000 |
| Due to / from Feeder Funds | B-7 | | 0 | B-7 | | 0 |
| Organizational expenses | | 10,000 | | | 10,000 | |
| *less:* Cumulative amortization | A-7 | (1,000) | | A-7 | (833) | |
| Deferred organizational expenses | | | 9,000 | | | 9,167 |
| Receivable for fund shares sold | | | 0 | | | 0 |
| **Total Assets** | | | 5,594,749 | | | 8,653,517 |

CONFIDENTIAL

CIT00182

# LINUXOR GLOBAL MACRO FUND, L.P.

NET ASSET VALUE STATEMENTS

PERIOD MARCH 1, 2002 THRU AUGUST 31, 2002

(In U.S. Dollars)

| STATEMENT OF ASSETS AND LIABILITIES **LIABILITIES** | | August 31, 2002 Unaudited | | | July 31, 2002 Unaudited | |
|---|---|---|---|---|---|---|
| | | proceeds | market value | | proceeds | market value |
| *Investments sold short, at value:* | | | | | | |
| Equities | B-2 | 0 | 0 | B-2 | 0 | 0 |
| Bonds | B-2 | 0 | 0 | B-2 | 0 | 0 |
| Discount papers | B-2 | 0 | 0 | B-2 | 0 | 0 |
| Options | B-2 | 353,125 | 306,563 | B-2 | 297,791 | 514,363 |
| | | | | | 297,791 | 514,363 |
| *Unrealized loss on financial instruments:* | | | | | | |
| Futures contracts | B-2 | 0 | | B-2 | 0 | |
| Forward contracts | B-2 | 0 | | B-2 | 0 | |
| Contract For Differences | B-2 | 0 | | B-2 | 0 | |
| | | | 0 | | | 0 |
| *Due to brokers:* | | | | | | |
| Balances according to statements | B-1 | 0 | | B-1 | 0 | |
| Payable losses on forward contracts, expiring after reporting date | B-3 | 0 | | B-3 | 19,774 | |
| | | | 0 | | | 19,774 |
| Repurchase agreements | B-4 | | 0 | B-4 | | 0 |
| Payable for investments purchased | B-3 | | 0 | B-3 | | 51,500 |
| Accrued interest on bonds | B-5 | | 0 | B-5 | | 0 |
| Overdue coupon interest payable | B-5 | | 0 | B-5 | | 0 |
| Interest received in advance on bonds sold | B-3 | | 0 | B-3 | | 0 |
| Accrued interest on repurchase agreements | B-4 | | 0 | B-4 | | 0 |
| Interest payable on bank, broker and other balances | | | 0 | | | 0 |
| nds payable on shares sold short | B-6 | | 0 | B-6 | | 0 |
| *Other, payables and accrued expenses:* | | | | | | |
| Management fees | | 27,425 | | | (2,075) | |
| Performance fees | | 0 | | | 0 | |
| Administrative services | A-7 | 18,000 | | A-7 | 15,000 | |
| Audit fees | A-7 | 12,500 | | A-7 | 10,417 | |
| Legal fees | A-7 | 0 | | A-7 | 0 | |
| General fees | | 6,295 | | | 4,937 | |
| Due to Investment Manager | | 10,000 | | | 10,000 | |
| Operational & Research Costs | A-7 | 36,198 | | A-7 | 30,165 | |
| | | | 110,418 | | | 68,444 |
| Due to Shareholders | B-7 | | 0 | B-7 | | 0 |
| | B-7 | | | B-7 | | |
| Payable for fund shares repurchased | B-7 | | 0 | B-7 | | 0 |
| **Total Liabilities** | | | 416,980 | | | 654,080 |
| **NET ASSETS** | | | 5,177,769 | | | 7,999,436 |

