UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

U.S. COMMODITY FUTURES　　　　　　　05-CV-8091 (LAK)
TRADING COMMISSION,

　　　　　　　　Plaintiff,　　　　　　　　ECF CASE

　　　v.

ABBAS A. SHAH and LINUXOR ASSET
MANAGEMENT LLC,

　　　　　　　　Defendants.

-----------------------------------------------------------X

## RULE 56.1 COUNTERSTATEMENT
## IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Charles B. Manuel, Jr. (CM 3020)
Shira Y. Rosenfeld (SR 5392)
SHIBOLETH, YISRAELI, ROBERTS & ZISMAN, LLP
One Penn Plaza, Suite 2527
New York, New York 10119
Tel: 212-244-4111
Fax: 212-563-7108

*Attorneys for Defendants Abbas Shah,
Linuxor Asset Management, LLC, and
Linuxor Capital Management, LLC*

October 19, 2007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, <br> Plaintiff, <br><br> v. <br><br> ABBAS A. SHAH and LINUXOR ASSET MANAGEMENT LLC, <br> Defendants. | 05-CV-8091 (LAK) <br><br> ECF CASE <br><br> **DEFENDANTS' RULE 56.1 COUNTERSTATEMENT** |

Pursuant to Rule 56.1 of the Local Rules United States District Courts for the Southern and Eastern Districts of New York, Abbas A. Shah ("Shah") and Linuxor Asset Management LLC ("LAM") respectfully submit their Rule 56.1 Counterstatement of material facts as to which there are genuine issues that must be tried.

    **I. RESPONSES TO PLAINTIFF'S STATEMENTS**

1-8. Admitted.

9. Denied. Shah initially *solicited* only one investor – Philip McCarthey ("McCarthey") (DX-A - McCarthey Dep. 19[10] – 20[19]). Philip Egger ("Egger"), a McCarthey family friend, voluntarily later invested $300,000 in the fund on June 3, 2002 (DX-A - McCarthey Dep. 9[11–16]; Shah Aff. ¶2). McCarthey initially invested in March 2002 only on behalf of the 2001 Jane F. McCarthey GRAT No. 5 (the "McCarthey Trust") (DX-A - McCarthey Dep. 26[17] – 27[12]). Subsequent to that time, McCarthey elected to make further investments in the pool through two additional entities over which he had control – McCarthey Investments, LLC ("MI") and JFM Holdings L.P. - approximately two months later in May 2002 (DX-A - McCarthey Dep. 28[10–20]). Plaintiff has mischaracterized the record, as Defendants'

Answer merely admits that there were four original pool participants, not that Shah initially solicited four (Answer ¶ 25).

10. Admitted, except aver that the pool funds were initially mistakenly directed to Linuxor Capital Management ("LCM") due to an administrative error by the attorney who set up the account (DX-B – December 23, 2004 Hall Email; Shah Aff. ¶[24). The attorney, Charles E. Hall Jr., admitted that he erroneously listed the wrong account number when placing the funds in an account (DX-B – December 23, 2004 Hall Email). When this error was realized, this mistake was promptly corrected and all of the funds were transferred to the proper account, along with the appropriate interest (DX-C – LAM Chase Account Statements Evidencing Account Correction; Shah Aff. ¶24).

11. Admitted.

12. Admitted, except aver that Shah was told by his attorney, Charles Hall, Jr., that he had to file under the exemptions of CFTC Regulation 4.7, as there was only 1 investor and McCarthey was a Qualified Eligible Person ("QEP"). McCarthey, in fact, was a financial advisor who now has a website offering his financial advisory services in Salt Lake City. McCarthey failed to mention these qualifications when asked about any certifications he possesses during his deposition (Shah Aff. ¶25; DX-D – Notice of Claim of Exemption under Rule 4.7 dated March 18, 2002; DX-A – McCarthey Dep. 7[3–23]; DX-E - McCarthey Financial Advisor Internet Listing).

