# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, ) ) ) ) | |
| Plaintiff, ) ) | 05 CV 8091 (LAK) |
| v. ) ) | ECF Case |
| ABBAS A. SHAH and LINUXOR ASSET MANAGEMENT LLC, ) ) ) | |
| Defendants. ) ) | |

## REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS ABBAS A. SHAH AND LINUXOR ASSET MANAGEMENT, LLC.

U.S. COMMODITY FUTURES TRADING COMMISSION

Stephen J. Obie [SO-5502]
David Acevedo [DA-0388]
Michael R. Berlowitz [MB-7615]
Division of Enforcement
140 Broadway, 19th Floor
New York, New York 10005
(646) 746-9754
(646) 746-9940 (facsimile)
dacevedo@cftc.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

DEFENDANTS' RULE 56.1 COUNTERSTATEMENT ............................................................ 1

DEFENDANTS HAVE FAILED TO SET FORTH SPECIFIC FACTS SHOWING THAT

THERE ARE GENUINE ISSUES FOR TRIAL ........................................................................ 2

    A.   The Court Should Disregard Shah's Affidavit.................................................................. 2

    B.   Count I of the Complaint .............................................................................................. 4

    C.   Count II of the Complaint ............................................................................................. 7

    D.   Count III of the Complaint............................................................................................. 8

    E.   Count IV of the Complaint ............................................................................................ 8

CONCLUSION ...................................................................................................................... 10

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)(citations omitted)............................ 7

*Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236* (1991) ....................................................... 7

*Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986) ................................... 7

*Dressler v. MV Sandpiper*, 331 F.2d 130, 133 (2d Cir. 1964)........................................................ 2

*Drexel Bumham Lambert, Inc. v. Commodity Futures Trading Commission.*, 271 U.S. App. D.C.

    49 (D.C. Cir. 1988) ..................................................................................................................... 6

*First Commodity Corp. v. CFTC*, 676 F.2d 1, 7 (1st Cir. 1982)...................................................... 6

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348 (1989) 2

*McCarthy v. Kemper Life Insurance Companies*, 924 F.2d 683, 687 (7th Cir. 1991).................... 7

*Miller v. International Telephone & Telegraph Corp.,* 755 F.2d 20, 24 (2d Cir. 1985), *cert.*

    *denied*, 474 U.S. 851 (1985) ...................................................................................................... 2

*Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) ......... 2, 3

*Reisner v. General Motors Corp.*, 671 F.2d 91, 93 (2d Cir. 1982), *cert. denied*, 459 U.S. 858

    (1982)........................................................................................................................................... 2

*SEC v. Grossman*, 887 F.Supp. 649, 656-657 (S.D.N.Y. 1995)..................................................... 1

## Statutes

Section 4b of the Act, 7 U.S.C. §6b........................................................................................... 6, 7

Section 4b(a) of the Act, 7 U.S.C. §6b(a)................................................................................. 4, 5, 7

Section 4o(1)(A) of the Act, 7 U.S.C. §6o(1)(A) ........................................................................... 7

Section 4o(1)(B) of the Act, 7 U.S.C. §6o(1)(B)............................................................................ 7

## Rules

Fed. R. Civ. P. 56(e) ................................................................................................................. 4, 7

Rule 56.1 ...................................................................................................................................... 5

## Regulations

CFTC Regulations 4.20(b), 17 C.F.R. § 4.20(b)......................................................................... 8

CFTC Regulations 4.20(c), 17 C.F.R. § 4.20(c)......................................................................... 8

CFTC Regulations 4.7(b), 17 C.F.R. § 4.7(b)............................................................................. 8

CFTC Regulations 4.7(c), 17 C.F.R. § 4.7(c)............................................................................. 8

Plaintiff U.S. Commodity Futures Trading Commission (the "CFTC"), respectfully submits this Reply in further support of its Motion for Summary Judgment against Defendants Abbas A. Shah ("Shah") and Linuxor Asset Management, LLC., (collectively "the Defendants") pursuant to Federal Rule of Civil Procedure 56(a) and Local Rule 56.1.

## INTRODUCTION

As evidenced by their Memorandum of Law in Opposition to Plaintiff's Motion For Summary Judgment ("Memorandum"), and accompanying documents, Defendants eschew responsibility for their violations of the Commodity Exchange Act (the "Act") and instead cast blame for their violations on their former attorney, the pool participants, their broker and accountant. Shah has submitted a newly-minted affidavit custom tailored to respond to Plaintiff's Motion for Summary Judgment which contradicts his prior sworn deposition testimony. Moreover, Defendants try to circumvent their fraudulent e-mails by characterizing them as "mistakes." In an attempt to obfuscate the facts, Defendants, in their Memorandum, belabor what this case is not about, specifically, conduct that was not charged or alleged by the CFTC.

