KAPLAN, J.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

U.S. COMMODITY FUTURES )
TRADING COMMISSION, )
)
    Plaintiff, )
)
v. )
)
ABBAS A. SHAH and LINUXOR ASSET )
MANAGEMENT LLC, )
)
    Defendants. )
)

05 CV 8091 (LAK)

ECF Case

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/28/08
```

## JOINT PRETRIAL ORDER

    The parties having conferred among themselves and with the Court pursuant to

Fed. R. Civ. P. 16, the following statements, directions and agreements are adopted as the

Pretrial Order herein.

## I. NATURE OF THE CASE

    A.    General Nature of the Action

    On September 19, 2005, Plaintiff Commodity Futures Trading Commission ("CFTC")

filed a four-count complaint against Defendants Abbas A. Shah ("Shah") and Linuxor Asset

Management ("LAM") alleging that they violated Sections 4b(a)(2)(i)-(iii) and 4o (1) of the

Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(2)(i)-(iii) and 6o(1) (2002), by

defrauding pool participants in connection with their investments in the Linuxor Global Macro

Fund commodity pool ("the Linuxor Pool"). The complaint also alleges Defendant LAM

violated CFTC Regulations for receiving Linuxor Pool funds in other than the pool's name and

commingling Linuxor Pool funds with the property of others, in violation of CFTC Regulation

4.20(b)-(c), 17 C.F.R. § 4.20(b)-(c). The Complaint also alleges that Defendants' failure to provide any quarterly reports or timely annual reports violated CFTC Regulation Sections 4.7(b)(2)-(3), 17 C.F.R. § 4.7(b)(2)-(3).

As a controlling person of Defendant LAM, the Complaint further alleges that Shah is liable for LAM's violations of Sections 4b(a)(2)(i)-(iii) and 4o(1) of the Act and CFTC Regulations 4.7(b)(2)-(3) and 4.20(b)-(c) pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b). By operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2004), Defendant LAM is vicariously liable for Shah's alleged violations of the Act.

Defendant Shah, the sole trader and a controlling person of LAM is alleged by the CFTC to have violated the Act and CFTC Regulations as set forth in the Plaintiff's contentions below.

Defendants have denied the allegations of the complaint, and particularly the allegations of fraud, except they have admitted that they did not send quarterly Net Asset Value ("NAV") reports and did not send timely annual financial reports; but Defendants allege that they made almost daily reports by telephone, in person and by e-mail to the Pool participants, and Defendants deny (i) that they acted with fraudulent intent or (ii) that the Pool participants were deceived in any way.

In an Order dated February 25, 2008 the Court granted, in part, Plaintiff's motion for summary judgment as to liability for Defendants' violations of CFTC Regulations 4.7(b)(2)-(3) and 4.20(b)-(c) thereby establishing Defendants' liability on counts three and four of the Complaint. The Court denied Plaintiff's motion for summary judgment on counts one and two of the Complaint. Thus, the issues to be decided at trial are (1) intent, (2) misrepresentation or omission, and (3) materiality. Defendants' scienter is a disputed fact and is material to

2

determining (i) whether defendants committed fraud, (ii) whether a permanent injunction is an appropriate remedy, and (iii) whether a civil monetary penalty ("CMP") and restitution are appropriate remedies and, if so, in what amounts.

B.     Relief Sought

Plaintiff seeks the following relief from both Defendants (see additional relief in section XI, hereunder):

1.     A permanent injunction from further violations of Sections 4b(a)(2)(i)-(iii) and 4o(1) of the Act and CFTC Regulations 4.7(b)(2)-(3) and 4.20(b)-(c);

2.     An order prohibiting Defendants from trading commodity futures and options on any registered entity, as defined by 7 U.S.C. § 1a(29), either for themselves or others;

3.     An order prohibiting Defendants from registering in any capacity with the CFTC or acting in any way which requires registration with the CFTC;

4.     A $480,000 CMP against Defendant Shah and a $480,000 CMP against Defendant LAM; and

5.     An award of $7.3 million in restitution plus pre- and post-judgment interest, joint and several, against Defendants for losses caused by Defendants' violations of the Act and CFTC Regulations.

## II. JURY/NON-JURY

Defendants requested a jury trial. The issues for trial may or may not, in part or whole, be triable to a jury. The parties estimate that the trial will last approximately 5 days.

## III. STIPULATED FACTS

1.     Defendant Shah is a resident of New York, New York.

2.    Shah received a Bachelor of Science from Columbia University in Biology with a concentration in Economics.

3.    Shah worked for Deutsche Bank in New York.

4.    Shah worked at UBS Securities ("UBS") in New York.  At UBS Shah was Head of the U.S. Zero Strips Desk, responsible for managing a multi-billion dollar book of Zero Coupon and longer-dated U.S. Treasury Securities.

5.    Shah worked at Lehman Brothers in New York.  At Lehman Brothers, Shah held a similar position managing Lehman's multi-billion dollar zero coupon and longer-dated U.S. Treasury Securities.

6.    In the fall of 2001, Shah formed Linuxor Asset Management LLC ("LAM") to act as the registered commodity pool operator ("CPO") for the pool.

7.    A CPO is any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or indirectly or through capital contributions, the sale of stock or other form of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility.

8.    LAM is a Delaware limited liability company with its principal place of business at 20 Exchange Place, 45th floor, New York, N.Y. 10005 and a registered CPO.

9.    Since 2001, Defendant Shah was a principal, owner, and employee of LAM.  Shah has also been registered with the CFTC as an Associated Person ("AP") of LAM for the same period.

10.    Shah managed the Linuxor Pool and acted as its trading advisor.

11.    LAM is the general partner of the Linxuor Pool.

12.    The Linuxor Pool began trading commodity futures in March 2002.

13.    At all times relevant to the Complaint, Shah was registered with the CFTC and a member of the National Futures Association ("NFA"). The NFA is a self-regulatory organization whose members include futures commission merchants, commodity pool operators, commodity trading advisors, introducing brokers, commodity exchanges, commercial firms, and banks, that is responsible, under CFTC oversight, for certain aspects of the regulation of Futures Commission Merchants, CPOs, Commodity Trading Advisors, Introducing Brokers, and their APs, focusing primarily on the qualifications and proficiency, financial condition, retail sales practices, and business conduct of these futures professionals. NFA also performs arbitration and dispute resolution functions for industry participants.

14.    In March 2002, Shah sent written notice to the NFA that LAM would operate pursuant to the exemptions contained in CFTC Regulation 4.7, 17 C.F.R. § 4.7, which would require it to provide financial reports on a quarterly basis (4 times a year).

## IV. PARTIES' CONTENTIONS

The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties:

A. Plaintiff's Contentions as to Facts

1.    In 2002, Shah solicited four pool participants; one individual, Phillip Egger, who invested $300,000 and three affiliated pool participants who shared a common representative (the "McCarthey pool participants"), who collectively invested $11.5 million, making the total invested for these four pool participants $11.8 million.

5

2.    Defendant LAM received pool participant funds in a bank account named Linuxor Capital Management ("LCM"), not LAM, thus commingling pool funds with non-pool property.  LCM is an entity owned by Shah but is not a named defendant in this action.

3.    Shah received monthly reports from Citco detailing the Linuxor Pool's NAV from March 2002 to October 2003.

4.    Shah, on behalf of LAM, knew that he was required to send both quarterly and annual financial reports to the Linuxor Pool participants and promised to send the McCarthey pool participants quarterly reports regarding the Linuxor Pool's trading results, as required by Commission regulation.

5.    Defendants intentionally or recklessly did not send quarterly financial reports to pool participants even though Defendants received the Linuxor Pool's financial information, including the NAV, from Citco on a monthly basis.