# LINUXOR GLOBAL MACRO FUND, L.P.

### NET ASSET VALUE STATEMENTS

PERIOD MARCH 1, 2002 THRU AUGUST 31, 2002

(In U.S. Dollars)

| STATEMENT OF OPERATIONS | | March 1 thru August 31, 2002 Unaudited | | March 1 thru July 31, 2002 Unaudited | |
|---|---|---|---|---|---|
| **Investment Income** | | | | | |
| *Income:* | | | | | |
| Interest: · Bonds | | 1,670 | | 1,670 | |
| · Discount papers | | 0 | | 0 | |
| · Reverse repurchase agreements | | 0 | | 0 | |
| · Bank and broker balances | | 37,956 | | 28,015 | |
| | | | 39,626 | | 29,685 |
| Dividends (gross income) | | 0 | | 0 | |
| *less :* Withholding tax | | 0 | | 0 | |
| | | | 0 | | 0 |
| Other income | | | 0 | | 0 |
| Total income | | | 39,626 | | 29,685 |
| | | | | | |
| *Expenses:* | | | | | |
| Interest: · Bonds | | 9,980 | | 6,633 | |
| · Discount papers | | 0 | | 0 | |
| · Repurchase agreements | | 0 | | 0 | |
| · Bank and broker balances | | 1,612 | | 1,612 | |
| Dividends on short sales | | 0 | | 0 | |
| Management fees | | 123,625 | | 94,125 | |
| Performance fees | | 0 | | 0 | |
| Administrative services | 5 | 18,000 | 5 | 15,000 | |
| Audit fees | 4.1 | 12,500 | 4.1 | 10,417 | |
| General fees | | 7,585 | | 4,937 | |
| Bank and broker expenses | | 1,021,377 | | 769,899 | |
| Amortization on organizational expenses | E-1 | 1,000 | E-1 | 833 | |
| Financial & Research Costs | | 36,198 | | 30,165 | |
| Total expenses | | | 1,229,877 | | 933,621 |
| Net investment income (loss) | | | (1,190,251) | | (903,936) |
| | | | | | |
| **Realized and unrealized gains (losses) on investments** | | | | | |
| *Realized gains (losses) on investments in:* | | | | | |
| Securities | | | (614,507) | | (349,603) |
| Securities – Hot Issues | | | 0 | | 0 |
| Options | | | (1,567,026) | | 192,440 |
| Futures contracts | | | (3,040,058) | | (2,252,396) |
| Forward contracts | | | 99,053 | | 75,014 |
| Realized currency exchange differences | | | (177,390) | | (220,521) |
| | | | (5,299,927) | | (2,555,067) |
| | | | | | |
| *Unrealized appreciation (depreciation) on investments in:* | | Beginning of year | End of period | Beginning of year | End of period |
| Securities | | 0 | (26,137) | 0 | (10,737) |
| Securities – Hot Issues | | 0 | 0 | 0 | 0 |
| Options | | 0 | (105,938) | 0 | (1,002,460) |
| Futures contracts | | 0 | 0 | 0 | 626,160 |
| Forward contracts | | 0 | 0 | 0 | 0 |
| Contract for differences | | 0 | 0 | 0 | 0 |
| | | 0 | (132,075) | 0 | (387,037) |
| | | | | | |
| Increase (decrease) unrealized appreciation on investments | | | (132,075) | | (387,037) |
| | | | | | |
| *Unrealized gains (losses) on foreign currency exchange:* | | | | | |
| Beginning of year (1-1-1999) | | 0 | | 0 | |
| End period | | 21 | | 45,476 | |
| | | | 21 | | 45,476 |
| | | | | | |
| Net realized and unrealized gains (losses) on investments | | | (5,431,980) | | (2,896,628) |
| Net increase (decrease) in net assets resulting from operations | | Page 3 of 4 | (6,622,231) | august financials sent to: 3,800,564 | |

CONFIDENTIAL

CIT00184

# LINUXOR GLOBAL MACRO FUND, L.P.

NET ASSET VALUE STATEMENTS

PERIOD MARCH 1, 2002 THRU AUGUST 31, 2002

(In U.S. Dollars)