13. Admitted, except aver that Shah notified the investors, McCarthey and Egger, or their appointed investment adviser, of the value of their investments on nearly a daily basis (PX-D - Shah Dep. 340[6 – 10]. Additionally, Defendants aver that McCarthey, a QEP, specifically

told Shah not to send paper quarterly reports saying, "the only time we need a report is annually for tax purposes" (Shah Aff. ¶26).

14. Admitted, except aver that Shah notified the investors, McCarthey and Egger, or their appointed investment adviser, of the value of their investments on nearly a daily basis (PX D - Shah Dep. 340[6 – 10]. Additionally, Defendants aver that McCarthey, a QEP, specifically told Shah not to send paper quarterly reports saying, "the only time we need a report is annually for tax purposes" (Shah Aff. ¶26).

15. Denied. Defendants aver that in July 2002, the pool suffered losses in the amount of $934,500. In August 2002, the pool suffered losses in the amount of $2,570,773. Therefore, the correct statement is that, in the months of July and August 2002, the pool suffered losses of $3,505,273 or approximately 30 percent (DX-F – Market Value of Fund Assets Spreadsheet).

16. Admitted, except aver that good-faith extension requests were made by the fund accountant to the IRS and Shah notified pool participants, or their appointed investment adviser, of the value of their investments on nearly a daily basis (Answer ¶ 2; Shah Dep. 340[6–10]). This delay was caused by the broker and the accountant, who filed for the tax extension because one brokerage firm had not yet submitted final trading records for 2002, and was not Mr. Shah's fault whatsoever (Shah Aff. ¶27; DX-G – April 8, 2003 Letter from Tim Garret to McCarthey). Moreover, McCarthey and his adviser, Brashear, were informed by letter of the extension request which they approved (Shah Aff. ¶27; DX-G – April 8, 2003 Letter from Tim Garret to McCarthey).

17. Admitted, except aver that good-faith extension requests were made by the fund accountant to the IRS and Shah notified pool participants, or their appointed investment adviser, of the value of their investments on nearly a daily basis (Answer ¶ 2; PX-D - Shah Dep. 340[6–

10]). This delay was caused by the broker and the accountant, who filed for the tax extension because one brokerage firm had not yet submitted final trading records for 2002, and was not Mr. Shah's fault whatsoever (Shah Aff. ¶27; DX-G – April 8, 2003 Letter from Tim Garret to McCarthey). Moreover, McCarthey and his adviser, Brasher, were informed by letter of the extension request which they approved (Shah Aff. ¶27; DX-G – April 8, 2003 Letter from Tim Garret to McCarthey).

18. Admitted.

19. Admitted, except (i) the report showed the pool's losses for 2002 amounted to $5,058,709 (*See* Answer ¶ 31) and (ii) Defendants aver that the losses were disclosed to McCarthey, his advisers and Egger on a current basis (Shah Aff. ¶28).

20. Denied, but admit that Mr. Shah sent an e-mail to the McCarthey pool participants' representative on August 25, 2003. Plaintiff inaccurately refers to the quotation in paragraph 20 as the "pertinent part" of this correspondence and takes this statement completely out of context. Mr. Shah made it extremely clear in his deposition that this email was with respect to certain options and futures positions only, rather than as to the entire investment in the aggregate (PX-D - Shah Dep. 345). In addition, Mr. Shah stated in the actual email itself to the McCarthey pool participants' representative, just before the statement quoted by Plaintiff, "Please note that the capital invested through the end of the year in some options and futures position is shown as an unrealized loss which was completely reversed in the first week of January. As you know we are approaching our trading and investment of your capital very cautiously. Despite that we have been able to outperform most global market indices (fixed income or equities)" (PX-E - Shah email dated August 25, 2003). The email then leads into the portion where Mr. Shah states that they have recovered more than half of the capital loss, and the capital loss very clearly relates to