## I.

## DEFENDANTS' RULE 56.1 COUNTERSTATEMENT

In *SEC v. Grossman*, it is established that if the evidence submitted by the opposing party is "merely colorable, conclusory, speculative or not significantly probative" summary judgment is appropriate. *SEC v. Grossman*, 887 F.Supp. 649, 656-657 (S.D.N.Y. 1995). Furthermore, mere disagreement, bald assertions, allegations in pleadings, and legal conclusions are all

insufficient to defeat a summary judgment motion.  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 1355-56 (1989) (mere "metaphysical doubt" insufficient to defeat summary judgment motion).  The "facts" advanced in Defendants' 56.1 Counterstatement fits these descriptions.  For instance, Shah repeatedly attempts to excuse misrepresentations he made in various e-mails as misunderstood because they are taken out of context.[1]  Such arguments are decidedly metaphysical in nature because the Defendants wants to engage the Plaintiff and the Court in an inane discussion of how other statements might affect the perceived accuracy of something that is a misrepresentation on its face.  In sum, Defendants fail to set forth specific facts showing that there are genuine issues for trial and, therefore, Plaintiff's Motion for Summary Judgment should be granted.

## II.

### DEFENDANTS HAVE FAILED TO SET FORTH SPECIFIC FACTS SHOWING THAT THERE ARE GENUINE ISSUES FOR TRIAL

### A.     The Court Should Disregard Shah's Affidavit

The Defendants' Memorandum includes an affidavit from Shah in which he introduces new facts that contradict his prior sworn testimony.  It is well settled that on a motion for summary judgment, an affidavit which contradicts a party's prior sworn deposition testimony should be disregarded.  *Miller v. International Telephone & Telegraph Corp.,* 755 F.2d 20, 24 (2d Cir. 1985), *cert. denied*, 474 U.S. 851 (1985); *Reisner v. General Motors Corp.*, 671 F.2d 91, 93 (2d Cir. 1982), *cert. denied*, 459 U.S. 858 (1982); *Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969); *Dressler v. MV Sandpiper*, 331 F.2d 130, 133 (2d Cir. 1964).  As the Court stated in *Perma*, "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own

[1] See Defendants' 56.1 Counterstatement, ¶20.

prior testimony, this would greatly diminish the utility of summary judgment as a procedure for

screening out sham issues of fact." *See Perma* at 578.

The contradiction in Shah's affidavit concerns misrepresentations contained in his

January 30, 2004 e-mail. Shah, in his October 2007 affidavit claims:[2]

> *Once again, the e-mail on January 30, 2004 was an acknowledged*
> *mistake. In response to a request from Brashear, the e-mail was*
> *hurriedly sent late in the evening from a vacation hotel, in a remote*
> *location, where I had no records or financial information with me*
> *for reference. As soon as I returned to New York and discovered*
> *my mistake, I called McCarthy's financial advisor, Todd Brashear,*
> *on the telephone on or about February 6, 2004, notified him of*
> *the inaccurate e-mail, and disclosed the accurate account balances.*

However, at his June 2006 deposition, Shah testified that he first discovered the "mistake"

(inaccurate account balances) contained in his January 2004 e-mail months after he sent the e-

mail in January.[3] As opposed to his most current rendition of the story, Shah testified in June

2006 that it wasn't until months after the January 2004 e-mail when he was performing his own

accounting of the December 30, 2003 net asset value that he discovered the "mistake." And,

Shah placed the discovery months after the January e-mail because he "remembered" it was

contemporaneous with the National Futures Association's ("NFA") audit of Linuxor for which

Shah was required to provide the NFA with documents and information for the audit. Shah's

affidavit contradicts his deposition and, thus, should be disregarded by the Court.

Additionally, Shah alleges, for the first time, in his affidavit that he called Todd Brashear,

a representative of McCarthey's, on the telephone on or about February 6, 2004, to notify him of

the inaccurate e-mail Shah sent on January 30, 2004.[4] These new facts contradict his prior sworn

testimony. During Shah's two days of sworn deposition testimony, Plaintiff repeatedly

---

[2] See Shah Affidavit ¶32.
[3] See Plaintiff's Reply Exh. 1, pp. 396 – 399.
[4] See Shah Affidavit, p.5, ¶32.

questioned him on the subject of the January 30, 2004, e-mail.  In response, Shah testified that he never corrected his "mistake" in writing.  Nor did he testify that he called Brashear or McCarthey to correct his e-mail.  At best, Shah testified that he spoke "to them very frequently," meaning McCarthey and Brashear.[5]  But, he did not specifically testify that he told Brashear or McCarthey that his e-mail was inaccurate.  Now, years later with the passage of time, Shah would have the Court believe, via his affidavit, that his memory is better and that he not only recalls telling Brashear and McCarthey of his inaccuracy, but also remembers telling them as early as February 6, 2004.

In an effort to thwart Plaintiff's motion for summary judgment, Shah has tailored his affidavit to respond to Plaintiff's motion.  Although Fed. R. Civ. P. 56(e) provides the defense with the opportunity to submit affidavits of additional testimony, it is clear that this provision is not to be misused by introducing contradictory facts in hopes of thwarting a plaintiff's legitimate motion for summary judgment.  Accordingly, Plaintiff respectfully requests that the Court disregard Shah's affidavit in its entirety.

## B.    Count I of the Complaint

Defendants claim that there are "serious issues of material fact" with respect to Count I charging them with fraud in violation of Section 4b(a) of the Act, 7 U.S.C. § 6b(a).  They assert that "Defendants did not make any intentional statements or omissions to their clients." Defendants are wrong.