6.    In August or September 2002, Shah advised the McCarthey pool participants' representative that the pool had recently suffered losses of approximately 30 percent, or approximately $3.5 million.  The McCarthey pool participants thereafter spoke with Shah, at which time Shah reiterated the level of losses and promised to try to recoup those losses.  The McCarthey pool participants determined to remain invested in the pool and to review the year-end results before deciding whether to withdraw their funds from the pool.

7.    Despite repeated requests from the McCarthey investors, Defendants did not send out the 2002 Annual Financial Report to pool participants until August 2003, five months late.

8.    The 2002 Annual Report, sent August 2003, showed that the pool had lost almost $5.1 million (43%) by the end of 2002.  Defendants did not disclose these 2002 losses to pool participants until August 2003.

9.     After the pool participants received the 2002 annual report in August 2003, the McCarthey investors contacted Shah inquiring about the losses.

10.    On April 23, 2002, Shah sent a letter to Philip McCarthey stating, among other things, that from March 19 through April 18, 2002, the gross realized earnings for the Linuxor Pool were $155,325.08 and the gross realized earnings change was 10.36%. The April 23 letter did not include a statement of the unrealized gain or loss or the NAV for the pool.

11.    Shah's April 23, 2002, letter to Phillip McCarthey, stating in part that from March 19 through April 18, 2002, the gross realized earnings for the Linuxor Pool were $155,325.08 and the gross realized earnings change was 10.36%, was materially misleading because it did not state the unrealized gain or loss or the NAV.

12.    On August 25, 2003, Shah sent an e-mail to the McCarthey pool participants' representative, Todd Brashear, wherein Shah falsely stated, in pertinent part, "we have thus far recovered more than half of the capital loss and if we continue at this pace we hope that we will have not only recovered all of the capital loss but there is a good likelihood that we will be positive as far as returns since inception are concerned."

13.    The above statement from the August 25, 2003 email was false because in fact the Linuxor Pool actually suffered further losses in 2003 of approximately $2.5 million and had not recovered half its capital loss from 2002.

14.    Shah knew the Linuxor Pool had suffered further losses in 2003 when he wrote his August 25, 2003 email to the McCarthey investors.

15.    The false statements by Shah in his August 25, 2003, email were material to the McCarthey pool participants.

16.    In October 2003, James Temple ("Temple) invested $2 million in the Linuxor Pool.

7

17.   Defendant Shah sent an email to the McCarthey pool participant representative on January

30, 2004 at 10:08 pm in which Shah falsely stated in pertinent part:

**Your account balance as of 12/30/03 was approximately:**
**$8,095,000**
**Realized $6,500,000**
**Unrealized $1,595,000**

18.   At the time he sent the January 30 email, Shah knew or recklessly disregarded that the

actual value of the Linuxor Pool was close to $4 million as of December 30, 2003.

19.   The January 30, 2004 misrepresentation of the Linuxor Pool's NAV was material to the

McCarthey pool participants.

20.   Shah never corrected, in writing, the $4 million discrepancy to the McCarthey pool

participants.

21.   The McCarthey pool participants never received written or oral representations from

Defendants correcting the $4,000,000 discrepancy.

22.   Shah received monthly reports from Caledonian detailing the Linuxor Pool's NAV.

23.   As the sole principal of LAM and the sole trader for the Linuxor Pool, Shah had a firm

grasp on the financial status of the Linuxor Pool and knew what the pool was worth on any given

day.

24.   In October 2003, Shah instructed a fifth pool participant James Temple to send his

investment to the bank account of LCM instead of directly to the Linuxor Pool, thus

commingling pool property with non-pool property.

25.   In April 2004, James Temple received back $2.1 million from his investment in the

Linuxor Pool, having made a profit of $100,000.

8

26.    In July 2004, Defendants closed all trading positions and sent the McCarthey pool participants approximately \$4 million, which was the amount remaining in their investment after Defendants' trading losses.

27.    The McCarthey pool participants lost approximately \$7.3 million of the investment in Linuxor Pool.

28.    Following the liquidation of the McCarthey pool participants' investment in the pool, \$80,000 still remained in the pool's bank account at Chase Bank, \$20,000 of which Shah had wired to his wife, Jennifer J. Verger, who was not employed by LAM.

B.  Plaintiff's Contentions as to Law

1.    This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the CFTC that any person has engaged, is engaging in, or is about to engage in any act or practice constitution a violation of any provision of the Act or any rule, or order promulgated thereunder, the CFTC may bring an action against such person to enjoin such practice or to enforce compliance with the Act.

2.    Venue lies properly with this Court, pursuant to Section 6c(c) of the Act, 7 U.S.C. § 13a-1(c), in that Defendants are found, inhabit, or transact business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur in this District.

3.    Defendants violated Section 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i)-(iii) by cheating or defrauding Linuxor Pool participants in connection with commodity futures or options trading. Defendants' misrepresentations were material and made with scienter.

4.    Defendants violated Section 4o(1) of the Act, 7 U.S.C. § 6o(1), in that as a CPO or an AP of a CPO, Defendants, through the mail or means of instrumentality of interstate

commerce, employed a devise, scheme or artifice to defaud the Linxur Pool Participants, or engaged in transactions, practices or courses of business which operated as a fraud or deceit upon the Linuxor Pool participants. Defendants misrepresentations were material and they acted with the requisite scienter, although Section 4o(1)(B), 7 U.S.C. § 6o(1)(B) of the Act does not require scienter.

5.      Defendants intentionally failed to send the Linuxor Pool Participants the required quarterly reports showing the pool's NAV and failed to send the annual reports in a timely manner, thus violating CFTC Regulation 4.7(b)(2) and (b)(3) respectively, 17 C.F.R. §§ 4.7(b)(2)-(3).

6.      Defendants violated CFTC Regulation 4.20(b) and (c), 17 C.F.R. §§ 4.20(b)-(c) by commingling Linuxor Pool funds with non-pool funds and receiving Linuxor Pool participants' funds in the name of other than the Linuxor Pool.

7.      LAM is liable for any violations of the Act or CFTC Regulations made by Shah pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), in that Shah's violations were within the scope of his office or employment with LAM.

8.      Shah is liable for any violations of the Act or CFTC Regulations by LAM pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), in that Shah was a controlling person of LAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations of the Act and CFTC Regulations.

9.      Each and every act in violation of the Act or CFTC Regulations is alleged as a separate and distinct violation.

C. Defendant's Contentions as to Facts

10

1.    In February 2002, at a dinner in New York, New York, J. Tydus Richards and Phillip Egger, a former attorney at Milbank Tweed, and college friend and former attorney of Philip McCarthey, introduced Abbas Shah to Philip McCarthey.

2.    McCarthey was presented to Shah as a wealthy individual with a reputation as a frequent gambler. He is also a registered and certified investment advisor and he even has a website offering his services as a certified financial planner to the public.

3.    Shah was introduced to McCarthey as a professional trader who was setting up a hedge fund designed to achieve 1 to 2 % return per month with comparatively high safety.

4.    During that dinner, McCarthey said that he was not interested in such tame investments. He then forcefully insisted to Shah that he was interested in high, tripledigit returns. Shah warned McCarthey of the high risk of losses that could result from the type of high volatility investments that could also produce such high returns. McCarthey dismissed these warnings and began discussed trading strategies with Shah. At that same dinner, McCarthey told Egger, the trust operator of McCarthey Trust Funds, to make an initial investment of $1.5 million.

5.    Shortly thereafter, Egger, acting as an agent for McCarthey, conducted a due diligence background check on Shah. Egger also commissioned an evaluation of Shah's trading experience and planned strategies.