| STATEMENT OF CHANGES IN NET ASSETS | March 1 thru August 31, 2002 Unaudited | March 1 thru July 31, 2002 Unaudited |
|---|---|---|
| **Increase (decrease) in net assets from operations:** | | |
| Net investment income (loss) | (1,190,251) | (903,936) |
| Net realized gains (losses) on investments | (5,299,927) | (2,555,067) |
| Increase (decrease) unrealized appreciation on investments | (132,075) | (387,037) |
| Net unrealized gains (losses) on foreign currency exchange | 21 | 45,476 |
| Net increase (decrease) in net assets resulting from operations | (6,622,231) | (3,800,564) |
| | | |
| **Distribution to Stockholders** | 0 | 0 |
| | | |
| **From capital stock transactions:** | | |
| Proceeds from sales of shares | 11,800,000 | 11,800,000 |
| Cost of repurchases of shares | 0 | 0 |
| Increase (decrease) in net assets resulting from | | |
| capital stock transactions | 11,800,000 | 11,800,000 |
| | | |
| Net increase (decrease) in net assets | 5,177,769 | 7,999,436 |
| | | |
| **Net Assets:** | | |
| Beginning of year (1-1-1999) | 0 | 0 |
| **End of period** | 5,177,769 | 7,999,436 |

CONFIDENTIAL

august financials sent to adam

CIT00185

Exhibit "G"

**LINUXOR GLOBAL MACRO FUND, L.P.**
NET ASSET VALUE STATEMENTS
PERIOD JANUARY 1, 2003 THRU AUGUST 31, 2003
(In U.S. Dollars)

| STATEMENT OF ASSETS AND LIABILITIES ** ASSETS ** | | August 31, 2003 Unaudited | | | July 31, 2003 Unaudited | |
|---|---|---|---|---|---|---|
| | | cost | market value | | cost | market value |
| ments, at value: | B-2 | 0 | 0 | B-2 | 0 | 0 |
| | B-2 | 0 | 0 | B-2 | 0 | 0 |
| | B-2 | 0 | 0 | B-2 | 0 | 0 |
| Discount papers | B-2 | | | | | |
| Options | B-2 | 423,301 | 410,000 | B-2 | 313,712 | 68,750 |
| | | 423,301 | 410,000 | | 313,712 | 68,750 |
| **Unrealized gain on financial instruments:** | | | | | | |
| Futures contracts | | (1,142) | | | (344,156) | |
| Forward contracts | B-2 | 0 | | B-2 | 0 | |
| Contract For Differences | B-2 | 0 | | B-2 | 0 | |
| | | | (1,142) | | | (344,156) |
| **Cash and cash equivalents:** | | | | | | |
| Cash at banks | | 0 | | | 0 | |
| Deposits | B-1 | 0 | | B-1 | 0 | |
| | | | 0 | | | 0 |
| Reverse repurchase agreements | B-4 | | 0 | B-4 | | 0 |
| **Due from brokers:** | | | | | | |
| Balances according to statements | B-1 | 3,869,964 | | B-1 | 4,772,968 | |
| able gains on forward contracts, expiring reporting date | B-3 | 0 | | B-3 | 0 | |
| | | | 3,869,964 | | | 4,772,968 |
| ceivable for investments sold | B-3 | | 0 | B-3 | | 0 |
| Accrued interest on bonds | B-5 | | 0 | B-5 | | 0 |
| Overdue coupon interest receivable | B-5 | | 0 | B-5 | | 0 |
| Interest paid in advance on bonds purchased | B-3 | | 0 | B-3 | | 0 |
| Accrued interest on reverse repurchase agreements | B-4 | | 0 | B-4 | | 0 |
| Interest receivable on bank, broker and other balances | B-7 | | 0 | B-7 | | 0 |
| Dividends receivable on shares | B-6 | | 0 | B-6 | | 0 |
| Other receivables and prepaid expenses | B-7 | | 47,000 | B-7 | | 47,000 |
| Due to / from Feeder Funds | B-7 | | 0 | B-7 | | 0 |
| ional expenses | | 10,000 | | | 10,000 | |
| less: cumulative amortization | A-7 | (3,000) | | A-7 | (2,833) | |
| Deferred organizational expenses | | | 7,000 | | | 7,167 |
| Receivable for fund shares sold | | | 0 | | | |
| **Total Assets** | | | 4,332,823 | | | 4,551,729 |