that of the capital invested in options and futures in 2003. *Id.* To further clarify this email correspondence, the options and futures positions at issue were carried forward at the end of 2002 into 2003. *See* Shah Dep. page 345. Mr. Shah spoke to McCarthey in May 2003 and notified him that the value of his account had gone down further (Shah Aff. ¶29; DX-H – Excerpts of Telephone Records from Shah and LAM to McCarthey, Egger, and Brashear). Then, in the August 25, 2003 email, Mr. Shah clearly notifies McCarthey's representative that they had recovered "more than half of the capital loss" in the options and futures position since May 2003, and that, continuing at the current pace, they "will have not only recovered all of the capital loss[,] but there is a good likelihood that [they] will be positive as far as returns since inception" of the options and futures position investments (PX-E - Shah email dated August 25, 2003; DX-I – LAM Futures and Options Positions December 31, 2002 to January 30, 2003).

21 - 22.  Admitted.

23.  Admitted, except aver that Mr. Shah was confused by an incomprehensible question, as the fund originated at the beginning of 2002, and a fund cannot suffer any losses prior to its existence (Shah Aff. ¶30).

24.  Admitted, but aver that Citco values options at book value while market value is calculated assuming market value of the options.  Using market value, the approximate net asset value of the pool was $5,919,609 (DX-F – Market Value of Fund Assets Spreadsheet).  Both valuations are correct, however, despite getting different numbers.  It is typical for a discrepancy to exist, even among highly reputable professional auditors, as the value of these funds fluctuate intraday as well as from day to day (Shah Aff. ¶31).

25.  Admitted.

26. Admitted, except aver that the email was an acknowledged mistake (PX-D - Shah Dep. 376[25] – 377[1-25]; Shah Aff. ¶32). In response to a request from Brashear, the email was hurriedly sent late in the evening from a vacation hotel, in a remote location, where Mr. Shah had no records or financial information with him for reference (PX-D - Shah Dep. 373[23] – 374[3]; Shah Aff. ¶32). As soon as Mr. Shah returned to New York and discovered his mistake, he called McCarthey's financial adviser, Todd Brashear, on the telephone on or about February 6, 2004, notified him of the inaccurate email, and disclosed the accurate account balances (Shah Aff. ¶32). Upon Shah's notifying Mr. Brashear of the mistaken email and providing the accurate pool balances, not only did the McCarthey pool participants not withdraw their investment, but Mr. Brashear told Mr. Shah to keep "doing what you're doing" (Shah Aff. ¶32). Moreover, the McCarthey pool participants did not incur any loss from Mr. Shah's mistaken email of January 30, 2004. Indeed, if the McCarthey pool participants had withdrawn their investment on January 30, 2004, they would have lost money, as the pool made substantial gains from January 30, 2004 forward, even with forced liquidation costs factored in (Shah Aff. ¶32; DX-F – Market Value of Fund Assets Spreadsheet).

27. Admitted, but aver that Mr. Shah directly notified Mr. Todd Brashear, the McCarthey's financial representative, of the correct pool balances in a telephone conversation taking place on or about February 6, 2004 as soon as he became aware of the accurate pool balances, rather than months after (Shah Aff. ¶32).

28. Admitted, but aver that Mr. Shah directly notified Mr. Todd Brashear, the McCarthey's financial representative, of the correct pool balances in a telephone conversation taking place on or about February 6, 2004 as soon as he became aware of the accurate pool balances (Shah Aff. ¶32).

29. Admitted, but aver that Mr. Shah admittedly made a mistake as to the funds' worth on January 30, 2004, when he sent an erroneous email to Mr. Brashear, the McCarthey's financial representative, late in the evening from a vacation hotel, in a remote location, where Mr. Shah had no records or financial information with him for reference (PX-D - Shah Dep. 373[23] – 374[3]; 376[25] – 377[25]); Shah Aff. ¶32). As soon as Mr. Shah returned to New York and discovered his mistake, he called Todd Brashear on the telephone on or about February 6, 2004, notified him of the inaccurate email, and disclosed the accurate account balances (Shah Aff. ¶32).