They admit that quarterly financial reports were not sent and that only one annual financial report was sent to the pool participants, and that one was late.  Defendants excuse this failure by, *inter alia*, blaming their accountants and the broker.  Thus, there are no factual issues

---

[5] Plaintiff's Reply Exhibit 1, pp.382-387.

in dispute with regard to Defendants' violation of Section 4b(a) of the Act, which deprived the pool participants of critical financial information.[6]

Also, on pages 13 through 15 of their Memorandum, Defendants do not address the fraudulent August 25, 2003 e-mail Shah sent the McCarthy pool participants wherein Shah wrote, in impertinent part:

> *We have thus far recovered more than half of the capital loss and if we continue at this pace we hope that we will have not only recovered all of the capital loss but there is a good likelihood that we will be positive as far as returns since inception are concerned.*

Shah never denied that the pool had suffered further losses of approximately $2.5 million since the beginning of 2002 and when asked about it at his deposition, he testified that he did not recall.[7]  As documented in Plaintiff's Memorandum of Law In Support of Summary Judgment,[8] Shah's August 25, 2003 e-mail was fraudulent as the pool had lost approximately $2.8 million since the beginning of 2003 and had not recovered "more than half of the capital loss."  It is only in Shah's October 2007 affidavit that he now claims "I was confused [at the deposition] by an incomprehensible question…."

Defendants admit that Shah sent an e-mail on January 30, 2004, that contained a "break down" of the 12/30/03 account balances totaling $8,095,000.  The e-mail included a realized account balance of $6,500,000 an unrealized account balance of $1,595,000.  Shah admits that the $8,095,000 figure is more than a 100% overstatement of the account's actual $4,000,000 balance.[9]  Moreover, in Defendants' Rule 56.1 Counterstatement, Shah admits that "as the sole

---

[6] In their 56.1 Counterstatement, p.11, ¶25, Defendants write:  "Linuxor only missed one report to the CFTC in 2004, as no quarterly reports were required to be made to the CFTC under the CFTC Regulation 4.7 exemption."  It is important to point out that the Defendants are not charged with failing to send quarterly reports to the CFTC, they are charged for failing to send proscribed quarterly reports to their pool participants.  Regulation 4.7, however, does require Defendants to maintain quarterly financial reports and produce them to the CFTC upon request.
[7] See Plaintiff's Reply Exhibit 1, pp.345-346.
[8] See pp. 5 - 6.
[9] See Plaintiff's Rule 56.1 Statement, ¶¶26 and 27, and Defendants' Rule 56.1 Counterstatement, ¶¶ 26 and 27.

principal of Linuxor and the sole trader for the pool…he had a firm grasp on how the pool was doing and that he knew what the fund was worth on any given day."[10]

In his October 2007 affidavit, Shah dismisses the e-mail as a "mistake" claiming that he promptly corrected it on February 6, 2004. As discussed above, Shah's affidavit directly contradicts his prior sworn deposition testimony. Furthermore, he claims in his affidavit that he "hurriedly sent" the January 2004 e-mail "late in the evening from a vacation hotel in a remote location, where [Shah] had no records or financial information with [him] for reference." Given the content of the e-mail, his previous admissions that he was the sole trader of the pool and knew what the pool was worth on any given day, and that the McCarthey pool participants' total investment comprised almost all of the pool's funds for the period December 30, 2003,[11] it is incredulous that Shah made a "mistake."

There is now a "virtually unanimous agreement" among the circuits that recklessness is sufficient to satisfy section 4b's scienter requirement. *Drexel Bumham Lambert, Inc. v. Commodity Futures Trading Commission.*, 271 U.S. App. D.C. 49 (D.C. Cir. 1988) A reckless action is one that departs so far from the standards of ordinary care that it is difficulty to believe the actor was not aware of what he was doing. *First Commodity Corp. v. CFTC*, 676 F.2d 1, 7 (1st Cir. 1982). In the instant case, Shah admits that he had a "firm grasp" on how the fund was doing because he performed the trading for Linuxor on a daily basis.[12] Thus, while Shah maintains that his January 30, 2004 e-mail, in which he overstated the McCarthy fund's value by 100%, was a "mistake," it is clear that he either knowingly misled the McCarthy's in violation of 4b, or at a minimum, that he demonstrated recklessness in misstating the account balance by $4,000,000, an act which meets the scienter requirements of Section 4b of the Act. Clearly,

---

[10] See Plaintiff's Rule 56 Statement ¶29, and Defendant's Rule 56 Counterstatement ¶29.
[11] See Plaintiff's Reply Exhibit 1, p.383.
[12] See Plaintiff's Reply Exhibit 1, p. 380.

Shah's use of "mistake" is a euphemism for recklessness.  Rather than a defense, his "mistake" excuse is additional evidence of Shah's intent to mislead or his reckless disregard of the facts.  In either case, he violated Section 4b(a) of the Act with his January 2004 e-mail.