6.    In early 2002, McCarthey also received and signed a confidential offering memorandum (COM) from Linuxor which detailed the warnings and risks of trading losses, Linuxor's allowable expenses, and the high water mark that the fund carried, which meant Shah only earned commissions when the fund was at or above that mark. The COM also explicitly stated that Linuxor was a newly-formed entity with no performance history:

> **Limited Operating History.** Although the Managing Member and the Investment Manager have had significant experience investing and trading equity securities and commodity interests...both the Investment Manager and the Fund are newly-formed entities with no history of operating performance. (COM p. 17)

7.    The COM enumerated the risk factors involved in investing in the Linuxor Pool Fund

in no uncertain terms as follows:

> There can be no assurances that the Fund's objectives will be satisfied. (COM p. 2)

> The Investment Manager has wide latitude in choosing Fund investments.    Although the Investment Manager's proprietary trading system emphasizes multi-asset diversification and follows a set of money management rules that limit the amount of Fund assets committed to each trade, market, and country (as disclosed above), the Investment Management Agreement imposes no limits on the types of securities or other instruments in which the Fund may invest, the types of positions it may take, the concentration of its investments (whether by sector, industry, fund, country, asset class or otherwise) the amount of leverage it may employ or the number or nature of short positions it may take.    Further, depending on conditions and trends in the financial markets, the Investment Manager may pursue other strategies or employ other techniques it considers appropriate and in the Fund's best interests. (COM p. 12)

> An investment in the Fund involves significant risks.    Some of those risks are summarized below.    Some are discussed more fully elsewhere in this Memorandum.    Prospective investors should carefully consider all the risks discussed below and should consult their own legal, tax, and financial advisers about these risks and an investment in the Fund generally. (COM p. 16)

> **Not a Complete Investment Program.**    An investment in the Fund may be deemed a speculative investment and is not intended as a complete investment program.    It is designed only for sophisticated and experienced investors who can bear the risk of loss of their entire investment in the Fund. (COM p. 17)

8.    The subscription agreements signed by McCarthey on behalf of the GRAT No. 5,

JFM Holdings, LP and McCarthey Investment stated the following with respect to risk disclosure

and other warnings:

> (c)    Review of Offering Materials and Independent Advice.
> Subscriber has carefully reviewed the Confidential Offering
> Memorandum (the "Offering Memorandum") relating to the Fund's
> Offering of Interests and its exhibits (including the Partnership
> Agreement and the Investment Management Agreement) and has
> discussed with Fund representatives any questions Subscriber may
> have had as to such materials or the Fund or the business, operation,
> or financial condition of the Fund or the General Partner or the
> Investment Manager.  Subscriber understands the risks of this
> investment, as described in the "Certain Risk Factors" section and
> other portions of the Offering Memorandum, and the conflicts of
> interest to which the General Partner and the Investment Manager
> will be subject.  In deciding to invest in Interests, Subscriber has
> not relied on any statements or information other than those
> contained in the Offering Memorandum and its exhibits, as ameded
> and supplemented, and in financial statements provided by the
> General Partner.  Subscriber has consulted with Subscriber's own
> legal, accounting, tax, investment, and other advisers in connection
> with this investment, to the extent that Subscriber has deemed
> necessary. (Subscription Agreements p. 15)

9.    In March 2002, Egger, acting on behalf of McCarthey, transferred $1.5 MM to

Shah's fund from Milbank,Tweed, the firm acting as trust operator for Article Second of the Jane

F. McCarthey Grantee Retained Annuity Trust ("GRAT") Number 5.

10.    A GRAT is a sophisticated tax evasion vehicle. GRAT beneficiaries benefit when the

total return of the GRAT exceeds a pre-set nominal benchmark rate.  That incremental return is

tax free and can only be distributed to beneficiaries on an annual basis.  This is the reason

McCarthey was only concerned with receiving year-end reports from Linuxor.

11.    McCarthey also reiterated his position to Shah that he is not interested in small

returns such as one to two percent per month.  McCarthey said that he was looking for very high

percentage returns and that he was quite prepared to take the risks associated with possible large

returns. McCarthey instructed Shah to look for trades with the potential of achieving large returns.

12.    In response, Shah changed from the investment strategy originally implemented to trading strategies that met McCarthey's request for a high-risk, high return investment (e.g. long Japanese equities – short Japanese Government Bonds), as he was permitted to do, even without notice to McCarthey, because the COM stated, in pertinent part, as follows:

> **Changes in Investment Strategies.** The Investment Management Agreement gives the Investment Manager broad discretion to expand, revise or contract the Fund's business without the consent of the Limited Partners. Thus, the investment strategies described elsewhere in this Memorandum may be altered without prior approval by, or notice to, the Limited Partners if the Investment Manager determines that such change is in the best interests of the Fund. Any such decision to engage in a new activity could result in the exposure of the Fund's capital to additional risks which may be substantial. (COM p. 18)

13.    On April 23, 2002, Shah, on behalf of Linuxor, prepared an internal report of the realized profits and losses in a futures account of the Linuxor Fund from March 19 through April 18, 2002. The report did not purport to be a statement of the entire fund, nor on its face does it purport to be a NAV statement.

14.    Neither Shah, nor anyone on behalf of Linuxor, sent this internal report to McCarthey or anyone associated with McCarthey. Therefore, it is not known how McCarthey obtained possession of this internal report. Further, if McCarthey did in fact receive this internal report, he would have and should have known at that time that the Linuxor Pool Fund only contained $1.5 million which constituted McCarthey's investment in the fund and no other monies.

15.    On May 8, 2002, Egger invested $300,000 of his own money into Linuxor.

16.    In May 2002, Shah began trading with leveraged positions. McCarthey, on behalf of McCarthey Investments and JFM Holdings, transferred an additional $10 million to Linuxor ($5 million of which came from McCarthey Investments, and $5 million from JFM Holdings, LP) so that McCarthey's total investment in theLinuxor fund was $11.5 million, no more than 5% of McCarthey's total net worth.

17.    McCarthey did not request or receive any documents from Shah or anyone on behalf of Linuxor between March 2002 when McCarthey made his initial $1.5 million investment in Linuxor and May 2002 when McCarthey invested an additional $10 million in Linuxor.

18.    After making the additional investment, both McCarthey and Egger directed Shah to take large leveraged trading positions in the hopes of achieving large gains, in spite of the high risks involved.  Egger even told Shah that McCarthey was accustomed to risky gambles and in fact had been known to place bigger bets in Las Vegas.

19.    In June 2002, Shah called McCarthey to report the status of his investments, specificually, that the trading strategy that the funds were using did not work and had caused a loss in excess of 30%.  McCarthey repeated to Shah that he only wanted year-end tax reports. During this monthly telephone conference between Shah and McCarthey, McCarthey introduced Shah to Brashear as McCarthey's Chief Financial Officer.  Shah did not speak with Brashear again until around April 2003.

20.    In fact, throughout the duration of McCarthey's investment in Linuxor, McCarthey never made any request for a report other than the year-end K-1 reports.

21.    In around June 2002, Egger phoned Shah frequently to inquire as to the status of the fund, often several times per day.  Egger also visited New York, New York on numerous occasions and spent time with Shah discussing the fund, among other things.

22.    The initial trades set up in the fund experienced losses resulting in a large drawdown in the fund.  The losses, as well as the complete status of the portfolio, were made known to McCarthey and Egger at this time in a detailed printed report.  After learning of these losses, McCarthey stated, "Well, we didn't hit the home run we were hoping for, but keep your head down and keep trading."

23.    By August 2002, the portfolio showed paper losses of approximately fifty percent due to a sudden drop in the Nikkei and related moves in Japanese Government Bonds, on which the fund had invested heavily in the opposite direction.  This loss was reported to McCarthey and Egger from April 2002 until August 2002 via frequent telephone conversations.  Linuxor provided McCarthey and Egger with a printed report of this loss via mail in early September.

24.    From the beginning with McCarthey's initial investment in the fund and even after Shah sent the written report in early September detailing the 30% loss experienced by Linuxor, McCrthey did not make any complaints to Linuxor or Shah and McCarthey did not ask for redemption or for any reports other than a year-end report.  Linuxor carried on trading and reporting in accordance with McCarthey's wishes.  McCarthey and his associates were in frequent contact with Linuxor via telephone calls and numerous personal visits to Linuxor's offices, including due diligence conducted by attorneys from Milbank & Tweed acting on behalf of McCarthey.