CONFIDENTIAL

CIT00348

## LINUXOR GLOBAL MACRO FUND, L.P.
### NET ASSET VALUE STATEMENTS
PERIOD JANUARY 1, 2003 THRU AUGUST 31, 2003
(In U.S. Dollars)

| STATEMENT OF ASSETS AND LIABILITIES ** LIABILITIES ** | | August 31, 2003 Unaudited | | July 31, 2003 Unaudited | |
|---|---|---|---|---|---|
| | | proceeds | market value | proceeds | market value |
| ents sold short, at value: | B-2 | 0 | 0 | 0 | 0 |
| B.... | B-2 | 0 | 0 | 0 | 0 |
| Discount papers | B-2 | 0 | 0 | 0 | 0 |
| Options | B-2 | 213,686 | 203,438 | 616,960 | 849,156 |
| | | 213,686 | 203,438 | 616,960 | 849,156 |
| | | | | | |
| Unrealized loss on financial instruments: | | | | | |
| Futures contracts | B-2 | 106,344 | | (39,365) | |
| Forward contracts | B-2 | 0 | | 0 | |
| Contract For Differences | B-2 | 0 | | 0 | |
| | | | 106,344 | | (39,365) |
| Due to brokers: | | | | | |
| Balances according to statements | B-1 | 0 | | 0 | |
| Payable losses on forward contracts, expiring after reporting date | B-3 | 0 | | 0 | |
| | | | 0 | | 0 |
| | | | | | |
| Repurchase agreements | B-4 | | 0 | | 0 |
| Payable for investments purchased | B-3 | | 0 | | 0 |
| Accrued interest on bonds | B-5 | | 0 | | 0 |
| ...ble coupon interest payable | B-5 | | 0 | | 0 |
| ...st received in advance on bonds sold | B-3 | | 0 | | 0 |
| Accrued interest on repurchase agreements | B-4 | | 0 | | 0 |
| ...est payable on bank, broker and other balances | | | 0 | | 0 |
| ...idends payable on shares sold short | B-6 | | 0 | | 0 |
| | | | | | |
| Other payables and accrued expenses: | | | | | |
| Management fees | | 64,049 | | 55,305 | |
| Performance fees | | 0 | | 0 | |
| Administrative services | A-7 | 21,000 | | 18,000 | |
| Audit fees | A-7 | 33,500 | | 31,417 | |
| Legal fees | A-7 | 0 | | 0 | |
| General fees | A-7 | 42,801 | | 38,551 | |
| Due to Investment Manager | | 10,000 | | 10,000 | |
| Operational & Research Costs | A-7 | 96,983 | | 90,950 | |
| | | | 268,333 | | 244,222 |
| | | | | | |
| Due... ...harcholders | B-7 | | 0 | | 0 |
| | B-7 | | | | |
| Payable for fund shares repurchased | B-7 | | 0 | | 0 |
| Total Liabilities | | | 578,114 | | 1,054,014 |
| NET ASSETS | | | 3,754,708 | | 3,497,715 |



CONFIDENTIAL

CIT00349

# LINUXOR GLOBAL MACRO FUND, L.P.
### NET ASSET VALUE STATEMENTS
### PERIOD JANUARY 1, 2003 THRU AUGUST 31, 2003
### (In U.S. Dollars)

| STATEMENT OF OPERATIONS | Jan 1 thru August 31, 2003 Unaudited | | Jan 1 thru July 31, 2003 Unaudited | | Difference in Dollars per Month |
|---|---|---|---|---|---|
| **ment Income** | | | | | |
| - Bonds | 35,014 | | 35,014 | | |
| - Discount papers | 0 | | 0 | | |
| - Reverse repurchase agreements | 0 | | 0 | | |
| - Bank and broker balances | 6,895 | | 5,675 | | 1,220 |
| Dividends (gross income) | | 41,909 | | 40,689 | |
| | 0 | | 0 | | |
| less: Withholding tax | 0 | | 0 | | |
| Other income | | 0 | | 0 | |
| | | 300 | | | 300.06 |
| Total income | | 42,209 | | 40,689 | |
| **Expenses:** | | | | | |
| Interest: - Bonds | 55,511 | | 55,511 | | |
| - Discount papers | 0 | | 0 | | |
| - Repurchase agreements | 22,342 | | 22,237 | | |
| - Bank and broker balances | 320 | | 320 | | |
| Dividends on short sales | | 72,454 | | 63,690 | -8,744.29 |
| Management fees | 24,000 | | 21,000 | | |
| Performance fees | 16,660 | | 14,583 | | |
| Administrative services | 54,000 | | 29,750 | | |
| fees | | | | | |
| al fees | | | | | |
| Bank and broker expenses | 1,189,161 | | 1,073,320 | | |
| Amortization on organizational expenses | 1,333 | | 1,167 | | |
| Operational & Research Costs | 48,264 | | 42,231 | | |
| Total expenses | | 1,454,933 | | 1,323,808 | 131,125 |
| Net investment income (loss) | | (1,412,724) | | (1,283,120) | |
| **Realized and unrealized gains (losses) on investments** | | | | | |
| *Realized gains (losses) on investments in:* | | | | | |
| Securities | | (294,003) | | (249,160) | (44,843.60) |
| Securities - Hot Issues | | 0 | | 0 | |
| Options | | 109,602 | | (230,647) | 340,249.20 |
| Futures contracts | | (1,730,233) | | (1,138,327) | (591,905.82) |
| Forward contracts | | | | | |
| ior differences | | 37,905 | | 37,905 | |
| currency exchange differences | | 23,713 | | 23,689 | 24.87 |
| | | (1,853,017) | | (1,556,541) | (296,476) |