30. Denied. Philip McCarthey, through his three McCarthey family pool participants, was the only investor in the pool, besides Egger, a McCarthey family friend who voluntarily invested in the fund, and James Temple, who only invested in the fund from December 2003 to April 2004 (DX-A - McCarthey Dep. 9[11–16]; Shah Aff. ¶2). The McCarthey pool participants received their distributions shortly after June 2004 (DX-A - McCarthey Dep. 72[13] – 73[3]). Egger and Temple received their distributions in April 2004 (Shah Aff. ¶33).

31. Admitted.

32. Admitted, but aver that the NFA made no finding of fact; and nothing in the award of the NFA arbitration panel constituted a finding of fraud; and the panel did not award punitive damages or attorneys' fees. (PX-J - NFA Arbitration Award Documents).

## II.   ADDITIONAL MATERIAL ISSUES OF FACT TO BE TRIED

1. In February 2002, at a New York City dinner, McCarthey told Mr. Shah he was interested in investing for high returns and told his financial representative Egger to give Shah $1.5 million as an initial trial investment amount (Shah Aff. ¶1).

2. McCarthey was told that he would be the first investor and that the fund had not been started (Shah Aff. ¶1).

3. Per McCarthey's request, Milbank Tweed conducted due diligence on Mr. Shah and the proposed Linuxor investment pool prior to McCarthey's investment (Shah Aff. ¶3; DX-J – Egger Dep. 9[18]-10[8]).

4. In March 2002, as McCarthey's financial representative, Egger transfered the $1.5 million out of McCarthey's trust funds, under the care of his law firm, Milbank Tweed, into LAM's fund (Shah Aff. ¶4).

5. In March 2002, McCarthey told Mr. Shah that he was not interested in small returns like 1-2% per month, but stated that he was looking for very high percentage returns and was prepared to take the risks and volatility associated with extremely high possible return (Shah Aff. ¶5). McCarthey also directed Mr. Shah to look for trades that meet these requirements (Shah Aff. ¶5).

6. Around May 2002, McCarthey invested an additional $10 million into the fund on behalf of two trusts under his control (Shah Aff. ¶6; DX-K - April 30, 2002 Milbank Wire Transfer). Both McCarthey and Egger instructed Mr. Shah to take on positions that could possibly achieve large gains, notwithstanding the high volatility and risks involved (Shah Aff. ¶6; DX-L - August 15, 2002 Email from Egger to Shah).

7. Mr. Shah made no promise to stay within 15% parameters. Mr. Shah may have discussed conservative investment strategies with 1-2% monthly returns and drawdowns limited to 15% with McCarthey, but McCarthey rejected any such approach. McCarthey consistently asserted that he was only interested in large gains and was prepared to take the risks and volatility associated with extremely high possible returns (Shah Aff. ¶7).

8. Egger told Shah that McCarthey was accustomed to risky gambling and had been known to place larger bets in Las Vegas than the amounts he invested into Shah's fund (Shah Aff. ¶8).

9. In June 2002, Shah called McCarthey to give him a status report on the investments and was told that he only wanted to receive year-end annual reports because these were required for tax purposes (Shah Aff. ¶9).

10. McCarthey and Eggers told Shah on numerous occasions from June 2002 throughout 2003 not to send any reports other than annual reports (Shah Aff. ¶10).

11. By June 2002, Egger, who was by then an investor in the fund, telephoned Mr. Shah very frequently, often several times per day (Shah Aff. ¶11; DX-H - Excerpts of Telephone Records from Shah and LAM to McCarthey, Egger, and Brashear).

12. Egger also visited New York City on numerous occasions to observe Shah and monitor the fund. (Shah Aff. ¶12; DX-L - August 15, 2002 Email from Egger to Shah.)

13. In June 2002, the initial trades set up in the fund experienced significant losses (Shah Aff. ¶13).

14. On or around August 14, 2002, the complete status of the portfolio was made known to McCarthey and Egger in a telephone call detailing the loss (Shah Aff. ¶14; Complaint ¶ 29; DX-L - August 15, 2002 Email from Egger to Shah). This report disclosed that McCarthey and Egger were down 32% at this time (Shah Aff. ¶14; Complaint ¶ 29).