## C.    Count II of the Complaint

Defendants assert there are issues of fact with the scienter requirements of Section 4o(1)(A) of the Act.  They are wrong.  First, the conduct as described in Count I of the Complaint also applies to Count II.  Plaintiff has discussed at length, above and in its earlier submission, the facts that support summary judgment for Count II.  Additionally, except for challenging the scienter requirements relevant to this count, Defendants failed to raise any specific facts that demonstrate a genuine issue for trial.  A non-moving party "must set forth specific facts showing that there is a genuine issue for trial."[13]  The opposing party may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986) ; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)(citations omitted); *Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236* (1991)*; McCarthy v. Kemper Life Insurance Companies*, 924 F.2d 683, 687 (7th Cir. 1991).

Defendants do not address, let alone oppose, Section 4o(1)(B) of the Act, which does not have a scienter requirement.  As long as the conduct charged with violating 4o(1)(B) operated as a fraud, scienter does not have to be proven.[14]  Therefore, the violation of 4o(1)(B) should be deemed admitted.  Accordingly, summary judgment should be granted on Count II of the Complaint.

---

[13] Fed. R. Civ. P. 56(e)
[14] See Plaintiff's Memorandum of Law In Support of its Motion for Summary Judgment, p. 13.

### D.    Count III of the Complaint

The Defendants admit to violating CFTC Regulations 4.7(b) and (c), 17 C.F.R. §

4.7(b)(2) and (3), in their Rule 56.1 Counterstatement.  They attempt to excuse their violation by

contending that their violations caused no harm to the pool participants.  Additionally,

Defendants allege that the McCarthey pool participants did not want quarterly reports, only

annual reports, and that the Defendants preempted a need for the reports by keeping the

McCarthey pool participants constantly informed of the pool's value.  Defendants are wrong.

A violation of CFTC Regulations 4.7(b)(2) and (3) does not require investors to be

harmed by the reporting failures.  Indeed, the purpose of Regulation 4.7(b)(2) and (3) is to

provide registered commodity pool operators who seek exemption under this regulation relief

from reporting to pool participants on a monthly basis.  Also, Shah sent written notice to the

NFA that he would be operating the pool under the exemptions of Regulation 4.7.[15]  Shah now

seeks to escape the responsibilities required by the very exemption he sought and was granted.

CFTC Regulation 4.7 does not contain a reporting requirement waiver provision or an allowance

for the informal transmission of information to serve as a substitute for these requirements.

Therefore, summary judgment is appropriate for Count III.

### E.    Count IV of the Complaint

Defendants admit violating CFTC Regulations 4.20(b) and (c), 17 C.F.R. §§4.20(b) and

(c), and attempt to excuse their violation by blaming it on bad advice provided by Shah's former

attorney.[16]  Furthermore, Defendants' submission of Exhibit B, which is not referenced

anywhere in Defendants' submission, is an e-mail communication thread from Thomas Yee

(who is unidentified) to Charles E. Hall, Jr. (never identified as Shah's former attorney).  The e-

---

[15] See Plaintiff's 56.1 Statement, ¶12, and Defendants' 56.1 Counterstatement, ¶12.
[16] See Defendants' 56.1 Counterstatement, p.2, ¶12

mail thread is dated December 22 and 23, 2004, long after the McCarthey's liquidated their investment in the pool. The subject of the e-mail is "The Request" and purportedly the e-mail exhibit supports Defendants' claim that it was Mr. Hall's fault that the Defendants' received pool participants' funds in accounts other than in the pool's name. In summary, Mr. Yee implores Mr. Hall to "write a few words addressing the inadvertent typo. (sic) error with the Linuxor docs." Thereafter, Mr. Hall responds that it was his "understanding that Linuxor Capital Management was acting as the General Partner to the Linuxor Global macro Fund and that Linuxor Asset Management was acting as the investment adviser to the Fund. That is all that I know about this issue." Thus, Mr. Hall's response strongly suggests that his understanding of things was based on representations made to him. The exhibit is neither persuasive nor an admission by Mr. Hall, as Defendants claims in their Memorandum.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its Motion

for Summary Judgment against the Defendants.


Dated: New York, New York
        November 16, 2007

                                    Respectfully submitted,

                                    U.S. COMMODITY FUTURES TRADING
                                    COMMISSION


                                    _____/s/_____
                                    David Acevedo [DA-0388]
                                    Stephen J. Obie [SO-5502]
                                    Michael R. Berlowitz [MB-7615]
                                    Division of Enforcement
                                    U.S. Commodity Futures Trading Commission
                                    140 Broadway, 19th Floor
                                    New York, New York 10005
                                    Ph. (646) 746-9754
                                    Fax (646) 746-9940
                                    dacevedo@cftc.gov

# PLAINTIFF'S REPLY
# EXHIBIT 1

Shah

2    30, '03, "was approximately," and I am reading

3    from your e-mail, "$8,095,000."

4          A      Okay.

5          Q      Did you write that?

6          A      Yes.

7          Q      And was their account balance as of

8    12/30/03, approximately $8,095,000?

9          A      Is that the entire e-mail?

10         Q      If you want I will read more of the

11   e-mail in.

12         A      Yes, please.

13         Q      "Realized 6,500,000, unrealized

14   1,595,000." I believe if you add the two numbers

15   together it will come up to $8,095,000.

16              It goes on to say, "For the week

17   ending January 31, 2004, the P/L," profit and

18   loss, "was: $89,000."