25.    On October 29, 2002, Temple transferred $2,000,000 to Linuxor.

26.    On December 1, 2002, Linuxor began to trade with Temple's investment.

27.    In January 2003, during the customary monthly telephone conversation between Shah and McCarthey regarding the status of the Linuxor fund, Shah informed McCarthey that

the fund was experiencing losses and McCarthey responded that Shah should keep his head down and continue trading, stating "so we didn't hit the home run we were hoping for."

28.    In April 2003, Linuxor's accountant, Rothstein Kass & Company, requested a tax reporting extension from the IRS because one brokerage firm had not yet submitted their final trading records for 2002. Shah informed McCarthey of the reporting delay and McCarthey said he had no problem with it.

29.    Further, the delay in providing these reports was not willful or grossly negligent. As stated in the Limited Partnership Agreement between the McCarthey investors and Linuxor, in pertinent part, as follows:

> 8.1.1 *Exculpation.* Neither the General Partner, nor the Investment Manager, nor any member, employee, agent or other Affiliate of the General Partner, nor any board or body with respect to the General Partner or the Fund (each, an "*Indemnitee*") will be liable to any Partner for any act or omission performed or omitted by such Indemnitee in connection with this Agreement or the Fund's business or affairs . . . and no such act or omission will in and of itself constitute a breach of any duty owed by Indemnitee to the Fund or any Limited Partner hereunder or under the Act, provided such act or omission did not constitute gross negligence or a willful violation of the law. (Limited Partnership Agreement, p. 16).

30.    Shah invited McCarthey and Brashear to feel free to contact Shah's accountant with any questions regarding the portfolio and the records.

31.    Rothstein Kass & Company also made McCarthey and Brashear aware of the portfolio's losses at around that same time.

32.    In August 2003, Linuxor's accountant submitted the K-1 reports for 2002 to Linuxor.

33.    On August 14, 2003, Shah sent a copy of the 2002 K-1s to McCarthey and Egger by regular mail.

34.   On August 25, 2003, Shah called McCarthey's office to notify them they would be receiving a copy of the 2002 K-1s via facsimile. Several minutes later, Shah sent a copy of the 2002 K-1s to McCarthey via facsimile. That same day, Shah also delivered a copy of the 2002 K-1s to Egger in person at a Chinese restaurant and Egger sent a copy of the 2002 K-1s to McCarthey via facsimile from that Chinese restaurant.

35.   The 2002 K-1's clearly stated the nearly 50% drop in the value of the account as previously reported by both Shah and Linuxor's accountants, Rothstein, Kass & Company,  yet McCarthey remained invested in the fund and  sought no redemption.

36.   In or around mid August 2003, McCarthey, or Brashear on behalf of McCarthey, inquired as to the options and futures positions of McCarthey's investments in the Linuxor Pool Fund.

37.   On August 25, 2003, Shah sent an e-mail to the McCarthey pool participants' representative, Todd Brashear, directly responding to the inquiry made on behalf of McCarthey. With respect to the Fund's options and futures positions only, Shah correctly stated, "we have thus far recovered more than half of the capital loss and if we continue at this pace we hope that we will have not only recovered all of the capital loss but there is a good likelihood that we will be positive as far as returns since inception are concerned."

38.   Shah did not make or purport to make any statements regarding the value of the entire fund, nor on its face does it purport to be a NAV statement.

39.   Further, McCarthey did not recall ever seeing this email and, therefore, could never have relied on it.

40.   From the period beginning in August 2003 until January 2004, McCarthey did not make any requests for reports or redemption. Further, McCarthey made no complaints about

Linuxor or Shah as Shah performed in accordance with McCarthey's wishes with respect to reporting and was in daily contact with McCarthey and his associates via hundreds (more than 1500) of telephone calls and numerous visits to Linuxor's offices. McCarthey also personally visited Shah at Linuxor's offices New York, New York more than once, and once at Shah's home, and during those visits, specifically directed Shah to keep trading to try and recoup the outstanding losses. McCarthey also repeated his desire to only receive year-end reports instead of frequent reports during these visits.

41.    Neither Shah nor any employee or officer of Linuxor hid or misrepresented anything to McCarthey or his associates at any time, which is demonstrated by the fact that McCarthey remained in the fund without any complaints even after receiving the 2002 K-1s in August 2003.

42.    On or around January 30, 2004, Brashear sent Shah an email requesting an informal, approximate balance. (Brashear's Deposition p. 39).

43.    On January 30, 2004, while Shah was away on vacation, he used the hotel's computer to send an email to respond to a request from Brashear. Shah relied only on his memory when he wrote that email because he did not have any records with him on vacation. In that email, Shah mistakenly reported data as of October 2003 instead of data as of January 2004 as Brashear requested.

44.    The error contained in the email did not cause any damage to the McCarthey investors as their account value rose approximately 45% between January 2004 and the liquidation of the Linuxor fund at the end of June 2004. If McCarthey had chosen to withdraw their money from the Linuxor Fund immediately on January 30, 2004, they would have ended up with $2,519,661.00, far less money than they ultimately received in July 2004.

19

45.    Also, as McCarthey testified at his deposition that although he was "sure [he] would have seen it", McCarthey did not take any action as a result of seeing this email. (McCarthey Deposition at p. 107-7)

46.    Furthermore, one week later, immediately upon returning from vacation, Shah left a voicemail for McCarthey, and he contacted Egger and McCarthey's associate, Brashear, and another person invested in Linuxor regarding the mistake he made in the email dated January 30, 2004 and with both Egger as McCarthey's agent as well an investor in Linuxor regarding the error.

47.    At no time from the inception of the fund until the liquidation of the fund did Shah ever receive any personal gain from the fund.  The fund was never at or above the high water mark.

48.    On April 29, 2004, Temple's investment was worth $1,142,407 and Temple redeemed $1,100,000 from the Fund after $42,407 was paid to Linuxor as allowable expenses.

49.    On May 17, 2004, Brashear emailed Shah to ask that Shah withdraw $500,000 from the Linuxor Fund and transfer this amount to McCarthey Investments immediately.  As per Brashear's instructions, Shah withdrew $500,000 from the Linuxor fund the very next day and transferred the money to McCarthey Investments.  Several days later, McCarthey Investments reinvested the $500,000 back in the Linuxor Fund Pool.  If McCarthey suspected Linuxor or Shah of fraud, McCarthey would not have reinvested the money with Linuxor.

50.    From August 25, 2003 to July 2, 2004, the market value of the portfolio produced net gains in excess of $200,000.

51.    In mid-June, 2004, Brashear notified Shah that McCarthey wanted to close his accounts with Linuxor and withdraw all remaining funds.

52.     Linuxor completed the liquidation of the account by July 2, 2004 and all remaining funds were returned to McCarthey.

53.     Linuxor retained $80,000 from McCarthey's monies in the fund to account for only a small portion of the allowable expenses associated with administering the Fund, which are enumerated in the COM as follows:

> The Fund is responsible for all of the direct costs of administering its business. These include, among other things: brokerage commissions, interest on margin and other borrowings, borrowing charges on securities sold short, custodial fees, legal, research, accounting and audit fees and expenses, tax preparation fees, governmental fees and taxes, bookkeeping and other professional fees, telephone, travel and travel-related expenses in connection with the Fund's activities, costs of Fund reporting, costs of Fund governance activities (such as obtaining Partner consents if and when necessary and appropriate), and all other reasonable expenses related to the management and operation of the Fund and/or the purchase, sale or transmittal of the Fund assets, as the General Partner determines in its sole discretion . . . The General Partner will provide the Fund with office space, utilities, office equipment and certain administrative services. To the extent those facilities and services are not part of the General Partner's own operating, general administrative, and overhead costs, the Fund will bear its proportionate share of the associated costs. (COM p. 15)

54.     Linuxor took much less than it was entitled to for allowable expenses.

D. Defendant's Contentions as to Law

1.     Defendants did not make or purport to make any promise that the investments would only have a 15% downside risk. Even if defendants had done so, such alleged promises were not material because they are promises to do something in the future, which cannot be a legal basis for fraud. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994); *Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 510 N.Y.S.2d 88, 502 N.E.2d 1003, 1004 (1986).