| *Unrealized appreciation (depreciation) on investments in:* | Beginning of year | End of period | Beginning of year | End of period | |
|---|---|---|---|---|---|
| Securities | 0 | 0 | 0 | 0 | |
| Securities - Hot Issues | 0 | 0 | 0 | 0 | |
| Options | (546,960) | (3,052) | (546,960) | (477,159) | 474,106.35 |
| contracts | 10,661 | (107,486) | 10,661 | (304,791) | 197,305.26 |
| ward contracts | 0 | 0 | 0 | 0 | |
| ntract for differences | 0 | 0 | 0 | 0 | |
| | (536,299) | (110,538) | (536,299) | (781,950) | 671,412 |
| Increase (decrease) unrealized appreciation on investments | | 425,761 | | (245,651) | 671,412 |

| *Unrealized gains (losses) on foreign currency exchange:* | | | | | |
|---|---|---|---|---|---|
| Beginning of year (1-1-1999) | 0 | | (8,664) | | |
| End of period | 2,998 | | | | 11,662.47 |
| | | 3,159 | | (8,503) | 11,662 |
| Net realized and unrealized gains (losses) on investments | | (1,424,097) | | (1,810,695) | |
| **Net increase (decrease) in net assets resulting from operations** | | (2,836,821) | | (3,093,815) | 256,993.14 | 256,993 |

CONFIDENTIAL

CIT00350

-

# Exhibit "H"

Page 1 of 1

## Todd Brashear

| | |
|---|---|
| **From:** | <ashah@isospace.com> |
| **To:** | <toddb@mccunemansion.com> |
| **Cc:** | <ashah@isospace.com> |
| **Sent:** | 01/30/2004 10:08 PM |
| **Subject:** | Account Status |

Dear Todd, Please accept my thanks for being patient. I appreciate your understanding and cooperation: Listed below is your account balance and a summary of the P/L performance for the week ending january 31st,2004.

Your account balance as of 12/30/03 was approximately:

$8,095,000
Realized       $6,500,000
Unrealized    $1,595,000

For the week ending January 31st,2004 the P/L was: $89,000

Currently the fund is invested in the following:

Short Volatility in the equiites (SnP)
Long the US dollar versus the euro and Canadian dollar(Short term positive on the us dollar.
Short US Treasury Bond market (negative on the fixed income mkts.)
Short term negative on the Gold.

Please rest assured you will be recieving weekly P/L performance numbers at the end of each week and monthly reports reflecting the YTD balances. Once again sorry for the inconvenience,

Abbas Shah


PLAINTIFF'S
EXHIBIT 11
F 1D
6. 27·06

**00352**

02/02/04

# Exhibit "I"

72

```
 1                    McCarthey

 2       Q    Can, you said can get you?

 3       A    Can get you, yes.

 4            MR. BAZIL:  Would be able to.

 5            THE WITNESS:  Would be able to.

 6       Q    Did you instruct him thereafter, that

 7  is Mr. Shah, to wire $500,000 to an account?

 8       A    No.  Mr. Brashear and I then made the

 9  decision that that legal bill, why don't we put

10  that off for a few days since we didn't have to

11  pay it right that day.  So we did not follow up

12  and give Mr. Shah all the wire instructions.

13       Q    So at some point thereafter did you

14  provide Mr. Shah with a notice that you wanted to

15  liquidate the McCarthey investments in the

16  Linuxor fund?

17       A    I did it by phone, I believe I also

18  did it by e-mail.

19       Q    At some appointment thereafter were

20  you able to liquidate?

21       A    Yes.

22       Q    And was that in June, '04, was it

23  some time shortly thereafter, if you recall?

24       A    It was shortly after June of '04.

25       Q    And how much money was returned to
```

73

1                    McCarthey

2    you from the Linuxor fund?