15. As the portfolio showed losses of approximately 50% during July and August of 2002, Shah mailed reports to McCarthey and Egger notifying them of these losses in early

October, and McCarthey had discussions with Egger concerning these losses (Shah Aff. ¶15; DX-M - Citco Report from March 1, 2002 to August 31, 2002; DX-J - Egger Dep. 23[14-17]).

16. This written report in early September 2002 to McCarthey and Egger was in addition to continuous telephone contact with Shah since April 2002 (Shah Aff. ¶16; DX-H, Excerpts of Telephone Records from Shah and LAM to McCarthey, Egger, and Brashear).

17. McCarthey also spoke to Shah in January 2003 regarding the value of the investment, when he told Shah, "So, we didn't hit the home run we were hoping for" and to "keep your head down" (Shah Aff. ¶17).

18. As soon as Shah received the 2002 K-1's from the accountant, he delivered them to McCarthey and Egger by regular mail on August 14, 2003, and again by fax on August 25, 2003, (Shah Aff. ¶18; DX-N - K-1 Form).

19. Prior to August 25, 2003, Shah also invited McCarthey and his CFO, Todd Brashear, to contact the accountant directly with any questions regarding the portfolio and records (Shah Aff. ¶19).

20. After receiving the K-1s in August 2003, McCarthey remained invested in the fund, requested no further written reports, and sought no redemption until June 2004 (Shah Aff. ¶20).

21. McCarthey, Todd Brashear, Egger and a representative of the McCarthey investments were in frequent, often daily, contact with Shah concerning the investments, including over 1500 phone calls, numerous emails, and around 10 personal visits from 2002 until 2004 (Shah Aff. ¶21; DX-H - Excerpts of Telephone Records from Shah and LAM to McCarthey, Egger, and Brashear).

22. In an email to Shah, dated May 17, 2004, Brashear praised the gains realized during the prior week, and inquired about a withdrawal of only $500,000 from the McCarthey account (DX-O, Brashear Email 5-17-04).

23. After Brashear's May 17, 2004 email, Shah immediately transferred $500,000 to the Fund's checking account pending wire transfer to McCarthey, but within two days McCarthey decided not to withdraw the $500,000 and instructed Shah to return the full amount to the investment pool (Shah Aff. ¶23; DX-P - LAM $500,000 Transfer Documents).

24. The market value of the portfolio produced net gains of more than $200,000 from August 25, 2003 to final redemption in July 2004 (DX-F – Market Value of Fund Assets Spreadsheet).

25. Linuxor only missed one report to the CFTC in 2004, as no quarterly reports were required to be made to the CFTC under the CFTC Regulation 4.7 exemption (Shah Aff. ¶34).

26. Mr. Shah's compensation from the beginning of the fund in 2002 to liquidation in 2004 was approximately $60,000 in management fees. This compensation should be reduced by the substantial costs Shah incurred in setting up and operating the fund (Shah Aff. ¶35).

27. Mr. Shah received virtually no compensation based upon the profits earned by the fund (Shah Aff. ¶36).

28. Because of the high water mark that was attained in May 2002 and never met thereafter, Mr. Shah never received a profit-related incentive fee from the fund (Shah Aff. ¶36).

29. Mr. Shah could not have had a scheme to defraud because the effect would be that he himself received no compensation or benefit (Shah Aff. ¶37).

33. The losses in the fund were market losses only. There is no allegation, let alone any evidence, in this case that Mr. Shah misappropriated or misinvested funds (Shah Aff. ¶38).

34. Mr. Shah never intentionally mislead his investors (Shah Aff. ¶39).


Dated:  New York, New York
        October 19, 2007

                **SHIBOLETH, YISRAELI, ROBERTS & ZISMAN, LLP**


                    By:  *Charles B. Manuel, Jr*
                         Charles B. Manuel, Jr.
                         Of Counsel
                         One Penn Plaza, Suite 2527
                         New York, New York 10119
                         Tel. 212-244-4111

                    Attorneys for Defendants
                    Abbas A. Shah and Linuxor Asset Management LLC