19              I'm not going to concentrate on that

20   week. I am going to concentrate on the

21   information that's before that.

22         A      Okay.

23         Q      Which talks about the net asset

24   value, correct?

25         A      Yes.

376

1                              Shah

2          Q      We agree that this was a reference to

3    net asset value?

4          A      Yes.

5          Q      And you sent this on January 30,

6    2004?

7          A      Yes.

8          Q      And you sent it to Todd Brashear, who

9    is the McCarthey representative, correct?

10         A      Yes.

11         Q      And you knew that?

12         A      At that time, yes.

13         Q      And the information was, "Your

14   account balance as of 12/30/03, was approximately

15   $8,095,000."  Was it $8,095,000?

16         A      That's what I thought at the time.

17         Q      You put down the $8,095,000 number,

18   you acknowledge that?

19         A      Yes, that's my e-mail.

20         Q      There is no issue.  But you also

21   broke it out realized and unrealized, but you

22   told them that their NAV at that time as of

23   December 30, '03, was $8,095,000.

24         A      Yes.

25         Q      Was it $8,095,000?

377

                            Shah

1

2        A    At the time I thought that was the

3   case, and --

4             MR. WHITE:   The question is --

5        Q    Answer my question.

6             MR. WHITE:   -- was it.

7        Q    Was it $8,095,000?

8        A    The question is again, I'm sorry.

9        Q    Was the NAV for the McCarthey

10  interest as of December 30, 2003, $8,095,000?

11       A    No.

12       Q    It wasn't?

13       A    No.

14       Q    You misstated it?

15       A    I thought that was the case.

16       Q    I asked you if you misstated it.

17       A    I -- yes.

18       Q    And you knew that the number was not

19  $8,095,000?

20       A    I know it now, not then.

21       Q    Well, as of the e-mail of December

22  30, '03, excuse me, January 30, '04, you put down

23  $8,095,000?

24       A    Yes.

25       Q    What was the basis for putting down

378

Shah

2    $8,095,000?

3        A    I had the last report from Citco

4    which was as of October 30, and I believe that in

5    a rush to send the e-mail out, and if you look at

6    the e-mail as I recall it was sent at 11:55 p.m.

7        Q    It wasn't sent at 11:55 p.m.

8        A    This e-mail.

9        Q    Right, it wasn't sent at 11:55 p.m.

10   If you want, if you are inquiring as to what time

11   it was sent I will tell you this was not at

12   11:55 p.m.

13       A    What time was it?

14       Q    The e-mail is time stamped 10:08 p.m.

15       A    10:08 p.m.  At that time I was in

16   Florida, so if you got this e-mail from them it

17   would have a time stamp at that time, and what

18   would be the time in Florida at that time,

19   Miami?

20       Q    I am looking at this e-mail.  I don't

21   see any reference to Florida.

22           MR. WHITE:  Could I suggest that

23       you go back to the original question,

24       which was state the basis for the

25       $8,095,000.

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

379

Shah

1

2          MR. BERLOWITZ:  I will get back to

3      that, but not just yet.

4          Q    I see no reference in this e-mail to

5  Florida.  Do you see any reference to Florida in

6  this e-mail?

7          A    No.

8          Q    Irrespective of whether it was sent

9  from Florida or Hawaii or Kansas city or New

10  York, it does say, and you wrote this,

11  $8,095,000?

12          A    Yes.

13          Q    Right?

14          A    Yes.

15          Q    And you told the McCarthey

16  representative, therefore informed them, the

17  McCartheys, that as of December 30, '03, which

18  would be almost the end of that quarter and the

19  end of the year that their NAV was $8,095,000.

20  Is that a correct statement that I just made?

21          A    Yes.

22          Q    And do you acknowledge telling them

23  that information back in January 30 of '04?

24          A    Yes.

25          Q    Which is a month after the period?

380

Shah

2    A    Yes.

3    Q    It's correct to say that you did the

4    trading for Linuxor on a daily basis, right?

5    A    Yes, sir.

6    Q    And it's correct to say that you knew

7    through all these positions, options, futures,

8    did you do derivatives, too?

9    A    Primarily options, futures, cash.

10    Q    Options, futures and cash, you knew

11    on a daily basis how the fund was doing, right?

12    A    Not always.

13    Q    I didn't say second to second, but

14    you had a firm grasp of how the fund was doing,

15    right?

16    A    Yes.

17    Q    And you knew that when you wrote

18    this, the e-mail on January 30, 2004, that the

19    fund, that is the Linuxor fund, LAM, was nowhere

20    near $8,095,000?

21    A    I didn't know it at that time.

22    Q    Well, you certainly acknowledge

23    putting down $8,095,000 for the NAV, right?

24    A    Yes.

25    Q    And you got these numbers from

381

Shah

2    somewhere?

3        A    Yes.

4        Q    Did you just make up the highest

5    number you could?

6        A    No.

7        Q    Did you think that by giving them a

8    high number they would stay in the fund?

9        A    No.

10        Q    Did you want to deceive them?

11        A    No.

12        Q    Did you deceive them?

13        A    No, I didn't.

14        Q    Is that a deceptive number?

15            MR. WHITE:   Objection as to form.

16        A    It is a number that I reported to

17    them.