2.      Plaintiffs cannot maintain a cause of action of fraud against the Defendants based on their allegations that Defendants promised Plaintiffs a 15% downside risk because the COM clearly enumerated the risks of investing in the Linuxor Pool Fund. "If a literate, competent adult is given a document that in readable and comprehensible prose says X, and the person who hands it to him tells him, orally, not-X, our literate competent adult cannot maintain an action for fraud against the issuer of the document." *Carr v. Cigna Securities, Inc.*, 95 F.3d 544, 547 (7th Cir. 1996).

3.      Any inadvertent errors conveyed by Shah on behalf of Linuxor to McCarthey or anyone associated with McCarthey were innocent mistakes. They were not material nor intended to induce reliance. Bare figures without supporting documentation are not of the type relied on by the reasonable investor. *Black v. Riker-Maxson Corporation*, 401 F. Supp. 693 (S.D.N.Y. 1975). Further, any accidentally incorrect statements were not relied upon by the McCarthey investors.

4.      McCarthey was kept fully apprised, through verbal telephone and in person communication, of the status of the Linuxor Pool Fund and decided to remain invested despite the losses experienced by the Fund that he was fully aware of. "The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act." *See, Black v. Riker-Maxson Corporation*, 401 F. Supp. 693, 700 (S.D.N.Y. 1975) (quoting, *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 213-14 (9th Cir. 1962)).

5.      Defendants' failure to send the Linuxor Pool Participants quarterly reports showing the pool's NAV and timely annual reports was not done intentionally or fraudulently.

6.     Defendants actions lack the requisite scienter to be found in violation of CFTC Regulation Section 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i)-(iii).

7.     Defendants did not violate CFTC Regulation 4.20(b) and (c), 17 C.F.R. §§ 4.20(b)-(c) because they did not commingle Linuxor Pool funds with non-pool funds.

8.     Shah is not liable for any violations of the Act or CFTC Regulations by LAM pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), because Shah was not the controlling person of LAM. Further, he acted in and good faith with respect to LAM and the McCarthey investments and any violations of the Act and CFTC regulations were inadvertent and were done unknowingly.

9.     On December 6, 2007, Shah filed a petition in bankruptcy under Chapter 7 of the Bankruptcy Code. Pursuant to Section 364 of the Bankruptcy Code, the CFTC may not attempt to enforce any civil monetary penalty that may be granted by this Court. Therefore:

- The CFTC may continue the action seeking "finding[s]" and injunctive relief. (See sections A and B of CFTC's prayer for relief, Complaint at 11-12.)

- The CFTC may continue its claim for a civil monetary penalty, but it may not enforce any judgment that may be entered upon that claim. (See section C of CFTC's prayer for relief, Complaint at 12.)

- The CFTC may not continue its action seeking "ancillary relief including . . . disgorgement [and] restitution . . . ." (See section D of CFTC's prayer for relief, Complaint at 12.)

## V. ISSUES TO BE TRIED[1]

1. Whether Shah intentionally or recklessly failed to send out quarterly financial reports or timely annual financial reports to pool participants.

---

[1] On February 25, 2008, this Court granted in part and denied in part Plaintiff's summary judgment motion. The Court found that Defendants had violated CFTC Regulations 4.7(b)(2)-(3) and 4.20(b)-(c), 17 C.F.R. §§ 4.7(b)(2)-(3) and 4.20(b)-(c).

2. Whether, during the relevant period, Shah cheated or defrauded or attempted to cheat or defraud other persons and willfully made or caused to be made to such other persons false reports or statements, or willfully entered or caused to be entered for such other persons false records in connection with commodity futures contracts sales or purchases, for or on behalf of other persons, in violation of Section 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § b(a)(2)(i)-(iii) (2000).

3. Whether LAM is liable for Shah's violations of the Act pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2006), in that Shah's actions were in the scope of his employment.

4. Whether LAM, a CPO, and Shah, an AP of LAM, used the mails or other means of instrumentality of interstate commerce directly or indirectly a) to employ a device, scheme or artifice to defraud pool participants, and/or b) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon pool participants, all in violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1).

5. Whether Shah directly controlled LAM and its employees and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting violations described above, Shah is liable for any violations of the Act or Regulations by LAM pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

## VI. PLAINTIFF'S EXHIBITS

No exhibit not listed by the parties may be used at trial except (a) for cross-examination purposes or (b) if good cause for its exclusion from the pretrial order is shown.

Plaintiff's exhibit list for trial is attached hereto.

## VII. DEFENDANT'S EXHIBITS

No exhibit not listed by the parties may be used at trial except (a) for cross-examination purposes or (b) if good cause for its exclusion from the pretrial order is shown.

Defendants' exhibit list for trial is attached hereto.

## VIII. STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

Plaintiff's Objections to Defendants' Exhibits

| Exhibit | Description | Objection |
|---------|-------------|-----------|
| DX-I | Agreement for LAM to act as fund manager for LGM (3/15/02) | Authenticity (unsigned) |
| DX-N | Emails (Oct.-Nov. 2001) between Bornstein and Berger | Relevance and Hearsay |
| DX-R | Check from LAM to State of Alaska, and check from LAM to Custom Fund Group | Authenticity and Relevance |
| DX-Y | Letter from NFA to Bornstein | Duplicate of Exhibit DXX |
| DXB-B | ABN Amro letter to Bornstein 5/23/02 | Hearsay |
| DX-CC | ABN Amro letter to Bornstein 10/15/02 | Hearsay |
| DX-DD | Bornstein Agreement with B of A 9/27/02 | Hearsay |
| DX-FF | Brokerage Agreement between Bank of New York and LGM and Fax date 1/2/03 | Hearsay and Relevance |
| DX-HH | Email from Egger to Shah | Authenticity |
| DX-II | Monthly Global Stock Index Prices Feb '02 to Dec '07 | Relevance and Authenticity |
| DX-JJ | Chart of Japanes Stock Index 5/1/02 to 10/30/02 | Relevance and Authencity |