3         A    Approximately $4 million.

4         Q    That was from your initial $11.5

5    million investment back in '02?

6         A    That is correct.

7         Q    How did you know, Mr. McCarthey, that

8    that's what the McCarthey entities were entitled

9    to get back?  That is, how did you know you were

10   entitled to get back $4 million and not some

11   other figure?

12        A    I didn't.

13        Q    And why not?

14        A    I requested from Mr. Shah, I said, "I

15   was told it was between 9 and $9.5 million, and I

16   would like all of that, please."  And some time

17   in early July then what I got was $4 million.

18        Q    How did you know that when you spoke

19   to Mr. Shah that what he was telling you was

20   accurate, that is, that you were entitled to

21   receive 9 or $9.5 million then?

22        A    I put it in an e-mail and I asked him

23   on the phone, and that's what he told me.

24        Q    Aside from him telling you that

25   that's what it was worth, were you able to

# Exhibit "J"



## NATIONAL FUTURES ASSOCIATION

In the Matter of the Arbitration Between    )
)
McCarthey Investments, LLC,             )
                     Claimant,    )
)
            v.             )             AWARD
)
Linuxor Asset Management, LLC,      )
Linuxor Capital Management, LLC,    )
Adam S. Bornstein, and Abbas Shah,  )
                Respondents.   )

Re:    05-ARB-107

        The following issues were presented to and decided by the undersigned arbitrators: fraudulent concealment, breach of contract, breach of fiduciary duty, breach of implied covenant of fair dealing, fraudulent inducement, Claimant's request for punitive damages, attorney's fees, costs and interest, and Respondents' request for attorney's fees and costs.

        We, being the arbitrators appointed to review and determine this matter in accordance with National Futures Association's Code of Arbitration, hereby determine that the following relief shall be granted.

        Linuxor Asset Management, LLC, Linuxor Capital Management, LLC and Abbas Shah shall pay to McCarthey Investments, LLC:

| | | |
|---|---|---|
| Compensatory Damages | $ | 3,259,613.00 |
| Punitive Damages | $ | 0.00 |
| Treble Damages | $ | 0.00 |
| Interest | $ | 795,234.00 |
| Attorney's Fees | $ | 0.00 |
| Other Costs | $ | 0.00 |
| Total Amount of Award | $ | 4,054,847.00 |

Respondents Linuxor Asset Management LLC, Linuxor Capital Management, LLC and Abbas Shah are jointly and severally liable. During the course of the hearing, Claimant withdrew its claims against Respondent Adam S. Bornstein.

All other relief requested is hereby denied.

Each party shall bear its own costs and fees as incurred.

_Charles P. Nastro_
Charles P. Nastro, Chairman

Date of Award:  March 5, 2007

_____
Henry Maringer, Arbitrator


_____
James D. Yellen, Arbitrator

_____                    Date of Award:  March 5, 2007
Charles P. Nastro, Chairman

_____
Henry Maringer, Arbitrator


_____
James D. Yellen, Arbitrator

Date of Award: <u>March 5, 2007</u>

_____
Charles P. Nastro, Chairman


_____
Henry Maringer, Arbitrator

*James D. Yellen*
_____
James D. Yellen, Arbitrator

3/9/07



## NATIONAL FUTURES ASSOCIATION

| | |
|---|---|
| In the Matter of the Arbitration Between | ) |
| | ) |
| 2001 Jane F. McCarthey GRAT No. 5, | ) |
|                  Claimant, | ) |
| | ) |
|         v. | )                AWARD |
| | ) |
| Linuxor Asset Management, LLC, | ) |
| Linuxor Capital Management, LLC, | ) |
| Adam S. Bornstein, and Abbas Shah, | ) |
|                  Respondents. | ) |

Re:    05-ARB-133

        The following issues were presented to and decided by the undersigned arbitrators: fraudulent concealment, breach of contract, breach of fiduciary duty, breach of implied covenant of fair dealing, fraudulent inducement, Claimant's request for punitive damages, attorney's fees, costs and interest and Respondents' request for attorney's fees and costs.