18        Q    And it is an inaccurate number,

19    right?

20        A    There was a mix-up.

21        Q    I didn't ask you that.  It's an

22    inaccurate number, right?

23        A    Yes.

24        Q    Answer my question.

25        A    Yes.

1                    Shah

2        Q     And it's inaccurate because it's

3   millions of dollars higher than the actual NAV

4   back in that period of December 30, '03, correct?

5        A     Yes.

6        Q     How many millions of dollars off is

7   it from $8,095,000?

8        A     I don't remember exactly.

9        Q     Well, approximately, how many

10  millions of dollars off is it from $8,095,000?

11       A     Based on the reference number of

12  October 30 from Citco, it's off by a million.

13       Q     I didn't ask for the reference number

14  because I see no reference on this piece of paper

15  in front of me, which is your e-mail, to anything

16  dealing with Citco.

17             Do you see anything on here about

18  Citco?

19       A     No.

20       Q     How many millions of dollars off is

21  it from $8,095,000?  What was the NAV to put it

22  another way on or about December 30, '03?

23       A     I don't remember.

24       Q     Approximately what is it?

25       A     I don't know.

383

Shah

Q    Now, every day you are sitting at the trading desk, correct?

A    Yes.

Q    Every day you are dealing with what, thousands of dollars, millions of dollars of their money?

A    Yes.

Q    What percentage of that fund was McCarthey's money at that time?

A    It was most of it.

Q    Almost all of it?

A    Yes.

Q    Correct?

A    Yes.

Q    So even if you don't consider the Egger money at that time, if all you're thinking about is the McCarthey money at that time, you had to know on a daily basis how much money was the approximate value of that fund, correct?

A    Yes.

Q    Now, as you sit here before us under oath, what was the approximate value, because you were the trader of that fund, on December 30, '03?

384

Shah

2      A      I am trying to remember.

3      Q      And I am asking you to remember.

4      A      I think it was $4 million, now I

5  remember.

6      Q      $4 million would make that

7  approximately you overestimated the fund to the

8  McCarthey's on December 30, '03, of 100 percent,

9  correct?  The difference between four and eight

10  is 100 percent.  It's actually a little more

11  because you put down 8,095,000, correct?

12      A      Based on these numbers, yes.

13      Q      You said there was some confusion in

14  your mind, right?

15      A      Yes.

16      Q      Did you send a subsequent e-mail to

17  the McCartheys correcting this number?

18      A      No, I did not.

19      Q      Did you send them a letter correcting

20  this number?

21      A      No, I didn't.

22      Q      Did you send them a wire correcting

23  this number?

24      A      No, I didn't.

25      Q      Did you send them any document

385

Shah

2    whatsoever correcting this number?

3        A    No, I didn't.

4        Q    When I say "this number" this

5    $8,095,000 number.

6        A    I did not.

7        Q    And you acknowledge that freely?

8        A    I'm sorry?

9        Q    And you acknowledge that freely?

10       A    Yes.

11       Q    You know that to be the case?

12       A    As far as I remember, yes.

13       Q    And your memory is good on this?

14       A    Sometimes, yes.

15       Q    Would you agree with me that the

16   $8,095,000 representation as of December 30, '03,

17   was erroneous?

18           MR. WHITE:  Objection.  Asked and

19       answered.

20       Q    You may answer.

21           MR. WHITE:  You can answer.

22       A    Yes.

23       Q    It was erroneous?

24       A    Yes.

25       Q    And would you agree with me that you

386

Shah

1

2  never corrected it, this is a writing that you

3  sent to them on or about January 30, '04, but you

4  never corrected it in writing ever; is that

5  correct?  Would that be a correct statement, you

6  never corrected that number in writing?

7        A    I spoke to them very frequently.

8        Q    Listen to the question.

9             MR. WHITE:  In writing.

10       A    In writing, yes, I reported to them I

11  think in June.  When you said "never," so I have

12  to -- it was June of '04 when I sent them an

13  e-mail, I remember, in which I gave them the

14  correct value of the account and -- yes.

15       Q    You corrected the e-mail that you

16  sent on January 30, '04, citing the December 30,

17  '03, NAV in June of '04; is that what you are

18  saying?

19       A    No, that's not what I am saying.

20       Q    Well, listen to my question.

21            When did you correct the erroneous

22  NAV that you sent out in January 30, '04,

23  referencing the NAV for December 30, '03?  When

24  if ever did you correct that error that you made?

25       A    In writing, I did not.

387

1                         S h a h

2        Q      Never?

3        A      Never.

4        Q      And you freely acknowledge that you

5   sent this to them and that you represented that

6   their value of their fund was on or about

7   December 30, '03, $8,095,000?

8        A      That's my e-mail.

9        Q      That's your what?

10       A      That is my e-mail.

11       Q      You blamed Citco for this error?

12       A      No, I don't.

13       Q      You blame yourself, don't you?

14       A      Absolutely.

15       Q      You take responsibility for it?

16       A      I take responsibility for the

17  confusion, yes.

18       Q      I didn't ask for the confusion.  You

19  take responsibility and you acknowledge that it

20  was 100 percent in error, right?