| DX-KK | Chart of Stock Index | Illegible, Relevance and Authenticity |
| DX-LL | Chart of Japanese Government Bond Index, 5/1/02 -2/21/03 | Relevance and Authenticity |
| DX-MM | Chart of Japanese Government Bond Index, 5/1/02 – 5/31/04 | Authenticity and Relevance |
| DX-NN | Christmas Card from Egger to Shah | Relevance |
| DX-OO | List of NAVs by Citco, Rothstein Kass and Market Value as of 12/31/02 | Authenticity and Hearsay |

| DX-PP | One page of Citco NAV 12/31/02 | Incomplete |
|---|---|---|
| DX-QQ | LGM statements of financial condition as of 12/31/02 | Authenticity and Hearsay |
| DX-RR | Internal statement of Fund Value March '02 to Apr '05 | Authenticity and Hearsay |
| DX-SS | Citco statements March – August '02 | Incomplete |
| DX-TT | Linuxor open positions December '02 | Authenticity and Relevance |
| DX-ZZ | Shah Sprint Phone Bill June '02 | Relevance and Incomplete |
| DX-AAA | Phone Call Listing Summary 10/02 to 12/03 | Relevance, Authenticity and Hearsay |
| DX-BBB | Verizon Phone Bill Aug. '02 | Relevance |
| DX-CCC | Sprint Phone Bill March '02 | Relevance |
| DX-DDD | Rothstein Kass Audit Report 2002 | Authenticity |
| DX-GGG | Letters from Shah re: Rothstein Kass Audit | Authenticity |
| DX-HHH | Letter from Garrett to McCarthey 4/8/03 | Authenticity and Hearsay |
| DX-III | One page Citco NAV statement 10/31/03 | Incomplete |
| DX-JJJ | Document showing fund values 2002 and 2004 | Authenticity and Hearsay |
| DX-OOO | Email from Brashear to Shah 5/17/04 | Authenticity and Hearsay |
| DX-RRR | Linuxor internal P/L Statement | Authenticity and Hearsay |
| DX-UUU | Newspaper article re: Milbank Tweed attorney | Relevance and Hearsay |
| DX-WWW | Newspaper Article re: McCarthey | Relevance and Hearsay |
| DX-XXX | McCarthey "CLU" sheet, 10/17/07 | Relevance |
| DX-BBBB | Checks payable to Abbas Shah from LAM | Relevance |
| DX-CCCC | Bio of Philip G. McCarthey | Relevance and Authenticity |
| DX-DDDD | Emails from Charles Hall to Adam Bornstein | Relevance and Incomplete |
| DX-EEEE | Emails from Charles Hall to Adam Bornstein | Relevance and Incomplete |
| DX-FFFF | Bill from the Law Office of Charles Hall to LAM | Relevance |
| DX-GGGG | Correspondence from Charles | Relevance |

| | | |
|---|---|---|
| | Hall to Abbas Shah and Adam Bornstein | |
| DX-HHHH | Fax to John Zacharella from Abbas Shah | Relevance |
| DX-IIII | Email from John Zacharella to Abbas Shah | Relevance |
| DX-JJJJ | Fax from Egger to Abbas Shah attaching letter from Egger to Lou Kreisberg | Relevance |
| DX-LLLL | Telephone Records | Relevance |
| DX-MMMM | Telephone Records | Relevance |
| DX-NNNN | Fonetel Telephone Records | Relevance |

## Defendants' Objections to Defendants' Exhibits

| DEFENDANTS' OBJECTIONS TO PLAINTIFF'S EXHIBITS | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| # | D | A | R | H | FM | NF | I | M | P | W | Other |
| 1 | X | | | | | | | | | | |
| 2 | X | | | | | | | | | | |
| 3 | X | | | | | | | | | | |
| 4 | X | | | | | | | | | | |
| 5 | | X | X | X | X | X | | | | X | Objection to Non-Excerpted Transcript |
| 6 | | | | | | | | | | | See Objection to Excerpts |
| 7 | X | | | | | | | | | | |
| 8 | | | | X | | | | | | | No Objection to Fact Admissions |
| 9 | X | | | | | | | | | | |
| 10 | X | | | | | | | | | | |
| 11 | | | | X | | | | | X | X | Triple H as to " Informed Indirectly by one of the Employees" |
| 12 | | | | X | X | X | | | X | X | |
| 13 | | | | X | X | X | | | X | X | |
| 14 | X | | | | | | | | | | |
| 15 | | | | X | X | X | X | | | | See Objection to Excerpts |
| 16 | X | | | X | | | | | | X | |
| 17 | | | X | X | | | X | | | X | |
| 18 | | | | X | | | | | | X | |
| 19 | X | | | | | | | | | | |
| 20 | | X | X | X | X | X | | | X | X | Plaintiff has simply dumped a large set of files into an "Exhibit" |
| 21 | X | | | | | | | | | | |
| 22 | X | | | | | | | | | | |

27

| # | 0 | A | R | B | FM | NF | I | M | P | W | Other |
|---|---|---|---|---|----|----|---|---|---|---|-------|
| 23 | X | | | | | | | | | | |
| 24 | X | | | | | | | | | | |
| 25 | X | | | | | | | | | | |
| 26 | | | | X | X | X | X | | X | X | |
| 27 | X | | | | | | | | | | |
| 28 | | | | X | X | X | | | X | X | |
| 29 | | | X | X | X | | | | X | X | |
| 30 | | X | X | X | X | X | | | X | X | Objection to Non-Excerpted Transcript |
| 31 | X | | | | | | | | | | |
| 32 | X | | | | | | | | | | Duplicate |
| 33 | | | | | | | X | | | | |
| 34 | | | | | | | X | | | | |
| 35 | | | | | | | X | | | | |
| 36 | | | | | | | X | | | | |
| 37 | | | | X | | | | | | | |
| 38 | 0 | | | | | | | | | | |
| 39 | 0 | | | | | | | | | | |
| 40 | 0 | | | | | | | | | | |
| 41 | | | X | | | | | | | X | |
| # | 0 | A | R | B | FM | NF | I | M | P | W | Other |
| 42 | | | X | | | | | | | X | |
| 43 | | | X | | | | | | | X | |
| 44 | | | X | | | | | | | X | |
| 45 | | X | | | X | | | X | X | X | |
| 46 | | X | | X | | | | | X | X | |
| 47 | | X | | X | X | | | | X | X | |
| 48 | X | | | | | | | | | | |
| 49 | X | | | | | | | | | | |
| 50 | | X | X | X | | | | | X | X | |
| 51 | | X | X | X | | | | | X | X | |
| 52 | | X | X | X | | | | | X | X | |
| 53 | X | | | | | | | | | | |
| 54 | | X | X | X | | X | | | X | X | |
| 55 | | X | X | X | | X | | | X | X | |
| 56 | | X | X | X | X | X | | | X | X | |
| 57 | | | X | | | X | | | | X | |
| 58 | | X | X | X | X | X | | | X | X | |
| 59 | | | X | X | | | | | X | X | |
| 60 | | X | X | X | X | X | | | X | X | |

28

| # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | |
|----|---|---|---|---|---|---|---|---|---|---|
| 61 |   | X | X | X | X | X |   |   | X | X |
| 62 | X |   |   |   |   |   |   |   |   |   |
| 63 | X |   |   |   |   |   |   |   |   |   |
| 64 | X |   |   |   |   |   |   |   |   |   |
| 65 | X |   |   |   |   |   |   |   |   |   |
| 66 | X |   |   |   |   |   |   |   |   |   |
| 70 | X |   |   |   |   |   |   |   |   |   |
| 71 |   | X | X | X |   | X |   |   | X | X |
| 72 |   | X | X | X |   | X |   |   | X | X |
| 73 |   | X | X | X |   | X |   |   | X | X |
| 74 | X |   |   |   |   |   |   |   |   |   |
| 75 | X |   |   |   |   |   |   |   |   |   |
| 76 | X |   |   |   |   |   |   |   |   |   |
| 77 | X |   |   |   |   |   |   |   |   |   |
| 78 |   | X | X | X |   |   |   |   | X |   |
| 79 | X |   |   |   |   |   |   |   |   |   |
| 80 | X |   |   |   |   |   |   |   |   |   |
| 81 | X |   |   |   |   |   |   |   |   |   |
| 82 | X |   |   |   |   |   |   |   |   |   |
| 83 | X |   |   |   |   |   |   |   |   |   |
| 84 | X |   |   |   |   |   |   |   |   |   |