        We, being the arbitrators appointed to review and determine this matter in accordance with National Futures Association's Code of Arbitration, hereby determine that the following relief shall be granted.

        Linuxor Asset Management, LLC, Linuxor Capital Management, LLC and Abbas Shah shall pay to Jane F. McCarthey GRAT No. 5:

| | | |
|---|---|---|
| Compensatory Damages | $ | 977,883.00 |
| Punitive Damages | $ | 0.00 |
| Treble Damages | $ | 0.00 |
| Interest | $ | 238,570.00 |
| Attorney's Fees | $ | 0.00 |
| Other Costs | $ | 0.00 |
| Total Amount of Award | $ | 1,216,453.00 |

Respondents Linuxor Asset Management LLC, Linuxor Capital Management, LLC and Abbas Shah are jointly and severally liable.  During the course of the hearing, Claimant withdrew its claims against Respondent Adam S. Bornstein.

All other relief requested is hereby denied.

Each party shall bear its own costs and fees as incurred.

_____          Date of Award: <u>March 5, 2007</u>
Charles P. Nastro, Chairman


_____
Henry Maringer, Arbitrator


_____
James D. Yellen, Arbitrator

_____
Charles P. Nastro, Chairman

Date of Award:  <u>March 5, 2007</u>

_____
Henry Maringer, Arbitrator

_____
James D. Yellen, Arbitrator

_____          Date of Award:  <u>March 5, 2007</u>
Charles P. Nastro, Chairman


_____
Henry Maringer, Arbitrator


*James D. Yellen*
James D. Yellen, Arbitrator
3/9/07



## NATIONAL FUTURES ASSOCIATION

| | | |
|---|---|---|
| In the Matter of the Arbitration Between | ) | |
| | ) | |
| JFM Holdings L.P., | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | AWARD |
| | ) | |
| Linuxor Asset Management, LLC, | ) | |
| Linuxor Capital Management, LLC, | ) | |
| Adam S. Bornstein, and Abbas Shah, | ) | |
| Respondents. | ) | |

Re:    05-ARB-132

The following issues were presented to and decided by the undersigned arbitrators: fraudulent concealment, breach of contract, breach of fiduciary duty, breach of implied covenant of fair dealing, fraudulent inducement, Claimant's request for punitive damages, attorney's fees, costs and interest and Respondents' request for attorney's fees and costs.

We, being the arbitrators appointed to review and determine this matter in accordance with National Futures Association's Code of Arbitration, hereby determine that the following relief shall be granted.

Linuxor Asset Management, LLC, Linuxor Capital Management, LLC and Abbas Shah shall pay to JFM Holdings L.P.:

| | | |
|---|---|---|
| Compensatory Damages | $ | 3,259,613.00 |
| Punitive Damages | $ | 0.00 |
| Treble Damages | $ | 0.00 |
| Interest | $ | 795,234.00 |
| Attorney's Fees | $ | 0.00 |
| Other Costs | $ | 0.00 |
| Total Amount of Award | $ | 4,054,847.00 |

Respondents Linuxor Asset Management LLC, Linuxor Capital Management, LLC and Abbas Shah are jointly and severally liable. During the course of the hearing, Claimant withdrew its claims against Respondent Adam S. Bornstein.

All other relief requested is hereby denied.

Each party shall bear its own costs and fees as incurred.

_(signature)_
_____
Charles P. Nastro, Chairman

Date of Award:  <u>March 5, 2007</u>


_____
Henry Maringer, Arbitrator


_____
James D. Yellen, Arbitrator

Charles P. Nastro, Chairman

Date of Award: March 5, 2007

Henry Maringer, Arbitrator

James D. Yellen, Arbitrator

_____    Date of Award: <u>March 5, 2007</u>
Charles P. Nastro, Chairman

_____
Henry Maringer, Arbitrator

_James D. Yellen_
James D. Yellen, Arbitrator
         3/9/07