21       A      It was in error.

22       MR. BERLOWITZ:  Excuse me, let's

23       take a brief break.

24       (Whereupon, a recess was taken.)

25       MR. BERLOWITZ:  Can you mark that.

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

388

1                    S h a h

2              (E-mail marked as Plaintiff's

3         Exhibit 11 for identification, as of

4         this date.)

5  EXAMINATION BY MR. BERLOWITZ:

6         Q    Mr. Shah, I am still looking at this

7  e-mail that you sent to Todd Brashear, the

8  McCarthey representative, in January 30 of '04.

9              MR. ACEVEDO:  For the record, we

10        should indicate it has been marked.

11             MR. BERLOWITZ:  It has been marked,

12        and it's Exhibit 11.

13        Q    Were you yourself on the computer

14  when this e-mail was sent, or did somebody else

15  do it for you?

16        A    I did it.

17        Q    And when you did it, what time of day

18  was it for you?

19        A    I think it was close to midnight.

20        Q    And when you did it you knew that the

21  McCartheys wanted to see what their NAV was, it

22  was important for them; is that correct?

23        A    They had asked for it, yes.

24        Q    And you didn't do it orally, you

25  chose to do it in writing because you knew it was

389

Shah

2  important for them to see it in writing, right?

3      A    I could have done it orally.

4      Q    But you did it in writing because you

5  wanted them to see it in writing, right?  You

6  didn't leave a message for them?

7      A    No, I didn't get around to doing it

8  because I was sick that week in Florida.  I was

9  there for a week, and I didn't have Internet

10 connection where I was staying, so I walked over

11 to a hotel and did it from the business center.

12 It was late in the day.

13     Q    But you did it, you knew the

14 McCartheys' phone number?

15     A    Yes.

16     Q    You had earlier acknowledged the fact

17 that you had called them on a number of

18 occasions?

19     A    Many times, yes.

20     Q    And you could have left a message

21 with that information, right, you could have if

22 you chose to?

23     A    Yes, but I --

24     Q    You chose not to do it?

25     A    I chose not to do it.

390

```
1                          Shah
2          Q     You chose to do it in writing?
3          A     Yes.
4          Q     You did it in writing because you
5     wanted them to see the number; would that be
6     accurate?
7          A     Yes.
8                MR. BERLOWITZ:  May I have the
9          information for this period on the NAV.
10         Q     Now, your prime broker at that time
11    was Man?
12         A     EDF Man, yes.
13         Q     Man Financial?
14         A     Yes.
15         Q     And you used them because you had
16    confidence in them?
17         A     Yes.
18         Q     Did they give you information,
19    accurate information as to how each of your
20    investments was doing?
21         A     Yes.
22         Q     Did you rely on that information?
23         A     Yes.
24         Q     Did you rely on that information on a
25    daily basis?
```

391

1                          S h a h

2          A     On a daily basis, yes.

3          Q     Did you review the information on a

4    daily basis to see that it was accurate?

5          A     It was reviewed by my assistant.

6          Q     Did you review it on a daily basis?

7          A     I would just review my positions.

8          Q     By reviewing your positions, you

9    would see how each and every one of your

10   positions was doing, and if you add them all up

11   you could see how the entire fund was doing?

12         A     It's not that straightforward, yes.

13         Q     Did you do that?

14         A     I personally didn't do it.  It was

15   done by my assistant.

16         Q     Who is that?

17         A     Div, D-I-V, Kumar.

18               MR. ACEVEDO:   K-U-M-A-R.

19         Q     Did he do that on a daily basis?

20         A     Yes, he did.

21         Q     Was he accurate?

22         A     He was a very smart and accurate

23   guy.  I have no doubt in my mind that he was

24   accurate.

25         Q     He could add a column of figures and

392

1                            Shah

2    tell you what the fund was worth on a daily

3    basis, right?

4         A    Yes. It's not that simple because

5    there were numerous accounts, sub accounts within

6    the prime broker's account.

7         Q    You knew that the NFA did an analysis

8    of the NAV's at various times?

9         A    NFA?

10        Q    Yes.

11        A    Yes.

12        Q    And you know that they were able to

13   go back at any time frame, take a snapshot of

14   what the NFA claims the NAV was at any given

15   time?

16        A    Yes. We worked with them on that.

17        Q    Were you satisfied with the work they

18   did?

19        A    With NFA?

20        Q    Yes.

21        A    Can you be more specific?

22        Q    Were you satisfied with the work they

23   did as far as what the NAV was at any given time?

24        A    Well, they had --

25        Q    They did an audit?

393

1                          S h a h

2          A      Yes, they did an audit.

3          Q      Were you satisfied with the numbers

4   they came up with?

5          A      Yes, but there was a lot of back and

6   forth to correct those numbers with them.

7          Q      Were you satisfied with the numbers

8   that they came up with?

9          A      The numbers that they came up with

10  and showed them to us?

11         Q      Yes.

12         A      I don't know if they showed us

13  everything.

14         Q      Did you agree with those numbers?

15         A      At that time they were checked out by

16  Div Kumar.

17         Q      Did you ever check the numbers?

18         A      I worked with them and looked at the

19  numbers.