| 85 | X |   |   |   |   |   |   |   |   |   |
| 86 | X |   |   |   |   |   |   |   |   |   |
| 87 | X |   |   |   |   |   |   |   |   |   |
| 88 | X |   |   |   |   |   |   |   |   |   |
| 89 | X |   |   |   |   |   |   |   |   |   |
| 90 | X |   |   |   |   |   |   |   |   |   |
| 91 | X |   |   |   |   |   |   |   |   |   |
| 92 | X |   |   |   |   |   |   |   |   |   |
| 93 | X |   |   |   |   |   |   |   |   |   |
| 94 | X |   |   |   |   |   |   |   |   |   |
| 95 | X |   |   |   |   |   |   |   |   |   |
| 96 | X |   |   |   |   |   |   |   |   |   |
| 97 | X |   |   |   |   |   |   |   |   |   |
| 98 | X |   |   |   |   |   |   |   |   |   |
| 99 | X |   |   |   |   |   |   |   |   |   |
| 100 | X |   |   |   |   |   |   |   |   |   |
| 101 | X |   |   |   |   |   |   |   |   |   |
| 102 | X |   |   |   |   |   |   |   |   |   |

| 103 | X | | | | | | | | | | |
|-----|---|---|---|---|---|---|---|---|---|---|---|
| 104 | X | | | | | | | | | | |
| 105 | X | | | | | | | | | | |
| 106 | X | | | | | | | | | | |
| 107 | X | | | | | | | | | | |
| 108 | X | | | | | | | | | | |
| 109 | X | | | | | | | | | | |
| 110 | X | | | | | | | | | | |
| 111 | X | | | | | | | | | | |
| 112 | X | | | | | | | | | | |
| 113 | X | | | | | | | | | | |
| 114 | X | | | | | | | | | | |
| 115 | X | | | | | | | | | | |
| 116 | X | | | | | | | | | | |
| 117 | | | | X | X | | | | X | | |
| 118 | X | | | | | | | | | | |
| 119 | X | | | | | | | | | | |
| 120 | X | | | | | | | | | | |
| 121 | X | | | | | | | | | | |
| 122 | X | | | | | | | | | | |
| 123 | X | | | | | | | | | | |
| 124 | X | | | | | | | | | | |
| 125 | X | | | | | | | | | | |
| 126 | X | | | | | | | | | | |
| 127 | X | | | | | | | | | | |
| 128 | X | | | | | | | | | | |
| 129 | X | | | | | | | | | | |
| 130 | X | | | | | | | | | | |
| 131 | X | | | | | | | | | | |
| 132 | X | | | | | | | | | | |
| 133 | X | | | | | | | | | | |
| 134 | X | | | | | | | | | | |
| 135 | X | | | | | | | | | | |
| 136 | X | | | | | | | | | | |
| 137 | X | | | | | | | | | | |
| 138 | X | | | | | | | | | | |
| 139 | X | | | | | | | | | | |
| 140 | X | | | | | | | | | | |
| 141 | X | | | | | | | | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 142 | X | | | | | | | | | | |
| 143 | X | | | | | | | | | | |
| 144 | X | | | | | | | | | | |
| 145 | X | | | | | | | | | | |
| 146 | X | | | | | | | | | | |
| 147 | X | | | | | | | | | | |
| 148 | X | | | | | | | | | | |
| 149 | X | | | | | | | | | | |
| 150 | X | | | | | | | | | | |
| 151 | X | | | | | | | | | | |
| 152 | X | | | | | | | | | | |
| 153 | X | | | | | | | | | | |
| 154 | X | | | | | | | | | | |
| 155 | X | | | | | | | | | | |
| 156 | X | | | | | | | | | | |
| 157 | X | | | | | | | | | | |
| 158 | X | | | | | | | | | | |
| 159 | X | | | | | | | | | | |
| 160 | X | | | | | | | | | | |
| 161 | X | | | | | | | | | | |
| 162 | X | | | | | | | | | | |
| 163 | X | | | | | | | | | | |
| 164 | X | | | | | | | | | | |
| 165 | X | | | | | | | | | | |
| 166 | X | | | | | | | | | | |
| 167 | X | | | | | | | | | | |
| 168 | X | | | | | | | | | | |
| 169 | X | | | | | | | | | | |
| 170 | X | | | | | | | | | | |
| 171 | X | | | | | | | | | | |
| 172 | X | | | | | | | | | | |
| 173 | X | | | | | | | | | | |
| 174 | X | | | | | | | | | | |
| 175 | X | | | | | | | | | | |
| 176 | X | | | | | | | | | | |
| 177 | X | | | | | | | | | | |
| 178 | X | | | | | | | | | | |
| 179 | X | | | | | | | | | | |
| 180 | X | | | | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 181 | X | | | | | | | | | |
| 182 | X | | | | | | | | | |
| 183 | X | | | | | | | | | |
| 184 | X | | | | | | | | | |
| 185 | X | | | | | | | | | |
| 186 | X | | | | | | | | | |
| 187 | X | | | | | | | | | |
| 188 | X | | | | | | | | | |
| 189 | X | | | | | | | | | |
| 190 | X | | | | | | | | | |
| 191 | X | | | | | | | | | |
| 192 | X | | | | | | | | | |
| 193 | X | | | | | | | | | |
| 194 | | X | X | X | X | | | | | Inadmissible on Plaintiff's case |
| 195 | X | | | | | | | | | |
| 196 | X | | | | | | | | | |
| 197 | X | | | | | | | | | |
| 198 | X | | | | | | | | | |
| 199 | X | | | | | | | | | |
| 200 | X | | | | | | | | | |
| 201 | X | | | | | | | | | |
| 202 | X | | | | | | | | | |
| 203 | X | | | | | | | | | |
| 204 | | X | X | X | | X | X | | | X | Usable for Impeachment or Admission Purposes Only. |
| 205 | | X | X | X | | X | X | | | X | Usable for Impeachment or Admission Purposes Only. |
| 206 | | X | X | X | | X | X | | | X | Usable for Impeachment or Admission Purposes Only. |
| 207 | | X | X | X | | X | X | | | X | Usable for Impeachment or Admission Purposes Only. |
| 208 | | X | X | X | | X | X | | | X | Usable for Impeachment or Admission Purposes Only. |
| 209 | | X | X | X | | X | X | | | X | Usable for Impeachment or Admission Purposes Only. |
| 210 | | X | X | X | | X | X | | | X | Usable for Impeachment or Admission Purposes Only. |
| 211 | | X | X | X | | X | X | | | X | Usable for Impeachment or Admission Purposes Only. |

| LEGEND | | | |
|---|---|---|---|
| 0 | NONE | FM | FALSE AND MISLEADING |
| A | NOT AUTHENTICATED | NF | NO FOUNDATION |
| R | IRRELEVANT | I | INCOMPLETE |
| H | HEARSAY | M | MULTIPLE DOCUMENTS |
| P | PREJUDICIAL | W | WASTE OF TIME |

Any objections not set forth herein will be considered waived absent good cause shown.

## IX. PLAINTIFF'S WITNESS LIST

The witnesses listed below may be called at trial. No witness not identified herein shall be

permitted to testify on either party's case in chief absent good cause shown.

1. Abbas Shah
2. Philip McCarthey
3. Todd Brashear
4. Daniel Driscoll (NFA)
5. Michael Piracci (NFA)
6. Jay Peller (Citco)
7. Phillip Egger
8. Jennifer J. Verger
9. Ick Soo-Park (NFA auditor)
10. Custodian of Records from MF Global, formerly Man Financial
11. Custodian of Records from ABN AMRO
12. Judith Slowly (CFTC Investigator)
13. John Zacharella (former employee of Rothstein, Kass)
14. Caledonian Fund Administrator Employee
15. Ronald Carletta (CFTC Employee, Division of Clearing and Intermediate Oversight)

Deposition Transcript Excerpts:

a) Philip McCarthey: 6:3-7:23, 9:11-25, 11:5-10, 12:20-18:25, 19:10-24, 20:20-

27:12, 28:10-20, 29:5-31:2, 31:17-33:9, 33:25-38:3, 38:21-39:25, 40:13-41:23, 42:10-56:20,

59:6-62:2, 63:11-64:10, 64:16-68:25, 72:13-74:11, 84:12-85:11.

b) Todd Brashear: 7:15-8:14, 13:7-14:5, 14:12-18, 14:24-15:7, 16:13-17:25, 20:15-

23, 24:3-21, 27:24-29:2, 35:6-20, 39:10-21, 41:11-44:17, 46:15-47:6, 51:23-52:7, 53:12-54:4,

61:13-18, 66:8-67:2, 67:8-23, 68:12-16, 68:-69:9, 73:6-16, 81:4-7, 99:17-100:9, 109:4-17.