20         Q      Listen to my question.

21                MR. WHITE:  Listen to the

22         question.

23         Q      Your lawyer and I both want you to

24  listen to the question and answer the question

25  that I am asking, not the question that you want

394

1                          Shah

2    to answer.  Did you check the numbers?

3          A    Not personally.

4          Q    Never?

5          A    Never.

6          Q    So you don't know whether the NFA's

7    audit was accurate?

8          A    I don't know.

9          Q    You have no clue whatsoever?

10         A    Somebody from my company checked it.

11         Q    Mr. Shah, you know that the NFA has

12   brought a suit against you, right?

13         A    Yes.

14         Q    And you know that they did an audit?

15         A    Yes.

16         Q    And you know that the audit points

17   its finger against what you did with respect to

18   the Linuxor fund, you know that, right?

19         A    Yes.

20         Q    And you know that the audit shows

21   some problems with what you were doing, right?

22         A    They indicated some problems, yes.

23         Q    And you know that the NFA's audit

24   would be something important for you to review,

25   right?

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

395

1                              Shah

2          A    I did review it after they had done

3   it.

4          Q    Did you review it?

5          A    Yes, I did.

6          Q    Were you satisfied with their

7   numbers?

8          A    As I recall, we checked them out and

9   they were fine.

10         Q    Not we.  Did you check them out?

11         A    I personally didn't check the

12  numbers.

13         Q    You never personally checked the

14  NFA's audit numbers?

15         A    I did not personally check the

16  numbers.

17         Q    You are just going to rely on their

18  numbers?

19         A    No.

20         Q    Do you accept their numbers?

21         A    We reviewed the numbers and --

22         Q    Did you review the numbers?

23         A    Personally I did not check every

24  single number.

25         Q    Did you check any numbers?

1                          Shah

2          A     I just looked at some at a very high

3     level, the monthly numbers.

4          Q     You know that there was a serious

5     issue because it says in the NFA report as to

6     whether or not you misstated the NAV for the

7     McCartheys as of December 30, '03, you know that

8     was an important date, right?

9          A     Yes.

10         Q     Did you check that number, yes or no?

11         A     I checked that number.

12         Q     And what did you find by checking

13    that number for the NAV for the McCartheys for

14    December 30, '03?  What did you find?

15         A     There was a discrepancy.

16         Q     What was the discrepancy?

17         A     I think -- I don't remember exactly.

18         Q     Approximately.

19         A     I think maybe about 3 or $4 million.

20         Q     Millions of dollars off?

21         A     Yes.

22         Q     It could be as much as a 100 percent

23    difference, right, whether it was four million or

24    800 or eight million, correct?

25         A     Yes.

397

Shah

1
2    Q    Did you check to see if the NAV was

3    anywhere near $8,095,000 for December 30, '03?

4    Did you check to see that?

5         MR. WHITE:  Objection.  If there is

6         a document, a particular document that

7         you can --

8         MR. BERLOWITZ:  I will rephrase the

9         question.

10   Q    You know that the December 30, '03,

11   NAV that you sent to the McCartheys was in error,

12   correct?

13   A    Yes.

14   Q    Did you go back any time after

15   December 30, '03, actually after the e-mail of

16   January 30 of '04, to see what the NAV was for

17   the McCartheys for the date December 30, '03?

18   Did you do the math?

19   A    Yes, I did.

20   Q    What number did you come up with?

21   A    I don't remember the exact number.

22   Q    Approximately.

23   A    It was about I think four odd million

24   dollars.

25   Q    When did you do that?

398

1                          Shah

2        A    I think a couple of months after.

3        Q    After what?

4        A    After that e-mail, the January 30

5   e-mail.

6        Q    Three months after, four months

7   after?

8        A    I don't remember exactly.

9        Q    What triggered you to do your own

10  accounting of the December 30, '03, NAV?  What

11  caused you to do your own analysis?

12       A    I think it was also NFA had started

13  an audit, and we were providing them with all the

14  information.

15       Q    Why that date, why the December 30,

16  '03, NAV?  Why did you zero in on that date?

17       A    That was the end of the year '03.

18       Q    Did you do the end of the year '02?

19       A    No, we didn't do it.

20       Q    Did you do it?

21       A    I didn't do it.

22       Q    Did you do the end of the year '03

23  yourself?

24       A    Myself, no.

25       Q    Did you check the numbers, yes or no?

399

1                              Shah

2          A    I looked at the numbers, yes.

3          Q.   And that was a few months after

4    January 30, '04?

5          A    Yes.

6          Q    And you said that some few months

7    after January 30, '04, you knew that the NAV of

8    $8,095,000 for the period 12/30/03, was in error,

9    correct?

10         A    Yes.

11         Q    That it was something in the vicinity

12   of four million or four plus million dollars,

13   right?

14         A    Something like that.

15         Q    Did you at that time notify the

16   McCartheys in writing that you had overstated,

17   grossly overstated their NAV's?

18         A    Can you repeat that again.

19              (Whereupon, the record was read as

20         requested.)

21         A    At any time?

22         Q    For December 30, '03.

23         A    Not in writing.

24         Q    No?

25         A    No.