c) Phillip Egger: 6:1-10, 14:14-15, 18:11-15, 26:15-23, 28:10-13, 32:12-14, 38:11-

16, 43:10-44:1, 48:6-17, 56:15-57:16, 60:7-16, 63:17-25.

d) James Temple: 5:17-19, 10:7-25, 11:24-25, 12:2-12, 15:All, 16:2-6, 18:14-25,

19:15-25, 20:2-4, 15-24, 21:5-25, 22:2-22, 26:15-25, 27:2-7, 15-25, 28:2, 30:12-25, 31:2-6, 19-

25, 32:All, 33:All, 34:All, 35:2-16, 36:All, 37:All, 38:All, 39:All, 40:All, 41:All, 42:2-11, 20-25

43:2, 24-25, 44:2-5, 46:7-25, 48:2-5, 11-25, 49:All, 52:21-25, 53:2-8, 56:23-25, 57:2-17, 59:All

60:All, 61:All, 62:10-25, 63:2, 9-25, 64:All, 65:All, 66:2-14, 67:14-25, 68:2-8, 17-25, 69:2-5,

70:19-25, 71:All

## X. DEFENDANT'S WITNESS LIST

The witnesses listed below may be called at trial. No witness not identified

herein shall be permitted to testify on either party's case in chief absent good cause shown.

    1. Abbas Shah
    2. Alan Nathan
    3. Charles Hall, Jr.
    4. J. Tydus Richards
    5. A representative of Rothstein, Kass & Company
    6. Each witness on Plaintiff's witness list

Deposition Excerpts:

    (a)    Phillip Egger: 9:18-22; 11:9-22; 12:10-16; 14:10-16:2; 16:16-17:16; 18:11-15; 20:2-16.

    (b)    Philip McCarthey: 6:8-24; 7:4–12:25; 26:17 –31:2; 31:17 – 32:16; 32:23 –39:8;

77:4 – 14; 78:4 –79:8; 79:24 – 80:14; 83:5 –84:10; 84:19 – 85:11; 85:17 -23; 86: 8– 87:17; 88:9

– 89:19; 104:7 – 107:22; 109:6 – 110:20; 111:12 – 19.

    (c)    James Temple: All.

    (d)    Todd Brashear: 6:24-10:11; 10:18-11:16; 12:10-18; 17:13-25; 18:18-19:15; 20:8-

21:22; 21:23-23:18; 24:3-23; 26:17-27:23; 34:4-6; 38:15-22; 39:15-17; 39:22-40:3; 40:6-9; 56:2-

9; 59:13-60:15; 69:8-20; 70:3-7; 73:21-74:4; 75:7-76:23; 77:21-79:12; 83:24-84:15; 85:14-87:6;

95:3-5, 8-9; 100:2-101:4.

## XI. RELIEF SOUGHT

1.      Plaintiff seeks findings of fact and conclusions of law that Defendants violated Sections 4b(a)(2)(i)-(iii) and 4o(1) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) and 6o(1), and CFTC Regulations 4.7(b)(2)-(3) and 4.20(b)-(c), 17 C.F.R. §§ 4.7(b)(2)-(3) and 4.20(b)-(c).

2.      Plaintiff seeks the following Civil Monetary Penalty ("CMP") to be assessed by the Court: Defendants are ordered to pay $480,000 each, plus post-judgment interest. The CMP is immediately due and owing upon the entry of this Order. Post-judgment interest shall accrue beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961.

2.      Defendants shall pay restitution in the amount of $7,300,000, plus post-judgment interest (the "Restitution Obligation").

3.      Post-judgment interest on the Restitution Obligation shall accrue commencing on the date of entry of the Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of the Order pursuant to 28 U.S.C. § 1961.

4.      Appointment of Monitor: To effect payment by Defendants and the distribution of restitution, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor shall collect restitution payments from Defendants, and make distributions as set forth below. Because the Monitor is not being specially compensated for these services, and these services are outside the normal duties of the Monitor, he shall not be liable for any action or inaction arising from his appointment as Monitor, other than actions involving fraud.

5.      Defendants shall make their required restitution payments under the Order in the name of "Linuxor Settlement Fund" and shall send such restitution payments by electronic funds

transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under a cover letter that identifies Defendants and the name and docket number of the proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to (a) the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1152 21st Street, N.W., Washington, D.C. 20581, and (b) the Chief, Office of Cooperative Enforcement, at the same address.

6.      The Monitor shall oversee Defendants' Restitution Obligation, and shall have the discretion to determine the manner for distribution of funds in an equitable fashion to Defendants' customers, or may defer distribution until such time as it may deem appropriate. In the event that the amount of restitution payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative costs of making a restitution distribution to Defendants' customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments.

7.      To the extent that any funds accrue to the U.S. Treasury as a result of the Restitution Obligation in this Consent Order, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

8.      Plaintiff seeks an order permanently enjoining and prohibiting Defendants from directly or indirectly, cheating or defrauding or attempting to cheat or defraud other persons in connection with any commodity futures contract sale or purchase, for or on behalf of any other person; willfully making or causing to be made to such other persons any false report or statement thereof, or willfully entering or causing to be entered for such person any false record

thereof; and willfully deceiving or attempting to deceive such other person by any means

whatsoever in regard to any such order or contract or the disposition or execution of any such

order or contract, or in regard to any act of agency performed with respect to such order or

contract for such person in violation of Section 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i)-

(iii).

  9.  Plaintiff seeks an order permanently restraining, enjoining and prohibiting

Defendants from using the mail or any means or instrumentality of interstate commerce to

directly or indirectly employ any device, scheme or artifice to defraud any client or participant or

prospective client or participant, or to engage in any transaction, practice or course of business

which operates as a fraud or deceit upon any client or participant or prospective client or

participant in violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1).

  10.  Plaintiff seeks an order permanently restraining, enjoining and prohibiting

Defendants from violating Regulations 4.7 (b)(2)-(3) and 4.20(b),(c), 17 C.F.R. § 4.7(b)(2)-(3).

  11.  Plaintiff seeks an order permanently prohibiting Defendants from engaging,

directly or indirectly, in any activity related to trading in any commodity, as that term is defined

in Section 1a(4) of the Act, 7 U.S.C. § 1a(4) ("commodity interest"), including but not limited to,

the following:

> a. trading on or subject to the rules of any registered entity, as that term is
> defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29);
> b. engaging in, controlling or directing the trading for any commodity
> interest account for or on behalf of any other person or entity, whether by
> power of attorney or otherwise;
> c. soliciting or accepting any funds from any person in connection with the
> purchase or sale of any commodity interest;
> d. applying for registration or claiming exemption from registration with the
> Commission in any capacity, and engaging in any activity requiring such
> registration or exemption from registration with the Commission, except
> as provided for in Regulation 4.14 (a)(9), 17 C.F.R. § 4.14(a)(9) (2004), or
> acting as a principal, agent or any other officer or employee of any person

registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14 (a)(9), 17 C.F.R. § 4.14(a)(9) (2004);

e.    entering into any commodity interest transactions for his own personal account, for any account in which he has a direct or indirect interest and/or having any commodity interests traded on his behalf; and

f.    engaging in any business activities related to commodity interest trading.

12.    The injunctive provisions of any order shall be binding upon Defendants and any

person who is acting as officer, agent, employee, servant, or attorney on their behalf, and any

person acting in active concert or participation with Defendants who receives actual notice of

such order by personal service or otherwise.

Dated:

LEWIS KAPLAN
US DISTRICT COURT JUDGE

Approved as to form:

David Acevedo
Attorney for Plaintiff
Commodity Futures Trading Commission
140 Broadway, 19th Floor
New York, NY 10005
(646) 746-9733
dacevedo@cftc.gov

Charles B. Manuel, Jr.
Attorney for Defendants

38