**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| ABBAS A. SHAH and LINUXOR ASSET MANAGEMENT LLC, | )<br>)<br>) |
| Defendants. | )<br>) |

05 CV 8091 (LAK)

ECF Case

## PLAINTIFF'S MOTION IN LIMINE TO STRIKE PORTIONS
## OF WITNESS STATEMENT OF ABBAS A. SHAH

Plaintiff Commodity Futures Trading Commission ("CFTC") hereby moves *in limine* to to strike certain statements in Abbas A. Shah's Witness Statement ("Shah Statement")[1] which are hearsay, not relevant to any claim or defense and lack foundation as to the witness' knowledge. Defendants provided the CFTC with a copy of the Shah Statement on July 8, 2008,[2] as the direct testimony of Defendant Abbas A. Shah ("Shah") pursuant to the Court's local practices.

**I.    Shah's Hearsay Statements are Inadmissible**

Federal Rule of Evidence ("FRE") 802, also known as the Hearsay Rule, prohibits the admission of hearsay, which is defined under FRE 801 as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

---

[1] The July 8, 2008 Shah Statement is attached hereto as Exhibit 1.

[2] On July 10, 2008, Defendants emailed a revised version of the Shah Statement to Plaintiff's counsel. Because the revised Shah Statement was received so late, this motion *in limine* is based on the July 8 Shah Statement. To the extent the revised July 10 Shah Statement differs from the July 8 Statement, Plaintiff reserves to right to make any appropriate objections at trial.

The Shah Statement is replete with hearsay. Below is a chart of all hearsay statements contained within the Shah Statement and their paragraph numbers.

| Hearsay Statement | Paragraph No. |
|---|---|
| [Philip] McCarthey stated that he fully understood and appreciated the high risk-high return strategy. | 15 |
| McCarthey is the subject of an article published by the Columbia Journalism School that characterizes him as a frequent litigator and a heavy gambler in Las Vegas.[3] | 35 |
| [Phillip] Egger made the following comments about McCarthey:<br>• "He is a big investor looking for 300-400% returns."<br>• "He has no interest in 18% returns that he can get from Mutual Funds."<br>• "His investment in Linuxor represents less then [sic] 5% of his net worth and he has made bigger bets in Vegas." | 36 |
| Egger stated to Shah during one of his visits to NYC that he was paid over $2 million for his work. | 39 |
| McCarthey was presented to me as a wealthy individual with a reputation as a frequent gambler. | 43 |
| Egger responded [to Shah] that McCarthey was a big boy and a multi-millionaire who had made bigger bets in Vegas. Egger also commented that McCarthey "wants 300-400% Returns" which was subsequently confirmed by Egger and McCarthey. | 47 |
| [Egger and McCarthey] discussed their investments and the trading strategies that they were employing [in April 2002]. | 63 |
| Oring told me that trading strategy was highly volatile. | 67 |
|  | 68 |
| Egger even told me that McCarthey was accustomed to risky gambles and in fact had been known to place bigger bets in Las Vegas. | 78 |
| During June 2002, Egger phoned me frequently to inquire as to the status of the fund, often several times per day. | 80 |
| In one of the meetings in 2003, at Egger's usual New York city hotel on 63rd street and Lexington, Egger asked Shah if he could move all the losses in McCarthey's daughter's account to the two other trusts. He also discussed how he had helped MCarthey set GRATS trusts through securities transactions that saved him tens of millions of dollars in taxes. He also mentioned that the had been paid over 2 million for his work and he intimated that he could help with similar | 99 |

---

[3] This statement is hearsay because it is based on a newspaper article that Plaintiff has objected to on hearsay grounds. Morever, the statement is not relevant to any claim or defense. (See FRE 402).

| | |
|---|---|
| transactions in the future. He also cautioned me as I was leaving his room not to mention any of this to anyone because if McCarthey found out he would kill him. | |
| [McCarthey and Todd Brashear] asked about the unrealized profit and loss on the options and futures positions that were still outstanding at the end of 2002 and I told them I would get back to them with this information. | 100 |
| On August 26, 2003 Brashear called me back and told me that McCarthey was out of town and that they would call me when he returned, which they did. | 111 |
| Brashear had requested in a previous phone message that I send the approximate value of the fund for year end 2003, when it became available. | 127 |
| Several days later, McCarthey instructed us to reinvest the $500,000 back into the Linuxor Fund Pool. | 138 |
| During the conference, the [National Futures Association] finally agreed that, contrary to their earlier assertion, there were no fictitious accounts....[Cheryl Tulino] denied ever having called McCarthey/Brashear saying that it was NFA policy not to contact investors prior to the completion of an audit. | 139 |
| I asked [Brashear] what he wanted and he said that he was in New York City for the weekend having driven here from Utah and he wanted to meet me. He said that he no longer was employed by McCarthey and he had a proposition for me...He said that was okay with him and he suggested that we meet at the Second Avenue Deli at Second Avenue and 20th Street in Manhattan, at 5:00 p.m. | 153 |
| [Shah's wife] asked Brashear for his cell phone number so that she could give it Shah, but Brashear said that he was calling from a car phone in a car that was not his own. | 157 |
| Brashear's May 12, 2004 e-mail praising the Fund's recent improved performance and requesting a $500,000 withdrawal for McCarthey was rescinded when Brashear told me that McCarthey wanted to keep the amount in the Fund. | 169 |

Plaintiff respectfully moves to have all hearsay statements described above be deemed inadmissible under FRE 802.

## II.    Shah's Statements are Inadmissible for Lack of Foundation and Relevance

FRE 602 states that a "witness may not testify as to a matter unless evidence is introduced to support a finding that the witness has personal knowledge of the matter. Under the Court's Rules of Practice, witness statements in bench trials "shall contain all of the relevant facts to which the witness would testify including facts necessary to establish the foundation for the testimony." (Rules of Practice for Hon. Lewis A. Kaplan at 5). The Shah Statement contains numerous instances of factual assertions without any mention of the foundation for such assertions. In addition, many of those assertions are also irrelevant to any claim or defense and thus inadmissible under FRE 402.

The following chart is of statements in the Shah Statement which lack foundation or to which Shah has not demonstrated personal knowledge:

| STATEMENT | OBJECTION | PARAGRAPH No. |
|---|---|---|
| The central banks around the world, especially in the U.S. and Japan, had flooded the market with easy money bringing interest rates down to almost zero in Japan and 2-4$ in the U.S. The global markets fell while the fixed income had a large rally. | Lack of foundation and irrelevant | 16 |
| McCarthey inherited control of one of the two newspapers in Salt Lake City. He relinquished control but subsequently tried and failed to recover it after long drawn out but unsuccessful litigation. | Lack of foundation and irrelevant | 34 |
| [Egger] coordinated the transfer of funds from the trust to Linuxor and also coordinated with Milbank, Tweed, Hadley & McCloy LLP ("Milbank Tweed") to conduct professional due diligence on Linuxor...He was still involved with McCarthey's investment in Linuxor until at least March 2004. | Lack of foundation | 38 |
| [Egger] coordinated with Jonathan Battmachr ("Blattmachr"), a partner of Milbank Tweed, to help structure McCarthey's trusts. This resulted in | Lack of foundation and irrelevant | 39 |

| | | |
|---|---|---|
| saving many millions in taxes for the McCarthey family. | | |
| Jonathan Blattmachr ("Blattmachr") is a well-known senior partner at the law firm of Milbank, Tweed. He helped structure the McCarthey family trusts for generational wealth transfers which resulted in saving millions of dollars in taxes for the McCarthey family. | Lack of foundation and irrelevant | 41 |
| [McCarthey] also inherited a newspaper, which he relinquished control and later unsuccessfully sued to regain control of the paper. | Lack of foundation and irrelevant | 44 |
| The McCarthey advisory team included Egger, Todd Brashear ("Brashear") McCarthey's accountant, Jonathan Blattmachr, and Time [sic] Halloran partners at Milbank Tweed, who was responsible for due diligence. | Lack of foundation and irrelevant | 50 |
| Shortly thereafter, Egger, the principal spokesman for the McCarthey advisory team, concluded a due diligence background check on me. Egger also commissioned an evaluation of my trading experience and planned strategies. | Lack of foundation and irrelevant | 52 |
| In March 2002, Egger, acting on behalf of McCarthey, transferred $1.5 million to the fund from Milbank, Tweed, Hadley & McCloy LLP, the firm acting as trust operator for Article Second of the Jane F. McCarthey Grantee Retained Annuity Trust ("GRAT") Number 5. | Lack of foundation | 58 |
| McCarthey did not want anything but annual reports since his trust only required annual disbursements and tax filings. | Lack of foundation | 68 |
| The last trip [by Egger] was at the end of August 2003 and included our meeting at the Tse Yang Restaurant on August 25, 2003, when he faxed the K-1s for 2002 to himself in Washington State and to McCarthey in Utah. | Lack of foundation | 69 |
| This was not the first time Brashear had been given access to Zacharella, and in fact, Brashear had talked with him in the recent past. | Lack of foundation | 100 |

| | | |
|---|---|---|
| McCarthey did not want anything but annual reports since his trust only required annual disbursement and tax filings. | Lack of Foundation | 68 |
| Plaintiff objects to the series of statements concerning Brashear's alleged activities on or about September 16, 2006 | Relevance | 152-159 |
| This is an unreliable basis on which to determine fund performance, particularly when volatile and rapidly changing "market" values – often in thinly traded or sometimes non-existent "markets" – are used in the calculation | Lack of Foundation | 72 |
| Realized gains and losses, in contrast, are precise, actual data based on the completed trades of the Fund. | Lack of Foundation | 74 |
| The fallibility of the NAV data is also dramatically shown in the following chart (Ex. OO), which shows three dramatically different NAV's for the Linuxor Fund, calculated by three sources, as of December 31, 2002; (Plaintiff also objects to the underlying exhibits used which are Ex. OO, PP, and QQ and lack both foundation and authenticity). | Lack of Foundation and authenticity as to the underlying exhibits | 75 |

All of the statements described above from the Shah Statement provide no foundation as to how Shah had personal knowledge of such facts and are irrelevant. Thus, these statements are inadmissible under FRE 402 and 602.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully moves to strike the aforementioned statements contained within the Shah Statement as inadmissible hearsay, irrelevant and lacking foundation as to Shah's personal knowledge.

Respectfully submitted,

Dated: July 11, 2008

W. Derek Shakabpa
David Acevedo
Michael Berlowitz
Commodity Futures Trading Commission
140 Broadway, 19th Floor
New York, NY 10005
(646) 746-9748 (Shakabpa)
(646) 746-9940 (fax)
wshakabpa@cftc.gov

## CERTIFICATE OF SERVICE

I, David Spitzer, do hereby certify that I am over 18 years old and not party to this action and I caused to be sent, via facsimile and U.S. mail, a copy of PLAINTIFF'S MOTION IN LIMINE TO STRIKE PORTIONS OF WITNESS STATEMENT OF ABBAS A. SHAH to all parties and their attorneys of record listed below on 11 July 2008:

Charles Manuel, Esq.
Shiboleth
One Penn Plaza, Ste. 2527
New York, NY 10119
Attorneys for Defendants
(212) 563-7108 (fax)

David Spitzer

7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) | 05-CV-8091 (LAK) |
| v. | ) ) | ECF CASE |
| ABBAS A. SHAH and LINUXOR ASSET MANAGEMENT LLC, | ) ) ) | |
| Defendants. | ) ) ) | |

## ABBAS A. SHAH'S WITNESS STATEMENT

SHIBOLETH LLP
One Penn Plaza, Suite 2527
New York, New York 10119
Tel: 212-244-4111
Fax: 212-563-7108

Attorneys for Defendants
Abbas A. Shah and Linuxor Asset Management LLC

July 8, 2008

# TABLE OF CONTENTS

GLOSSARY OF TERMS...........................................................................1

DEFINITION OF TERMS....................................................................1

ABBAS A. SHAH'S WITNESS STATEMENT............................................5

INTRODUCTION...............................................................................5

BACKGROUND AND EXPERIENCE.....................................................6
    Professional Background.................................................6
    InterPacific Capital Fund...............................................6
    Linuxor Entities............................................................6
    Formation And Purpose.................................................6
    Linuxor Fund Strategies................................................8
    Personnel....................................................................10
    Abbas Shah.................................................................10
    Adam Bornstein...........................................................10

FUND ADVISORS..............................................................................10
    Law Firm - Charles R. Hall, Esq....................................10
    Accounting Firm - Rothstein Kass & Company.................. 11
    Fund Administrators.....................................................11
    CITCO Fund Services (USA), Inc....................................11
    Caledonian..................................................................11
    Fund Brokers............................................................... 11
    ABN-AMRO.................................................................11
    EDF Man Financial Securities.........................................11
    Bank of America Securities LLC.....................................11
    BNY Clearing Services LLC...........................................12

PHILIP McCARTHEY.........................................................................12
    Background..................................................................12
    The McCarthey Investment Vehicles................................13
    The McCarthey Advisory Team.......................................13
    Phillip

EGGER............................................................................................13
    Todd Brashear.............................................................14
    Jonathan Blattmachr.....................................................14
    McCarthey's Due Diligence on Linuxor............................14

CHRONOLOGY OF EVENTS................................................................15
    Introduction to Philip McCarthey....................................15

McCarthey's Investment in the Fund...............................................15
McCarthey's Due Diligence on Linuxor..........................................16
Execution of Fund Documents......................................................17
Realized Gains and Net Asset Values............................................20
The Volatility of Net Asset Values ...............................................22
McCarthey's Additional $10 Million Investment................................24
Reporting of 2002 Losses..........................................................27
The August 25, 2003 Email.........................................................30
The Temple Investment..............................................................33
The January 30, 2004 Email........................................................33

CIRCUMSTANTIAL EVIDENCE OF NO FRAUD...............................40
No Money Misappropriated From Investors....................................40
Minimal Fees Received From the Fund...........................................40
No Incentive Fees Because of High Water Mark................................42
Opportunity Cost....................................................................42
Ultra-Sophisticated Investors.....................................................43
Telephone Records Showing Constant Communication.........................43
Scrutiny by the NFA.................................................................43
McCarthey Team's Actions Reflecting Full Disclosure.........................43
Conservative Reporting of Realized P&L.........................................44
Limited Leverage Indicates No Fraud.............................................44

PLAINTIFF'S CONTENTIONS AS TO FACTS WITH MY RESPONSES..........45

## GLOSSARY OF TERMS

- Associated Person:                              "AP"

- Commodity Pool Operator:                       "CPO"

- Confidential Offering Memorandum"              "COM"

- Linuxor Global Macro Fund, LP:                 "Linuxor" or "LGMF"

- Linuxor Capital Management, LLC:               "LCM"

- Linuxor Asset Management, LLC:                 "LAM"

- National Future Association:                   "NFA"

- Net Asset Value                                "NAV"

- Profit/Loss                                    "P/L"

- Qualified Eligible Person"                     "QEP"


## DEFINITION OF TERMS

- **Futures:**   Contract to buy or sell a tradeable instrument or commodity at an agreed upon price at a future date.

- **Option:**    A call option is a right, but not an obligation, to purchase a fixed amount of an underlying instrument at a fixed price before a date at which the option expires.  Put options may be bought or sold.

- **Cash Instrument:**      Stock, Bond, Currency

- **Incentive Fee:**    Hedge Funds normally pay management an incentive fee equal to 20% of the net profit at year end.

- **General Expenses:**    All normal housekeeping expenses incurred in the course of conducting a business.  Examples are: rent, insurance, office supplies, telephone, secretarial services, legal and accounting fees, travel, taxes, etc.

- **Management Fees:**    For Hedge Funds, the management normally is entitled to an annual fee equal to 2% of the total capital under management.

- **Principal:** The total dollar amount of investor capital in the funds as of a reporting date.

- **NAV:**    The total value of the Funds' principal at a given date, including cash and securities, marked to market, to the extent possible.

- **Realized P/L:**    The net profit loss realized from a start date to a reporting date, for all trades that have been closed out during the time period.

- **Unrealized P/L:**  The net gain or loss shown by marking all open positions to market and computing the net P/L as if they were all to be closed out now.

- **Margin:**    A position in any security can be established for less than its market value by borrowing some percentage of the position's total value and paying cash for the remaining cost.

- **Leverage:** The use of various financial instruments or borrowed capital, such as margin, to increase the potential return of an investment.  Leverage can be created through options, futures, margin and other financial instruments.
  - If the margin percentage is 50% on a trade (i.e. if the buyer borrowed fifty percent of the position's total value), then the leverage is two times (2X) [e.g. 50% * 2 = 100%].  Similarly, if the margin percentage is 10% on a trade, the leverage is ten times (10X) [e.g. 10% * 10 = 100%].

- o If the value of an instrument (the buyer's position) doubles and the leverage is two times (2X), then the buyer will have a profit equal to two times (2X) his investment. If the instrument loses half (1/2) its value, then he must either put up more margin cash or sell out his positions and completely lose his original investment. If the leverage position is extremely high, a sudden drop in value can cost the investor all of his investment plus additional cash (e.g. Bear Stearns on March 14, 2009 and Carlyle Capital).

- **Stop Loss:** An open order left with a broker to close out a position should its price drop below a specified level so as to prevent any further losses.

- **Mark-to-Market:** Post the current market price of a security so as to calculate a position's current market value.

- **Mark to Model:** Carry the price of security at its book value (cost) so as to avoid trying to determine its current market value until it is sold. This is often done with options.

- **High Water Mark:** When a hedge fund applies a high water mark to an investor's money, this means that the manager will only receive performance fees on that particular pool of invested money when the value of the pool is greater than its previous greatest value. If the investment (and therefore the pool of invested money) drops in value, then the manager must first bring the value of the investment (i.e. the pool) back above its previous greatest value before the manager can receive performance fees again.

  - o Hedge Fund management typically receive annual incentive fees of thirty percent (30%) of the year's net profit only if the cumulative net profit from inception to the beginning of the next year is greater than or equal to zero. If the cumulative net profit is less than zero, the management will only receive an incentive fee

equal to twenty percent (20%) of the year's net profit less the cumulative loss from inception to the beginning of the following year.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) ) |
| v. | ) ) |
| ABBAS A. SHAH and LINUXOR ASSET MANAGEMENT LLC, | ) ) ) ) |
| Defendants. | ) ) |

05-CV-8091 (LAK)

ECF CASE

## ABBAS A. SHAH'S WITNESS STATEMENT

### INTRODUCTION

1.     I am the former CEO of Linuxor Asset Management LLC.  I make this Statement, which I am prepared to swear to under oath at trial, as my principal direct testimony at the trial of this case.

2.     In this Statement, I will (1) introduce the Court to the Linuxor Fund and its principals and advisors, (2) present the factual background of this case, and (3) set forth a rebuttal to the factual contentions of the Commodity Futures Trading Commission ("CFTC" or "Plaintiff").

3.     In essence, I respectfully submit that the factual allegations that are presented by the CFTC will not sustain a determination by this Court that I made any intentionally or recklessly false statement or omission of material fact in my close dealings with Philip McCarthey and his representatives, with whom I dealt on almost a daily basis for over two years. The facts, reasonable inferences and circumstantial evidence set forth herein will, I respectfully

5

submit, sustain a determination by this Court that I did not defraud Philip McCarthey or any other investor 9in the Linuxor Fund.

## BACKGROUND AND EXPERIENCE

4.    I received a Bachelor of Science from Columbia University in Biology with a concentration in Economics in 1986.    As shown on my resume, I have 15 years of broad experience in the financial sector, where I had management responsibilities in the securities, commodities and bond area. (My resume is attached hereto as Appendix A.) (Ex. 40.)

### Professional Background

5.    In over 15 years in the securities business, except for the McCarthy complaint, I have (i) never had a customer complaint filed against me and (ii) never been accused of any form of fraud and wrongdoing whatsoever in connection with any activity for any customer or for any firm I have worked for. I have pride in my record in the industry.

### InterPacific Capital Fund

6.    InterPacific Capital Fund was a global macro fund that I managed from 1996 through 1998. During the two- year life oft the Fund it produced returns over 150%.

### Linuxor Entities

#### Formation and purpose

7.    The Linuxor Global Macro Fund, L.P. ("Fund") was formed on October 31, 2001 and registered to do business in New York on November 5, 2001. (Exs. A-E, M, KKKK, 22.) The Confidential Offering Memorandum ("COM") for the fund describes the Fund's basic structure as follows:

> Linuxor Global Macro Fund, L.P. (the "fund") is a Delaware Limited Partnership formed in October 2001.  Linuxor Capital Management LLC (the "General Partner"), is a Delaware Limited Liability Company, and is the Fund's sole general partner.    The Fund's investment manager is Linuxor Asset

Management LLC, a Delaware Limited Liability Company (the "Investment Manager"). Under an Investment Management Agreement with the Fund, the Investment Manager has sole authority to manage the Fund's investment and Trading activities.

(Ex. F, p.1.)

8.    The COM also provides:

The Investment Manager is in the process of registering as an investment adviser with the U.S. Securities and Exchange Commission (the "SEC") under the Investment Advisers Act of 1940, as amended (the "Advisers Act") and as a commodity pool operator with the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA") under the Commodity Exchange Act, as amended (the "CEA").

(Ex. F, p.1.)

9.    The COM describes the fund's investment objective as follows:

The Fund's investment objective is to generate superior risk-adjusted returns over a full market cycle, primarily through discretionary trading in global fixed-income instruments, currencies, equities and equity indices, futures, options, currencies and other financial instruments such as forwards and swaps. The Fund seeks capital appreciation. Current income is not an objective."

(Ex. F, p. 1.)

10.    Linuxor Capital Management LLC ("LCM") was a Delaware limited liability company formed on October 1, 2001 and registered to do business in New York on November 7, 2001. (Ex. KKKK.)

11.    Linuxor Asset Management LLC ("LAM") was a Delaware limited liability company formed on November 6, 2001 and registered to do business in New York on November 7, 2001. (Exs. R, KKKK.) Shortly thereafter, LAM registered with the NFA. (Exs. K, O-Q, T, V, AA, 79.) On December 24, 2001, LAM was registered with the NFA as a Commodity Pool Operator. (Exs. T, KKKK.) On the same day, Shah was registered with the NFA as an Associated Person of LAM. And he filled out the NFA's end of the year online questionnaire.

7

(Exs. S, V, W, KKKK.)

12.    On February 13, 2002, LAM filed with the NFA a claim for exemption from the disclosure, reporting and record keeping requirements of Rules 4.21, 4.22 and 4.23(a)(10) and (a)(11), respectively. (Ex. U.) On March 18, 2002, LAM filed a Notice of Claim of Exemption with the NFA. (Ex. Z.)

13.    On February 26, 2002, LAM was admitted as a member of the NFA and Shah was admitted as an NFA associate member (Ex. W, X-Y, 57.)

**Linuxor Funds Strategies**

14.    Linuxor Global Macro Fund undertook a strategy that leveraged "Macro" events such as changes in global economies, typically brought about by shifts in government policy which affect interest rates, and which, in turn, affect all financial instruments, including currencies, stocks and bonds. Linuxor sought to anticipate such events and shifts and profit by investing in financial instruments whose prices were most directly influenced by these trends. Accordingly, we participated in all major global markets (equities, bonds, currencies, and commodities) and often used leverage and derivatives to accentuate the impact of market moves to meet the investment objectives of McCarthey for very high returns.

15.    I informed McCarthey at the outset that attaining his objective of very high returns would require this use of leverage on directional bets that often are not completely hedged, with consequently potential high returns, high risk and high volatility. McCarthey stated that he fully understood and appreciated the high risk-high return strategy.

16.    The fund started operations in March 2002, at a time marked by particularly high volatility because it was a year after the September 11, 2001 tragedy. The central banks around the world, especially in the U.S. and Japan, had flooded the market with easy money by bringing

8

interest rates down to almost zero in Japan and 2-4% in the U.S. The global equity markets fell, while the fixed income markets had a large rally.

17.     Linuxor Fund since inception was bullish on global equity markets, especially the Nikkei (Japanese equities index), and bearish on Japanese Government Bonds. Linuxor expected a big reversal in secular trends as a lagged effect of easy monetary policy that would thereby lead to a major secular bull market in global stocks and a bear market in global bonds. The fund therefore initiated a long Nikkei position and short position in Japanese Government Bonds.

18.     To meet the very high return investment objectives of our first and only investor, McCarthey, we assumed greater leverage by means of derivatives such as options and futures and held the positions longer with wider stop losses. As a result there was greater volatility of returns but also a realistic prospect for very high returns.

19.     By the end of May 2002, the markets did not respond as we had anticipated. The Nikkei continued to fall and the Japanese central bank continued to maintain very low interest rates. However, I remained of the view that the situation could reverse at any time and lead to a major profitable result for Mc Carthey. Around June and July of 2002, the fall in Nikkei accelerated and the rise in Japanese Government Bonds continued as well. Global equity markets fell sharply in a very short period of time, as much as 25 to 27%. Fixed income bonds rallied as much as 10%. Even with leverage of 2.5 to 3 times, which was far less then what macro hedge funds normally employ, with these drastic moves the market losses were quite large.

20.     Ultimately, Linuxor's entry into the market would prove to be not foolhardy but premature. Our view was ultimately proven right, beginning in late 2003 as the equity markets had one of the biggest secular bull markets in some time, while bonds had one of the biggest bear

markets ever. The Linuxor Fund started turning upward at that time, and our late-entrant investor, James Temple ("Temple"), made a small profit in the Fund. However, in the spring of 2004, the NFA pushed hard for liquidation of the Fund, and McCarthey then demanded the same. The result was losses for McCarthey that would have been substantially lessened if he had stayed the course a while longer.

### Personnel

#### Abbas Shah

21.    I was originally the 75% principal owner of LAM and eventually became the sole principal owner of LAM. My responsibilities included directing the Fund's trading strategy, marketing and seeking investors. (Ex. 39.)

#### Adam Bornstein

22.    Adam Bornstein ("Bornstein") was originally the 25% principal owner of the Fund. Bornstein was the Chief Operating Officer of the Fund from its formation in late 2001 until 2003 when he returned to Asia on business pursuits that he had engaged in previously. Bornstein's responsibilities at Linuxor included dealing with the attorneys, accountants and the Fund administrator. (Exs. N, O, S, T, U, W-DD, DDDD-EEEE, KKKK.)

## FUND ADVISORS

23.    Adam Bornstein and I were the two principals who operated and structured the Linuxor Fund with a number of experienced professional advisors, whom Mr. Bornstein had hired and with whom he was the principal contact. These advisors included:

#### Law Firm - Charles Hall, Esq.

24.    Charles Hall was the attorney who helped form the entities LAM and LCM and handled the fund's registration with the NFA. (Exs. B-D, P, EEEE-GGGG, KKKK.)

**Accounting Firm – Rothstein Kass & Company**

25.　Rothstein Kass & Company ("Rothstein") was Linuxor's accountant. (Ex. L.) Rothstein prepared the 2002 K-1 reports for Linuxor. (Exs. 111, 1, 9, 68-70.) I invited McCarthey and Brashear to feel free to contact John Zacharella ("Zacharella"), the Rothstein accountant who was handling Linuxor's taxes, with any questions regarding the portfolio and the records. Zacharella did communicate directly with McCarthey and Brashear about their portfolio and the records.

**Fund Administrators**

**CITCO Fund Services (USA), Inc.**

26.　The fund entered into an Administration Agreement with CITCO Fund Services (USA), Inc. ("CITCO") on December 1, 2001. (Ex. 19.)  CITCO ceased its services effective October 31, 2003. (Ex. 13.)

**Caledonian**

27.　Caledonian succeeded CITCO as Fund administrator in June 2004

**Fund Brokers**

**ABN – AMRO**

28.　On May 23, 2002, ABN-AMRO offered its prime broker services to LCM.  (Ex. BB.) ABN-AMRO became the prime broker for the fund in June 2002.  (Ex. CC, 64.)  The fund also rented space from ABN-AMRO in New York.  (Ex. EE.)

**E.D.F. Man Financial Securities**

29.　In January 2003, the fund retained E.D.F. Man Financial Securities as its prime broker.  (Ex. UU.)

**Bank of America Securities LLC**

11

30.    On September 26, 2002 Bank of America Securities LLC became the clearing broker for the Fund. (Ex. DD.)

### BNY Clearing Services LLC

31.    In January 2003, the fund retained BNY Clearing Services LLC for prime brokerage clearing services. (Ex. FF.)

### PHILIP McCARTHEY

#### Background

32.    Phillip McCarthey ("McCarthey") is a highly sophisticated investor and businessman. He has access to his own team of lawyers, CFO/accountants, financial advisors and tax lawyers.    He controls assets worth over $200 million. He has had prior experience in investing in hedge funds such as Leon Cooperman's Omega global hedge fund. (Brashear's CFTC Deposition)

33.    McCarthey is not the naïve investor he claims to be, instead he is a sophisticated investor who offers professional advice to clients on complex financial matters. He is a Certified Life Underwriter. (Exs. XXX, CCCC, 194, McCarthey Dep. 7:6-8.)

34.    McCarthey inherited control of one of the two newspapers in Salt Lake City. He relinquished control but subsequently tried and failed to recover it after long drawn out but unsuccessful litigation.

35.    McCarthey is the subject of an article published by the Columbia Journalism School that characterizes him as a frequent litigator and a heavy gambler in Las Vegas. (Ex. WWW.)

36.    Over the course of our relationship, Egger made the following comments regarding McCarthey:

- "He is a big investor looking for 300-400% returns."

- "He has no interest in 18% returns that he can get from Mutual Funds."

- "His investment in Linuxor represents less then 5% of his net worth and he has made bigger bets in Vegas."

**The McCarthey Investment Vehicles**

37.    The three McCarthey trusts, McCarthey Investments, L.L.C., J.F.M. Holdings, L.P. and The 2001 Jane F. McCarthey GRAT No. 5, a GRAT tax saving trust that encourages high risk/high return investments, that invested in Linuxor, were all managed solely by McCarthey. (Ex. 17, 194, McCarthey Dep. 6:14-20.)

**The McCarthey Advisory Team**

   **Philip Egger**

38.    Egger is an attorney and McCarthey's representative. (Ex. 15, Egger Dep. 28:14-23.) Egger had been suspended from practice of Law by State of Washington. (Ex. VVV; PPPP.) He introduced Shah to McCarthey. He coordinated the transfer of funds from the trust to Linuxor and also coordinated with Milbank, Tweed, Hadley & McCloy LLP ("Milbank Tweed") to conduct professional due diligence on Linuxor.   Egger followed up with frequent  phone calls and several visits to Linuxor's  office to keep an eye on the McCarthey investments. He was still involved with McCarthey's investment in Linuxor until at least March 2004.

39.    Phil Egger was also McCarthey's trust attorney. (Ex. 15 – Egger Dep. 28:14-23, Ex. 17.) He coordinated with Jonathan Blattmachr ("Blattmachr"), a partner of Milbank Tweed, to help structure McCarthey's trusts.   This resulted in saving many millions in taxes for the McCarthey family. Egger stated to Shah during one of his visits to NYC that he was paid over $2 million for this work.

**Todd Brashear**

40.   Todd Brashear ("Brashear") was McCarthey's Chief Financial Officer. (Ex. YYY.) Brashear, was first introduced to Shah on a conference call in June 2002 and he did not re-surface until April 2003.  Brashear was not directly involved with Linuxor until April 2003 when he spoke with Rothstein regarding the 2002 K-1s and approved the filing of an IRS tax filing extension from April until August 2003. (Exs. 5, 8.)

**Jonathan Blattmachr**

41.    Jonathan Blattmachr ("Blattmachr"), is a well-known senior partner at the law firm of Milbank, Tweed. He helped structure the McCarthey family trusts for generational wealth transfer which resulted in saving millions of dollars in taxes for the McCarthey family. Blattmachr was recently sued by a client for breach of fiduciary duty with respect to an IRS tax loophole that was subsequently disallowed by the IRS. (Ex. UUU.)

**McCarthey's Due Diligence on Linuxor**

42.    Egger and Milbank Tweed associate Tim Halleron, Esq. coordinated due diligence of Linuxor with an  industry expert, Martin Oring ("Oring"), who reviewed the fund's trading strategies in late April 2002, prior to further investment in May 2002 by McCarthey. (Ex. GG.)  Oring and a colleague, both industry experts, went to Linuxor's office on 43rd Street and Lexington Avenue in New York where they met with Adam and me. They reviewed the fund's records, trade sheets, position sheets, brokerage statements and other fund documentation and records. They were furnished documents or records that they requested. They reviewed fund performance and evaluated the high volatility of the trading.

**CHRONOLOGY OF EVENTS**

### Introduction to Philip McCarthey

43.    In February 2002, at a dinner in New York, New York, J. Tydus Richards and Egger, introduced me to McCarthey, a college friend and client of Egger'.

44.    McCarthey was presented to me as a wealthy individual with a reputation as a frequent gambler. Soon after, I found out that McCarthey is a highly sophisticated investor and businessman with a net worth of over $200 million. He is also a registered and certified life underwriter ("CLU") and he even has a website offering his services as a financial advisor to the public. He also inherited a newspaper, which he relinquished control and later unsuccessfully sued to regain control of the paper.

45.    I was introduced to McCarthey as a professional trader who was setting up a hedge fund designed to achieve 1 to 2 % return per month with comparatively high safety.

46.    During that dinner, McCarthey said that he was not interested in such tame investments. He then forcefully insisted to me that he was only interested in high, triple digit returns. I warned McCarthey of the high risk of losses that could result from the type of high volatility investments needed to produce such high returns. McCarthey dismissed these warnings and began discussing trading strategies with me. At that same dinner, McCarthey told Egger, his attorney and trust operator of the McCarthey Trust Funds, to make an initial investment of $1.5 million.

### McCarthey's Investment in the Fund

47.    A few days after this meeting, I called Egger and again discussed the risks involved in such an investment. Egger responded that McCarthey was a big boy and a multi-

15

millionaire who had made bigger bets in Vegas. Egger also commented that McCarthey "wants 300-400% Returns" which was subsequently confirmed by Egger and McCarthey.

48.    In an email dated August 15, 2002, Egger wrote, "You've incurred losses on a couple of trade strategies that were designed to return 300 - 400% if the strategies had worked." (Ex. HH.)

49.    In fact, McCarthey stated at his deposition, "I took it to mean, fine, we had not hit a home run of 300 to 400%." (Ex. 194 - McCarthey Dep. 39:67.)

50.    The McCarthey advisory team included Egger, Todd Brashear ("Brashear") McCarthy's accountant, Jonathan Blattmachr, and Time Halloran partners at Milbank Tweed, who was responsible for due diligence.

51.    The members of this investment group were no ordinary investors. Indeed, in all my experience on Wall Street I have never dealt with a more sophisticated qualified investment group. It is very rare that investors in a hedge fund come to meet the principals of the fund with their entire team of equally sophisticated advisors at their side including attorneys from one of the top law firms in New York, a senior attorney from Salt Lake City and a senior account financial advisor, but I was delighted to accommodate McCarthey and his team and to address every inquiry that they made.

**McCarthey's Due Diligence on Linuxor**

52.    Shortly thereafter, Egger, the principal spokesman for the McCarthey advisory team, conducted a due diligence background check on me. Egger also commissioned an evaluation of my trading experience and planned strategies.

53.    Egger and Milbank Tweed associate Tim Halleron, Esq. coordinated due diligence of Linuxor with an  industry expert, Martin Oring ("Oring"), who reviewed the fund's

trading strategies in late April 2002, prior to further investment in May 2002 by McCarthey. (Ex. GG.)   Oring and a colleague, both industry experts, went to Linuxor's office on 43rd Street and Lexington Avenue in New York where they met with Adam and me. They reviewed the fund's records, trade sheets, position sheets, brokerage statements and other fund documentation and records. They were furnished documents or records that they requested. They reviewed fund performance and evaluated the high volatility of the trading.

**Execution of Fund Documents**

54.    On or about January 29, 2002, I mailed copies of the Fund's Limited Partnership Agreement, Subscription Agreement, Investment Managers Agreement and Confidential Offering Memorandum to McCarthey and Egger.  (Exs. F-I, 22-23.) These documents fully disclosed the risks involved.  Each of them signed and returned the agreements.

55.    The confidential offering memorandum (COM) detailed the warnings and risks of trading losses, Linuxor's allowable expenses, and the high water mark that the fund carried, which meant I only earned commissions when the fund was at or above that mark.  (Ex. F.)  The COM also explicitly stated that Linuxor was a newly-formed entity with no performance history:

> **Limited Operating History.** Although the Managing Member and the Investment Manager have had significant experience investing and trading equity securities and commodity interests...both the Investment Manager and the Fund are newly-formed entities with no history of operating performance.

(Ex. F, p. 17.)

56.    The COM enumerated the risk factors involved in investing in the Linuxor Pool Fund in no uncertain terms as follows:

> There can be no assurances that the Fund's objectives will be satisfied.

(Ex. F, p. 2.)

17

\* \* \*

The Investment Manager has wide latitude in choosing Fund investments. Although the Investment Manager's proprietary trading system emphasizes multi-asset diversification and follows a set of money management rules that limit the amount of Fund assets committed to each trade, market, and country (as disclosed above), the Investment Management Agreement imposes no limits on the types of securities or other instruments in which the Fund may invest, the types of positions it may take, the concentration of its investments (whether by sector, industry, fund, country, asset class or otherwise) the amount of leverage it may employ or the number or nature of short positions it may take. Further, depending on conditions and trends in the financial markets, the Investment Manager may pursue other strategies or employ other techniques it considers appropriate and in the Fund's best interests.

(Ex. F, p. 12)

\* \* \*

An investment in the Fund involves significant risks. Some of those risks are summarized below. Some are discussed more fully elsewhere in this Memorandum. Prospective investors should carefully consider all the risks discussed below and should consult their own legal, tax, and financial advisers about these risks and an investment in the Fund generally.

(Ex. F, p. 16)

\* \* \*

**Not a Complete Investment Program.** An investment in the Fund may be deemed a speculative investment and is not intended as a complete investment program. It is designed only for sophisticated and experienced investors who can bear the risk of loss of their entire investment in the Fund.

(Ex. F, p. 17)

57.     The subscription agreements signed by McCarthey on behalf of McCarthey Investements, LLC, JFM Holdings, L.P. and The 2001 Jane F. McCarthey GRAT No. 5 stated the following with respect to risk disclosure and other warnings:

18

(c)    Review of Offering Materials and Independent Advice. Subscriber has carefully reviewed the Confidential Offering Memorandum (the "Offering Memorandum") relating to the Fund's Offering of Interests and its exhibits (including the Partnership Agreement and the Investment Management Agreement) and has discussed with Fund representatives any questions Subscriber may have had as to such materials or the Fund or the business, operation, or financial condition of the Fund or the General Partner or the Investment Manager.    Subscriber understands the risks of this investment, as described in the "Certain Risk Factors" section and other portions of the Offering Memorandum, and the conflicts of interest to which the General Partner and the Investment Manager will be subject.    In deciding to invest in Interests, Subscriber has not relied on any statements or information other than those contained in the Offering Memorandum and its exhibits, as amended and supplemented, and in financial statements provided by the General Partner. Subscriber has consulted with Subscriber's own legal, accounting, tax, investment, and other advisers in connection with this investment, to the extent that Subscriber has deemed necessary.

(Ex. H, p. 15.)

58.    In March 2002, Egger, acting on behalf of McCarthey, transferred $1.5 million to the fund from Milbank, Tweed, Hadley & McCloy LLP, the firm acting as trust operator for Article Second of the Jane F. McCarthey Grantee Retained Annuity Trust ("GRAT") Number 5. (Ex. 194, McCarthey Dep. 6:21-24.)

59.    Later, McCarthey had three trusts that would invest in Linuxor:  McCarthey Investments, L.L.C., J.F.M. Holdings, L.P. and The 2001 Jane F. McCarthey GRAT No. 5. (Ex. 67.)

60.    A GRAT short for Grantor Maintained Annuity Trust, is a sophisticated tax evasion vehicle. GRAT beneficiaries benefit when the total return of the GRAT exceeds a pre-set nominal benchmark rate.    That incremental return is tax free and can only be distributed to beneficiaries on an annual basis.

61.     McCarthey also reiterated his position to me that he is not interested in small returns such as one to two percent per month. McCarthey said that he was looking for very high percentage returns and that he was quite prepared to take the risks associated with possible large returns. McCarthey instructed me to look for trades with the potential of achieving large returns.

62.     In response, I changed from the investment strategy originally proposed to trading strategies that met McCarthey's request for a high-risk, high return investment (e.g. long Japanese equities – short Japanese Government Bonds), as I was permitted to do, even without notice to McCarthey, because the COM stated, in pertinent part, as follows:

> **Changes in Investment Strategies.** The Investment Management Agreement gives the Investment Manager broad discretion to expand, revise or contract the Fund's business without the consent of the Limited Partners. Thus, the investment strategies described elsewhere in this Memorandum may be altered without prior approval by, or notice to, the Limited Partners if the Investment Manager determines that such change is in the best interests of the Fund. Any such decision to engage in a new activity could result in the exposure of the Fund's capital to additional risks which may be substantial.

(Ex. F, p. 18.)

63.     In early April 2002, both Egger and McCarthey came to visit us in our office at Lexington Avenue and 43rd Street in Manhattan. They discussed their investments and the trading strategies that they were employing. They saw the volatility of the daily trading from our trading blotter.

**Realized Gains and Net Asset Values**

64.     On April 23, 2002, Bornstein, on behalf of Linuxor, prepared a report of the realized profits and losses in a futures account of the Linuxor Fund from March 19 through April 18, 2002. (Exs. 39, 202.) The report clearly stated that it was a "Realized Profit/Loss

Statement." (*Id.*)  The report and the covering letter did not purport to be an unrealized profit/loss statement or NAV statement. (*Id.*)

65.    I never signed the covering letter, which I first saw in the course of preparing for this trial. (*Id.*)  The first time I saw the report was at the NFA Arbitration in January 2007. Furthermore, McCarthey stated that he never received the report.  (Exs 194, McCarthey Dep. 32:8-22; 33:10-17; 34:8-17; 38:4-8.)

66.    In late April 2002, Egger and Tim Halloran, Esq. ("Halloran"), an associate attorney at Milbank Tweed, arranged for further due diligence of Linuxor and its trading strategies. Martin Oring ("Oring"), an industry expert, and his colleague were sent to our offices to conduct due diligence on Linuxor's trading strategies and the volatility of the Fund.  Bornstein and I were both present and we showed Oring and Halloran our actual trading sheets, broker and P&L statements and anything else they requested.

67.    Oring told me that the trading strategy was highly volatile. Because of the volatility of the instruments being traded in Linuxor's high risk positions, the market value of the open positions in place varied up and down as much as 10% to 15 % or more regularly, even on a daily basis. I told him that McCarthey had specifically requested a high return investment and that he had told me he was willing to take on a high degree of risk. Shortly thereafter, Egger, the principal spokesman for the McCarthey advisory team, conducted a due diligence background check on me.  Egger also commissioned an evaluation of my trading experience and planned strategies.

68.    McCarthey did not want anything but annual reports since his trust only required annual disbursements and tax filings. Instead he wanted to be kept informed more frequently by

means of phone calls to his representative Egger (Exs. ZZ-CCC, LLLL-NNNN, QQQQ, SSSS-XXXX.).

69.    There were numerous trips made by McCarthey and/or Egger to New York where they checked up on their investment in Linuxor from the end of 2001 through August 2003. At the end of 2001, both McCarthey and Egger came to New York. They also both traveled to New York in late March/early April 2002. They made another trip at the end of October 2002 and stayed at the Plaza Hotel. In 2003, Egger made four trips to New York in February, April, May and August of that year. The last trip was at the end of August 2003 and included our meeting at the Tse Yang Restaurant on August 25, 2003, when he faxed the K-1s for 2002 to himself in Washington State and to McCarthey in Utah.

70.    I spoke with McCarthey and Egger at the end of every month to update them on the status of their accounts.    (Exs. ZZ-CCC, LLLL-NNNN, QQQQ, SSSS-XXXX.) Additionally, I had several meetings with Egger, both in person and over the telephone, in which we discussed the Fund's status and trading strategy. (*Id.*)

71.    On late May 8, 2002, Egger invested $300,000 of his own money into Linuxor. (Ex. JJJJ.)

**The Volatility of Net Asset Values**

72.    The following chart, which summarizes date from the indicated CFTC exhibits, demonstrates that Net Asset Values for options and futures on global fixed-income instruments can vary drastically from day to day and week to week. This is an unreliable basis on which to determine fund performance, particularly when volatile and rapidly changing "market" values – often in thinly traded or sometimes non-existent "markets" – are used in the calculation.

| 73.<br><br>Ending Date | Week's Change in Realized P&L | Week's Change in NAV | CFTC Exhibit # | Month End |
|---|---|---|---|---|
| 9/5/2003 | 732,300 | | 161 | |
| 9/12/2003 | 282,000 | -907,848 | 161 | |
| 9/19/2003 | 146,000 | -46,346 | 161 | |
| 9/26/2003 | 213,000 | | 161 | 9/30/2003 |
| 10/3/2003 | -120,000 | -220,945 | 186 | |
| 10/10/2003 | 120,800 | | 186 | |
| 10/17/2003 | 182,500 | 155,104 | 186 | |
| 10/24/2003 | 97,500 | | 186 | |
| 10/31/2003 | -10,500 | -189,917 | 186 | 10/31/2003 |
| 11/7/2003 | 300,000 | | 170 | 11/30/2003 |
| 12/5/2003 | 55,230 | | 166 | 12/31/2003 |
| 1/2/2004 | 113,000 | | 177 | 1/31/2004 |
| 2/6/2004 | 17,000 | -259,821 | 167 | |
| 2/13/2004 | 40,000 | | 167 | |
| 2/20/2004 | -27,000 | -501,734 | 167 | |
| 2/27/2004 | 17,500 | -622,896 | 167 | 2/29/2004 |
| 3/5/2004 | 12,000 | | 168 | |
| 3/26/2004 | 17,000 | | 168 | 3/31/2004 |
| 4/2/2004 | 25,000 | | 173 | |
| 4/9/2004 | 30,250 | -520,819 | 173 | |
| 4/30/2004 | 23,512 | -732,051 | 173 | 4/30/2004 |
| 5/7/2004 | 15,122 | | 169 | |
| 5/21/2004 | 86,324 | -240,832 | 169 | 5/31/2004 |

Change of NAV for week **Greater** than reported actual Realized P&L
Change of NAV for week **Less** than reported actual Realized P&L

74.    Realized gains and losses, in contrast, are precise, actual data based on the completed trades of the Fund

75.    The fallibility of NAV data is also dramatically shown in the following chart (Ex. OO), which shows three dramatically different NAV's for the Linuxor Fund, calculated by three sources, as of December 31, 2002:

## Linuxor Net Asset Value

as of December 31, 2002

| As Reported By: | NAV |
|---|---|
| CITCO: | $6.592 Million |
| Rothstein & Kass: | $7.245 Million |
| Market Value: | $5.9 Million |

(The sources for Ex. OO are shown in Ex. PP.)  Note that the NAV variation between the low (McCarthey) and high (Rothstein Kass) valuations as of a single point in time is $1,345,000, *or 23%*.

**McCarthey's Additional $10 Million Investment**

76.    In May 2002, I began trading with leveraged positions. McCarthey, on behalf of McCarthey Investments, LLC and JFM Holdings LP, transferred an additional $10 million to Linuxor, $5 million of which came from McCarthey Investments, and $5 million from JFM Holdings, LP, so that McCarthey's total investment in the Linuxor fund was $11.5 million, no more than 5% of McCarthey's total net worth.  (Ex. JJJJ.)

77.    McCarthey did not request or receive any documents from me or anyone else on behalf of Linuxor between March 2002, when McCarthey made his initial $1.5 million investment in Linuxor, and May 2002 when McCarthey invested an additional $10 million in Linuxor.

78.    After making the additional investment, both McCarthey and Egger directed me to take leveraged trading positions in the hopes of achieving large gains, in spite of the high risks involved.  Egger even told me that McCarthey was accustomed to risky gambles and in fact had been known to place bigger bets in Las Vegas.

79.    In June 2002, I called McCarthey to report the status of his investments, specifically, that the trading strategy that the funds were using had not worked and had resulted in a loss in excess of 30%. I went long on the Nikkei and leveraged and short on the fixed income markets, i.e. Japanese government bonds and U.S. bonds. The Nikkei dropped and the fixed income markets rallied. McCarthey told me to keep my head down and keep trading. McCarthey repeated to me that he only wanted year-end tax reports. McCarthey also made it very clear to me that he wanted me to keep Egger, rather than himself, apprised of the trading results. During this monthly telephone conference between McCarthey and me, McCarthey introduced me to Brashear as McCarthey's Chief Financial Officer. I did not speak with Brashear again until around April 2003.

80.    In fact, throughout the duration of McCarthey's investment in Linuxor, McCarthey never made any request for a report other than the year-end K-1 reports.

81.    During June 2002, Egger phoned me frequently to inquire as to the status of the fund, often several times per day. Egger also visited New York on numerous occasions and spent time with me discussing the fund, among other things.

82.    The initial trades set up in the fund experienced losses resulting in a large drawdown in the fund. The losses, as well as the complete status of the portfolio, were made known to McCarthey and Egger at this time in a detailed report. After learning of these losses, McCarthey stated, "Well, we didn't hit the home run we were hoping for, but keep your head down and keep trading."

83.    By August 2002, the portfolio showed paper losses of approximately fifty percent due to a sudden drop in the Nikkei and related moves in Japanese Government Bonds, on which the fund had invested heavily in the opposite direction. (Exs. II-MM.) This loss was reported to

McCarthey and Egger from April 2002 through August 2002 via frequent telephone conversations. Linuxor provided McCarthey and Egger with a printed report of this loss via mail in early September.

84.    I called Egger to inform him that the Fund was down another $3.5 million, or 35%, from the last time I had spoken with him (June). I told him that the Nikkei and JGB trades were not working and that we would have to stay close to home to recover the losses. This led to the letter and email which Egger wrote to me and copied to McCarthey on August 15, 2002. (Exhibit HH.)

85.    From the beginning with McCarthey's initial investment in the fund and even after the report of additional 35% loss on August 15, 2002, that loss experienced by Linuxor, McCarthey did not make any complaints to Linuxor or me and McCarthey did not ask for redemption or for any reports other than a year-end report. Linuxor carried on trading and reporting in accordance with McCarthey's wishes. McCarthey and his associates were in frequent contact with Linuxor via telephone calls and numerous personal visits to Linuxor's offices, including due diligence conducted by attorneys from Milbank & Tweed acting on behalf of McCarthey.

86.    In September 2002, I received the first NAV statements from CITCO, the Linuxor fund administrator. The reports covered the time period from March 2002 through August 2002. (Ex. 66.) I mailed these personally from the United States Post Office at 44th and Lexington Avenue to both McCarthey and Egger. (Exhibit SS.)

87.    By October 2002, the market losses had shrunk the value of the account's principal below the minimum required by ABN AMRO to meet the margin requirements for the futures positions. (Ex. 55.) This occurred in part because they had divided the total fund cash

between the Futures account and the Cash securities account and were not including the cash in the Cash account when computing margin percentages. As a result, ABN AMRO dropped the Linuxor Futures account which was therefore switched back to EDF Man – Fianncial Securities, the original prime broker for futures at the inception of the fund, and ABN AMRO continued to service the cash account as late as approximately Feb 2003.

### Reporting of 2002 Losses

88.     In January 2003, during the customary monthly telephone conversation between McCarthey and myself regarding the status of the Linuxor fund, I informed McCarthey that the fund was experiencing losses and McCarthey responded "So we didn't hit the home run we were hoping for. Just keep your head down and let's try to get it back. If you can lose big, then you can make it big too."

89.     I made no misrepresentation of fact, nor omission of material fact in connection with the fund's 2002 losses. First, I gave regular reports of the status of the fund's finances to McCarthy and Egger throughout the entire period of their investments.

90.     Second, as of January 2003, I reported fund losses of approximately _____ dollars to Egger and McCarthey. This figure was approximate because the year-end values had not been calculated by the fund administrator and the accountants.

91.     Third, when I first learned of the loss of approximately $5.1 million in _____ 2003, I disclosed that information to both Egger and McCarthey, as noted above.

92.     Therefore, there was no false representation or omission of material information by me in addressing the 2002 losses with McCarthey and Egger. Furthermore, I did not act with reckless disregard for the truth or falsity of the information I disclosed to Egger and McCarthey. I disclosed all information I had when I had it, and nothing I said to them was untruthful at all.

93.     In or about March 2003, I sent audit inquiry letters to ABN AMRO, Charles Hall, Jr. and Man Financial, Inc. requesting that they furnish information to Rothstein Kass. (Ex. GGG, HHHH.)

94.     In April 2003, Linuxor's accountant, Rothstein Kass & Company, requested a tax reporting extension from the IRS until August 2003 because one brokerage firm had not yet submitted their final trading records for 2002. (Ex. 21.) My assistant, Tim Garrett, sent McCarthey a letter dated April 8, 2003 informing him of the reporting delay and McCarthey said he had no problem with it. (Ex. HHH.)

95.     Further, the delay in providing these reports was not willful or grossly negligent. As stated in the Limited Partnership Agreement between the McCarthey investors and Linuxor, in pertinent part, as follows:

> 8.1.1 *Exculpation.* Neither the General Partner, nor the Investment Manager, nor any member, employee, agent or other Affiliate of the General Partner, nor any board or body with respect to the General Partner or the Fund (each, an "*Indemnitee*") will be liable to any Partner for any act or omission performed or omitted by such Indemnitee in connection with this Agreement or the Fund's business or affairs . . . and no such act or omission will in and of itself constitute a breach of any duty owed by Indemnitee to the Fund or any Limited Partner hereunder or under the Act, provided such act or omission did not constitute gross negligence or a willful violation of the law. (Limited Partnership Agreement, p. 16).

96.     I invited McCarthey and Brashear to feel free to contact Linuxor's accountant with any questions regarding the portfolio and the records.

97.     Rothstein also made McCarthey and Brashear aware of the portfolio's losses at around that same time. In May 2003, I called McCarthey from the common area of the Helmsley Building. I told him that I was trying very hard to recover the losses. McCarthey told me that he

didn't care about interim fluctuations and only cared about the value of his investment at year's end.

98.    Egger visited me numerous times in NYC and we discussed the investments in the fund and how we were doing in great detail.

99.    In one of the meetings in 2003, at Egger's usual New York city hotel on 63rd street and Lexington, Egger asked Shah if he could move all the losses in McCarthey's daughter's account to the two other trusts. He also discussed how he had helped McCarthey setup GRATS trusts through securities transactions that saved him tens of millions of dollars in taxes. He also mentioned that he had been paid over 2 million for his work and he intimated that he could help with similar securities transactions in the future. He also cautioned me as I was leaving his room not to mention any of this to anyone because if McCarthey found out he would kill him.

100.    At the end of July 2003, I spoke with McCarthey and Brashear over the phone and told them the K-1's would be coming shortly. They asked about the unrealized profit and loss on the options and futures positions that were still outstanding at the end of 2002 and I told them I would get back to them with this information. I told Brashear to feel free to contact our accountant at Rothstein Kass & Company, Joe Zacherella. In a call to Zacherella, I told him to give Brashear whatever information he required. This was not the first time Brashear had been given access to Zacharella, and in fact, Brashear had talked with him in the recent past.

101.    On August 12, 2003, Rothstein submitted the K-1 reports for 2002 to Linuxor. (Exs. IIII, 1, 9, 68-70.)

102. I assumed that Rothstein was sending the K-1's to McCarthey and the other investors since they all had cover letters addressed to the investors with the Rothstein Kass letterhead. (Ex. EEE.)

103. Just to be sure, on August 14, 2003, I sent a copy of the 2002 K-1s to McCarthey and Egger by regular mail. (Ex. EEE.)

104. I went on vacation in the Bahamas from August 16, 2003 to August 23, 2003.

105. When I returned, I had a message from my office saying that Brashear had tried to reach me. I got that message when I returned home Saturday night. I assumed that he had not received the K-1's so I faxed the K-1's to Brashear on August 25, 2003 and followed up with an email and phone calls. (Ex. EEE.)

106. It was the responsibility of the Fund administrator CITCO, to circulate copies of the Fund annual statement to invertors (See Ex 19, Administration Agreement at 20)

**The August 25, 2003 Email**

107. On August 25, 2003, I called McCarthey's office to notify them they would be receiving a copy of the 2002 K-1s via facsimile. (Ex. EEE.) Several minutes later, I sent a copy of the 2002 K-1s to McCarthey via facsimile. (Ex. EEE.) That same day, I also delivered a copy of the 2002 K-1s to Egger in person at a Chinese restaurant and Egger sent a copy of the 2002 K-1s to McCarthey via facsimile from that Chinese restaurant. (Ex. EEE.)

108. The 2002 K-1's clearly stated the nearly 50% drop in the value of the account as previously reported by both me and Linuxor's accountants, Rothstein, yet McCarthey remained invested in the fund and sought no redemption. (Ex. EEE.)

109. On August 25, 2003, I sent an email to the McCarthey pool participants' representative, Brashear, directly responding to his inquiry made on behalf of McCarthey. (Ex.

10, 32.) With respect to the fund's open options and futures positions only, I correctly stated, "we have thus far recovered more than half of the capital loss and if we continue at this pace we hope that we will have not only recovered all of the capital loss but there is a good likelihood that we will be positive as far as returns since inception are concerned." (*Id.*)

110.    I did not make or purport to make any statements regarding the value of the entire fund, nor on its face does it purport to be a NAV statement.

111.    On August 26, 2003 Brashear called me back and told me that McCarthey was out of town and that they would call me when he returned, which they did.

112.    Egger was in town the week of August 27, 2003 and I had dinner with him on the evening of August 27, 2003 at a Chinese restaurant. The K1 report evidently was faxed by Egger to McCarthey with a cover letter displaying the letterhead of the restaurant and a date of August 27, 2003.

113.    From the period beginning in August 2003 until January 2004, McCarthey did not make any requests for reports or redemption. Further, McCarthey made no complaints about Linuxor or me as I performed in accordance with McCarthey's wishes with respect to reporting and was in daily contact with McCarthey and his associates via more than several hundred of telephone calls. McCarthey also personally visited me at Linuxor's offices in New York, New York more than once, and once at my home. During those visits, he specifically directed me to keep trading to try and recoup the outstanding losses. McCarthey also repeated his desire to only receive year-end reports instead of frequent reports during these visits.

114.    Neither I nor any employee or officer of Linuxor hid or misrepresented anything to McCarthey or his associates at any time, which is demonstrated by the fact that McCarthey remained in the fund without any complaints even after receiving the 2002 K-1s in August 2003.

115.   In a conference call in early to mid-September 2003 with Brashear and McCarthey, we discussed my plans for trying to recover the losses.

116.   After I spoke with Brashear and McCarthey, I began sending them weekly emails with market views and position updates. (Exs. 81-89, 90-95, 99.) These emails came from my analysis of the fund's profits and losses based on values listed on Bloomberg.com.

117.   At this time also, Egger came into town and visited us in our office and went over the status of his and McCarthey's investments.

118.   At the end of 2003, Rothstein provided Linuxor with the fund's Financial Statements and Independent Auditors' Report for the year ending December 31, 2002. (Ex. DDD, 38, 100.)

119.   During the Christmas season, my family received a Christmas card from the Eggers. (Ex. NN.)

120.   Plaintiff asserts that my e-mail of August 25, 2003 to Todd Brashear falsely states that half the "capital loss" of the Fund had been recovered as of that time (Ex. 32). This mischaracterizes both the e-mail and the actual facts.

121.   Plaintiffs are taking the e-mail completely out of context, because the e-mail refers to the unrealized gains and losses only on the Fund's open options and futures positions at the end of 2002. These end-of-year unrealized gains and losses data were apparently needed for tax reasons – an issue that McCarthey and Brashear raised with me in a conference call at the end of July 2003.

122.   The reports of the unrealized futures and options gains and losses in the e-mail were precisely accurate. The source data for the e-mail report are contained in exhibits VV, WW, XX and YY. These are the statements issued by Linuxor's prime broker, E.D.F. Man, for the

months December 2002 through March 2003, showing the unwinding of the open positions from 2002. These positions are listed in Exhibit TT.

123.    Plaintiff also attempts to directly mislead the Court by omitting key words from their quoted passage from the e-mail. The beginning of the e-mail makes very clear that its subject is not "capital" in general, but the *unrealized gain or loss on capital invested in open futures and options positions*, as to which we had, in fact, recovered more than half the loss since the beginning of the year:

> Please note that he capital invested through the end of the year in some options and futures positions is shown as an unrealized loss which we completely reversed in the first week of January.

It is most disturbing to see this plaintiff distort the facts through the misleading, selective excerpting of documents.

### The Temple Investment

124.    On October 29, 2003, James Temple ("Temple") transferred $2 million to Linuxor for investment in the fund on December 1, 2002. (Ex. 70.)  Temple had previously invested in Shah's InterPacific Capital Fund.

125.    On December 1, 2003, Linuxor began to trade with Temple's $2 million investment, plus $6,000 of accrued interest.

### The January 30, 2004 Email

126.    On or around January 30, 2004, Brashear sent me an email asking for a year-end report for 2003. (Exs. 5, Brashear Dep. 39.).  He asked for an approximate estimate of realized and unrealized P&L. (Ex. 99.)

127.    Brashear had requested in a previous phone message that I send the approximate value of the fund for year end 2003, when it became available. He then left a second message

later in January while I was out of town in Florida. My son was ill with high fevers and colds and my wife had taken him to her mother's home in Florida. I followed her later and I promptly came down with the flu myself. (Exs. 94, 96-99.)

128.    When I received Brashear's message in the late evening of January 30, 2004, I still did not have any audited year-end numbers from the accountants, and I had no access to the Internet or my own computer systems. I tried to get hold of my colleague, Div Kumar, in New York but he had left for the weekend. Brashear's request demanded an immediate response, so I did the best I could under the circumstances. I drove to a nearby hotel at 11:30 p.m. and managed to get their permission to use their business office internet computer although they were closing the office at midnight.

129.    I relied only on my memory when I wrote my responsive email to Brashear that night because I did not have any of the audited year-end numbers from the accountants, or my personal computer or records with me. In that email, I mistakenly reported data as of October 2003 instead of data as of January 2004 as Brashear requested.

130.    To the best of my recollection at the time, my last audited statement from CITCO, the fund administrator was as of October 31, 2003, showing a fund value of about 6.5 million. (Ex. III.) I tried to make a quick adjustment for the gains in November of about 1.5 million, done literally on the back of an envelope, and emailed it to Brashear just before the hotel closed their internet facility at midnight.

131.    I composed the message and responded in about 10 minutes before midnight local time. (Ex. 38, 100.) This very hasty email to Brashear contained several mistakes, which can now be seen by hindsight.

132.    The errors contained in the email did not cause any damage to the McCarthey investors as their account value rose approximately 45% between January 2004 and the liquidation of the Linuxor fund at the end of June 2004.  If McCarthey had chosen to withdraw their money from the Linuxor Fund immediately on January 30, 2004, they would have ended up with $2,519,661.00, far less than the $4,002,889 ultimately received in July 2004.

133.    Also, as McCarthey testified at his deposition that he was "sure [he] would have seen it", McCarthey did not take any action as a result of seeing this email. (Exs. 194, McCarthey Dep. 107: 7.)

134.    Furthermore, one week later, immediately upon returning from vacation, I left a voicemail for McCarthey, and I contacted Egger and McCarthey's associate, Brashear, and another person invested in Linuxor regarding the mistake I made in the email dated January 30, 2004.

135.    At no time from the inception of the fund until the liquidation of the fund did I ever receive any personal gain from the fund.  The fund was never at or above the high water mark.

136.    When I returned to my office in New York on Monday, February 2, 2004, the NFA had sent Linuxor a letter requesting annual reports in connection with a routine annual audit. (Exhibit KKK.)  In response, the NAV calculations requested by Brashear were carefully redone as they were also needed for the NFA and the upcoming NFA audit.  The errors were corrected on Monday.  On Tuesday, February 3, 2004 I called Brashear to correct the erroneous data I had sent him from Florida.  McCarthey was not reachable, so I informed Egger of the corrections. Since Egger and Brashear were both apprised of the corrected 2002 NAV data, I felt no need to send written corrections to McCarthey. (Exs. 101-105.)

137.    On April 16, 2004, Egger redeemed $197,000. This was calculated by Linuxor personnel from a time-weighted spreadsheet tracking each investor's pro-rata share of the pool's capital and expenses. (See Nathan's testimony with its Linuxor Portfolio History spreadsheet.]

138.    On April 6, 2004, Temple's investment was worth approximately $2,142,407 and Temple redeemed approximately $1,100,000 from the Fund after $42,407 was paid to Linuxor as allowable expenses. (Ex. 70.) On April 29, 2004, Temple redeemed approximately $1 million because he wanted to place his money in a new real estate venture. (Id.)

On May 17, 2004, Brashear emailed me and told me he was pleased with the prior week's profits and asked me to withdraw $500,000 from the Linuxor Fund and transfer this amount to McCarthey Investments immediately to pay off some legal bills. (Ex. OOO; Ex. 194 – McCarthey Dep. 72:6-12.) As per Brashear's instructions, I withdrew $500,000 from the Linuxor fund the very next day to the Fund's checking account awaiting wiring instructions.. (Ex. 115.) Several days later, McCarthey instructed us to reinvest the $500,000 back into the Linuxor Fund Pool. If McCarthey suspected Linuxor or me of fraud at the time, McCarthey would not have reinvested the money with Linuxor.

139.    Around May 28 or 29, 2004, I arranged a conference call for Tulino, Ik Soo Park, an on-site NFA auditor, Mr. Paracci of the NFA, Div Kumar of Linuxor and Asher Levitsky, Linuxor's attorney. During the conference, the NFA finally agreed that, contrary to their earlier assertion, there were no fictitious accounts. I asked Tulino whether she had spoken directly with McCarthey or Brashear regarding this issue. She denied ever having called McCarthey/Brashear saying that it was NFA policy not to contact investors prior to the completion of an audit.

140.    On June 4, 2004, Brashear wrote an email to Tulino which stated:

Abbas never guaranteed to me or Phil that he would recoup all the losses by June 30. He said it was his goal to recoup the losses by June 30. He obviously may not

recoup such losses by June 30, but as long as he is making progress we are willing to ride this storm out.

(Ex. PPP.)

141.    The NFA ordered me to begin a liquidation of the Fund immediately without hedging any of the open positions, which caused the fund to lose considerable value from this point until all positions were closed. Almost all of the losses after this point occurred on existing positions. (Ex. QQQ-TTTT.)

142.    In mid-June 2004, Brashear notified me that McCarthey wanted to close his accounts with Linuxor and withdraw all remaining funds. (Ex. 116, 194 – McCarthey Dep. 72:13-24.)

143.    The Limited Partnership Agreement signed by McCarthey gives Linuxor up to 90 days to complete an account liquidation, and that redemptions must fall at the end of a calendar quarter; but I liquidated as quickly as possible according to the investors' instructions. (Exs. F-H.)

144.    The daily pressure from the NFA to liquidate was imposed without any due process as would normally be required by the NFA's own rules requiring due process before forcing liquidation. (Exs. QQQ; 11, 14, 61, 119, 194: McCarthey Dep. 68:7-15.)

145.    From August 25, 2003 to July 2, 2004, the market value of the portfolio produced net gains in excess of $200,000.

146.    Linuxor completed the liquidation of the account by July 2, 2004 and all remaining funds, $4,002,899, were returned to McCarthey. (Exs. 120-21.)

147.    There were no remaining open positions after I returned these funds to McCarthey, only a cabinet bid for one position, for which there was no market. Cabinet bid positions are worthless, and you must let them expire.

148.    Linuxor retained $80,000 from McCarthey's monies in the fund to account for only a small portion of the allowable expenses associated with administering the Fund, which are enumerated in the COM as follows:

> The Fund is responsible for all of the direct costs of administering its business.    These include, among other things: brokerage commissions, interest on margin and other borrowings, borrowing charges on securities sold short, custodial fees, legal, research, accounting and audit fees and expenses, tax preparation fees, governmental fees and taxes, bookkeeping and other professional fees, telephone, travel and travel-related expenses in connection with the Fund's activities, costs of Fund reporting, costs of Fund governance activities (such as obtaining Partner consents if and when necessary and appropriate), and all other reasonable expenses related to the management and operation of the Fund and/or the purchase, sale or transmittal of the Fund assets, as the General Partner determines in its sole discretion . . . The General Partner will provide the Fund with office space, utilities, office equipment and certain administrative services.    To the extent those facilities and services are not part of the General Partner's own operating, general administrative, and overhead costs, the Fund will bear its proportionate share of the associated costs. (COM p. 15)

149.    Linuxor took much less than it was entitled to for allowable expenses.

150.    As is shown in the detailed spreadsheet that shows each individual investor's pro-rata share of the outstanding expenses and management fees, after liquidation in early July, all three investors together ultimately ended up owing Linuxor $171,508 for the total outstanding expenses and fees. This outstanding balance in effect has come out of Shah's pocket.

151.    In mid-2004, Linuxor received the Financial Statements with Independent Auditors Report for the year ending December 31, 2003.  (Ex. FFF.)

152.    Around 3:30 p.m. Saturday, September 16, 2006, I got a phone call at home from Brashear.

153.    I asked him what he wanted and he said that he was in New York City for the weekend having driven here from Utah and he wanted to meet me. He said that he no longer was

employed by McCarthey and he had a proposition for me. I told him that I could not see him without consulting my attorney because of the impending NFA arbitration hearing. He said that was okay with him and he suggested that we meet at the Second Avenue. Deli at Second Avenue and 10th Street in Manhattan, at 5:00 p.m.

154.    I was able to speak briefly with one of the attorneys from the firm representing me in the coming NFA hearing who suggested that I meet Brashear, hear him out, but say nothing.

155.    I enlisted my friend Alan Nathan ("Nathan") as a witness and we went downtown to 10th Street and Second Avenue before 5:00 pm.

156.    It turned out that the Second Avenue Deli was closed and a new restaurant was under construction in its place. We noticed that an open door café directly across the street from the closed deli had a single person seated at a table opposite the appointed meeting place. Nathan entered the café and noticed that the lone seated individual had a camera and voice recorder on his table. We kept the individual in sight for some time.

157.    Brashear eventually did call Shah's home number at 5:57 p.m. and spoke to my wife. She asked Brashear for his cell phone number so that she could give it to Shah, but Brashear said that he was calling from a car phone in a car that was not his own.

158.    So my wife gave Brashear my cell number. He called me around 6:25 p.m. and said that he was on 11th Street and Third Avenue. I suggested that we meet at a bar on 20th Street and Park Avenue. He told me that he would be in a black BMW and would be there shortly. I waited until 6:45 p.m. at that location but he did not show up. Then he called me on my cell phone and said that he was stuck on 18th Street and Lexington Avenue, had lost his way and would be at 20th Street and Park Avenue in a few minutes. Then he called me again and said

that he had been stopped by police on 18th Street and Lexington Avenue and was being given a traffic ticket. He said he would call me later that night. I told him that we would go to 18th Street and meet him since it was close by and he replied OK. We walked to 18th Street and realized that Lexington Avenue does not intersect 18th Street; rather the intersecting street is called Irving Place. We did not see a sign of a BMW car or a traffic cop.

159.    Brashear never called again. Neither Nathan nor I had ever met Brashear in person before this aborted meeting, but subsequently we found some photographs of him on the Internet, which confirmed that the lone café sitter we saw was Brashear. I also found out on the Internet that Brashear was still working for McCarthey.

## CIRCUMSTANTIAL EVIDENCE OF NO FRAUD

160. I had no motive or opportunity to defraud the Linuxor investors, as shown by the following evidence.

### No Money Misappropriated from Investors

161. Anyone trying to defraud investors is motivated by money – money that belongs to investors that the fund manager wishes to misappropriate for himself. I never attempted to take any money from the Linuxor investors for myself. The CFTC has not contested this point and does not contend that I misappropriated money from investors.

### Minimal Fees Received from Fund

162. Linuxor's management company and I actually received lower fees than we were entitled to under the governing Fund documents. For example:

> a.  Under the COM (Ex. F at 3) LCM, the Fund's Management Company, was entitled to a management fee equal to three percent of Fund assets, regardless of Fund performance. The

chart of Fund fees (see Nathan Statement) shows that LCM took only $491,570 in management fees and allowable expenses from the Fund's inception in October 2001 through June 2004, substantially less than *two* percent of the allowable amounts.

b. This meant that investors got more than they were technically entitled to. I acted consciously in not having LCM take the full amount of management fees because the Fund's overall performance was weak until late 2003.

c. I received a total of approximately $64,000 as my total income for the entire period of October 2001 through July 2004. This was less than $24,000 per year, far less than I was entitled to receive as the senior principal in LAM.

d. In fact, in 2004, I put $7,000 of my money back into the management company to pay expenses. (See Ex. ZZZ.)

e. Finally, and perhaps most important, the management fee for 2003 was based on the total valuation of the Fund of $4,998,889 including the McCarthey investments valuation of approximately $2.9 million that I reported to Brashear in early February 2004, and not the erroneous figure in my January 30, 2004 e-mail. If I had wanted to perpetrate a fraud, (i) I would have been consistent in using "inflated" valuations, and (ii) I

would have taken the management fee based on those valuations. (See Chart of Fund Fees in Nathan Statement.)

**No Incentive Fees Because of High Water Mark**

163. The Linuxor Fund had a high water mark, which means that the Fund would pay me a 30 percent incentive fee on profits earned by the Linuxor Fund – but only when the Fund value (less expenses) exceeds the value of the Fund on the date of its last prior incentive payout. (See the definitions at the beginning of this Statement.) Had there been no high water mark, and if the Fund lost money in 2002, then all gains in 2003 above the end-of-2002 value would be subject to an incentive fee; but, with the high water mark, the incentive fee could be received only if the Fund exceeded its highest value from inception to the end of 2003. And once I disclosed the large losses of 2002, placing my incentive fees deeply "under water," what motive would I have to hide other losses that occurred in 2003 – followed by significant gains later that year and in the next year.

164. A fund manager bent on deception would not impose on himself (ort strictly honor, as I did) a high water mark that effectively precluded me from receiving any incentive fees for the duration of the Linuxor Fund. Indeed, even when the value of McCarthey's holdings increased from $2.6 million to $4 million from January to June 2004, because of high water mark the management company and I received no incentive fees.

**Opportunity Cost**

165. Given that I took so little in fees, if I had been trying to make money I could have gone back to a firm where I could easily have earned a six- to seven-figure income. My behavior shows that I was not seeking to make money by inflating Fund figures with investors.

**Ultra-Sophisticated Investors**

166.    I was dealing not with innocent, uninformed investors, but with a highly sophisticated investment group and its team of consultants, who did thorough due diligence on the Linuxor Fund and me. An attempt to defraud this team would be an exercise in futility. It never happened.

**Telephone Records Showing Constant Communication**

167. The telephone records showing over 1,500 calls between the principal investors and me demonstrate that there was a constant information flow between us, which is the exact opposite of how a defrauder would deal with his investors. I respectfully submit to this Court that it is absurd in these circumstances, with these investors, to suggest that fund values and performance were not discussed constantly.

**Scrutiny by NFA**

168.    The fraud charge that the CFTC presses hardest is the charge that I defrauded the McCarthey group and Egger when I responded with mistaken value estimate in my January 30, 2004 e-mail. Even if I had been disposed not to correct that error promptly in early February – and I repeat that I did correct it – then I would have been committing suicide. The NFA inquiry letter dated January 31, 2004 (Ex. ___) was received by me in early February. I would never attempt to deceive my principal investors, and even had I been so inclined I would have been crazy to do so while under the NFA microscope.

**McCarthey Team's Actions Reflecting Full Disclosure**

169. Brashear's May 12, 2004 e-mail praising the Fund's recent improved performance and requesting a $500,000 withdrawal for McCarthey was rescinded when Brashear told me that McCarthey wanted to keep the amount in the Fund. McCarthey's team never would have made

that decision without knowing the value and performance of the Fund.

### Conservative Reporting of Realized P&L

170. My reporting of only realized P&L was conservative and thus frequently tended to understate the Fund's performance. (See the chart comparing realized P&L with NAV, above.) I also generally did not report unrealized gains and losses, which I also considered to be less conservative than my reporting./ Furthermore, since an NAV calculation can show volatile swings almost minute-by-minute, I could easily have used NAV calculations to manipulate valuations to my benefit and the investors' detriment. I never did so.

### Limited Leverage Indicates No Fraud

171. A badge of fraud in a hedge fund is high leverage: the manager will put investors' funds at high leverage and margin (and thus high risk of total loss) in order to maximize fees and gains for himself. This happened even at such prominent firms as Bear Stearns, whose two CDO hedge funds had 46 times leverage, and Lehman, whose fund had 22-28 times leverage.

172. In contrast, the Linuxor Fund had leverage (depending on valuation at different points in time) in the 2.5-4 range.

**PLAINTIFF'S CONTENTIONS AS TO FACTS WITH MY RESPONSES**

173.    I will now respond, paragraph-by-paragraph, to the fact statements made by the CFTC in

the pre-trial order.

### Plaintiff's Contention 1

In 2002, Shah solicited four pool participants; one individual, Phillip Egger, who invested $300,000 and three affiliated pool participants who shared a common representative (the "McCarthey pool participants"), who collectively invested $11.5 million, making the total invested for these four pool participants $11.8 million.

### Response to Plaintiff's Contention 1

174.    This contention is inaccurate and incomplete in important respects.    In early

2002, J. Tydus Richards and Phillip Egger, a former Milbank Tweed attorney and college friend

and attorney for Philip McCarthey, introduced me as an experienced trader to McCarthey, a

wealthy investor.    I discussed my background and the original Linuxor business plan with

McCarthey and his team, but it was McCarthey who "solicited" me to do what he wanted:

McCarthey told me that he was not interested in moderate returns with low risk but only in high-

return investments regardless of their inevitably larger risks.    Egger, who was McCarthey's

attorney and agent in conjunction with McCarthey's trust attorneys at Milbank Tweed and

McCarthey's other advisers, conducted extensive due diligence on both the newly formed hedge

fund, Linuxor, and me.    They received, reviewed and signed the required fund documents.

175.    In March 2002, McCarthey invested $1.5 million.    Then, in May 2002, without

"solicitation" but following additional due diligence, he added $10 million from three family

trusts that he manages.

176.    Attorney Egger handled all of these transactions for McCarthey.    Egger only

invested his own $300,000 later, on May 8, 2002, of his own volition. (See the detailed

45

chronology, above.)

---

### Plaintiff's Contention 2

Defendant LAM received pool participant funds in a bank account named Linuxor Capital Management ("LCM"), not LAM, thus commingling pool funds with non-pool property. LCM is an entity owned by Shah but is not a named defendant in this action.

### Response to Plaintiff's Contention 2

177.    This contention is false, misleading and incomplete in important respects. During the formation of Linuxor, Charles Hall Jr., the attorney who set up LAM and LCM and handled all the required paperwork for the Fund, inadvertently entered the LCM bank account number in the space for the LAM account in the subscription forms. (See Ex. H.) This typo caused investors to wire their investment funds to the wrong bank account, but it did not cause any problem as the received investment funds were immediately transferred to the brokerage accounts – not commingled with anything. The typo was corrected immediately when we discovered it. The statement that there was a "commingling of pool funds with non-pool property" obviously is intended to convey some deliberate wrongdoing on the part of Linuxor, its attorney or me, which is simply untrue. No money was lost due to this harmless wiring instruction error on the subscription forms.

---

### Plaintiff's Contention 3

Shah received monthly reports from CITCO detailing the Linuxor Pool's NAV from March 2002 to October 2003.

### Response to Plaintiff's Contention 3

178.    This contention is inaccurate and incomplete in important respects. CITCO

undertook to serve Linuxor and its investors as Fund Administrator and, among other things, to generate monthly reports. However, although CITCO had committed to supplying this service soon after the Fund's start in March 2002, it did not deliver any reports until September 2002, five months after the start of the Fund's operations. Later, CITCO again failed to deliver monthly reports for a period of time because they claimed that Linuxor had not paid CITCO's monthly invoices. This was not true, and ultimately one of CITCO's employees confirmed via e-mail that the bills had been timely paid but not acknowledged by CITCO's office. (See Ex. LLL.) CITCO then undertook to complete the late reports and bring the account up to date, and they did so.

---

### Plaintiff's Contention 4

Shah, on behalf of LAM, knew that he was required to send both quarterly and annual financial reports to the Linuxor Pool participants and promised to send the McCarthey pool participants quarterly reports regarding the Linuxor Pool's trading results, as required by Commission regulation.

### Response to Plaintiff's Contention 4

179.    This contention is inaccurate and incomplete in important respects. McCarthey himself told me on several occasions, beginning at our first meeting in late 2001, that he did not want any formal reports other than year-end reports. He also instructed me to provide all information regarding Fund performance and trading details to Egger, his point man. This interaction was continuous and frequent by means of phone calls (Exs. ZZ-CCC; LLL-NNNN; QQQQ; SSSS-XXXX.) and many personal visits by Egger and at least three times by both McCarthey and Egger together. McCarthey concurred with these arrangements and never made any objection, orally or in writing, until June 2004, when he lodged his original charges with the

NFA.

---

### Plaintiff's Contention 5

Defendants intentionally or recklessly did not send quarterly financial reports to pool participants even though Defendants received the Linuxor Pool's financial information, including the NAV, from CITCO on a monthly basis.

### Response to Plaintiff's Contention 5

180.    This is not true.  See response to Contentions 3 and 4 above.  In addition, CITCO generated no quarterly reports, only monthly reports, which were never timely.

---

### Plaintiff's Contention 6

In August or September 2002, Shah advised the McCarthey pool participants' representative that the pool had recently suffered losses of approximately 30 percent, or approximately $3.5 million.   The McCarthey pool participants thereafter spoke with Shah, at which time Shah reiterated the level of losses and promised to try to recoup those losses.   The McCarthey pool participants determined to remain invested in the pool and to review the year-end results before deciding whether to withdraw their funds from the pool.

### Response to Plaintiff's Contention 6

181. This contention confirms the fact that McCarthey was informed in September 2002 of the Fund's substantial losses (the report covering March to August 31, 2002).  Furthermore, it is also true that I had made Egger and McCarthey aware of the initial losses as early as June 2002 via many daily telephone conversations and some visits to New York by Egger (see telephone logs).

182.    It is also noteworthy that plaintiff herein admits that McCarthey determined to remain invested in the pool until year-end, presumably in the hope of recouping the losses to date.  This directly contradicts McCarthey's assertion that he was never informed of the losses

prior to the 2002 K1 report delivered to him in August 2003.

---

### Plaintiff's Contention 7

Despite repeated requests from the McCarthey investors, Defendants did not send out the 2002 Annual Financial Report to pool participants until August 2003, five months late.

### Response to Plaintiff's Contention 7

183.   This contention is inaccurate and incomplete in important respects.   The Fund Administrator, CITCO, was responsible for sending the Annual Financial Report to pool participants. (See Ex. E, COM at 20.)   The facts are that the auditors, Rothstein, Kass, had notified Linuxor that the K1 report for 2002 would be delayed because of incomplete brokerage data and they suggested a routine IRS extension.   McCarthey was informed of this fact by a Linuxor letter (Ex. HHH) and the extension application was approved by McCarthey and Brashear, neither of whom raised any issue about the 2002 K1 report extension until its final delivery in August 2003.

---

### Plaintiff's Contention 8

The 2002 Annual Report, sent August 2003, showed that the pool had lost almost $5.1 million (43%) by the end of 2002.  Defendants did not disclose these 2002 losses to pool participants until August 2003.

### Response to Plaintiff's Contention 8

184.   The first sentence of this contention is correct.  However, the second sentence is incorrect and misleading, as discussed in the Chronology section of this Statement.  I made full disclosure of the full amount of the 2002 loss to McCarthey and Egger, as stated above.

---

### Plaintiff's Contention 9

After the pool participants received the 2002 annual report in August 2003 the McCarthey investors contacted Shah inquiring about the losses.

#### Response to Plaintiff's Contention 9

185.    This statement is incorrect.  I called Todd Brashear on August 25, 2003, after I had faxed him the K1s that morning.  Brashear said he would get back to me.  He called on the 26th, but McCarthey was out of town.  We then had our usual monthly conference call in early to mid-September that is reported above in this Statement.

---

### Plaintiff's Contention 10

On April 23, 2002, Shah sent a letter to Philip McCarthey stating, among other things, that from March 19 through April 18, 2002, the gross realized Profit/Loss for the Linuxor Pool was $155,325.08 and the gross realized Profit/Loss change was 10.36%.  The April 23 report did not include a statement of the unrealized gain or loss or the NAV for the pool.

### Plaintiff's Contention 11

Shah's April 23, 2002; letter to Phillip McCarthey, stating in part that from March 19 through April 18, 2002, the gross realized profit/loss for the Linuxor Pool were $155,325.08 and the gross realized profit/loss change was 10.36%, was materially misleading because it did not state the unrealized gain or loss or the NAV.

#### Response to Plaintiff's Contentions 10 and 11

186.    These statements are highly misleading.  The report was an internal, intra-month report prepared by Adam Bornstein that explicitly showed only the gross realized profit/loss of the Fund as of April 18th, 2002. The only valid results to report were the gross realized P&L's from the closed trades to date.    Further discussion of this matter appears in the Chronology above, discussing net asset values and their volatility.

---

### Plaintiff's Contention 12

On August 25, 2003, Shah sent an e-mail to the McCarthey pool participants' representative, Brashear, wherein Shah falsely stated, in pertinent part, "we have thus far recovered more than half of the capital loss and if we continue at this pace we hope that we will have not only recovered all of the capital loss but there is a good likelihood that we will be positive as far as returns since inception are concerned."

### Plaintiff's Contention 13

The above statement from the August 25, 2003 email was false because in fact the Linuxor Pool actually suffered further losses in 2003 of approximately $2.5 million and had not recovered half its capital loss from 2002.

### Plaintiff's Contention 14

Shah knew the Linuxor Pool had suffered further losses in 2003 when he wrote his August 25, 2003 email to the McCarthey investors.

### Plaintiff's Contention 15

The false statements by Shah in his August 25, 2003, email were material to the McCarthey pool participants.

### Response to Plaintiff's Contentions 12-15

187.   These contentions are again a case of the plaintiff choosing to take statements out of contest and misinterpret them.  They are addressed in the Chronolgy above.

---

### Plaintiff's Contention 16

In October 2003, James Temple ("Temple), an individual who had been an investor in Shah's earlier highly profitable hedge fund (InterPacific) decided to invested $2 million in Linuxor.

### Response to Plaintiff's Contention 16

188.   This contention is partially incorrect.  Temple's investment was not added to the Linuxor Pool until December 1 in accordance with his request.  (See Exs. RR.) Market Value)

showing Temple investment was not in the Macro Fund account until December 1, 2003.)

---

### Plaintiff's Contention 17

Defendant Shah sent an email to the McCarthey pool participant representative on January 30, 2004 at 10:08 pm in which Shah falsely stated in pertinent part:

**Your account balance as of 12/30/03 was approximately:**
**$8,095,000**
**Realized $6,500,000**
**Unrealized $1,595,000**

### Response to Plaintiff's Contention 17

189.   The e-mail was sent after 11:30 p.m. from Florida to New York.  The version produced by plaintiff shows Mountain time.

---

### Plaintiff's Contention 18

At the time he sent the January 30 email, Shah knew or recklessly disregarded that the actual value of the Linuxor Pool was close to $4 million as of December 30, 2003.

### Plaintiff's Contention 19

The January 30, 2004 misrepresentation of the Linuxor Pool's NAV was material to the McCarthey pool participants.

### Plaintiff's Contention 20

Shah never corrected, in writing, the $4 million discrepancy to the McCarthey pool participants.

### Plaintiff's Contention 21

The McCarthey pool participants never received written or oral representations from Defendants correcting the $4,000,000 discrepancy.

### Response to Plaintiff's Contentions 18-21

190. These false and misleading contentions are addressed in the Chronology section of this Statement.

### Plaintiff's Contention 22

Shah received monthly reports from Caledonian detailing the Linuxor Pool's NAV.

### Response to Plaintiff's Contention 22

191. This contention is inaccurate and incomplete. Caledonian became the Fund Administrator in June 2004, when the liquidation of the Fund commenced.

### Plaintiff's Contention 23

As the sole principal of LAM and the sole trader for the Linuxor Pool, Shah had a firm grasp on the financial status of the Linuxor Pool and knew what the pool was worth on any given day.

### Response to Plaintiff's Contention 23

192. This contention is inaccurate and incomplete. First, Adam Bornstein handled all operations for the Fund and at any given time had as much information as Shah regarding "what the pool was worth." While I had a good handle on the Fund's trading positions on any given day, the market values for these instruments, which straddled global markets with different time zones, could not readily be determined at any particular time, especially when there were no market prices available in the case of options positions.

53

**Plaintiff's Contention 24**

In October 2003, Shah instructed a fifth pool participant James Temple to send his investment to the bank account of LCM instead of directly to the Linuxor Pool, thus commingling pool property with non-pool property.

**Plaintiff's Contention 25**

In April 2004, James Temple received back $2.1 million from his investment in the Linuxor Pool, having made a profit of $100,000.

### Response to Plaintiff's Contentions 24 and 25

193.   This contention is false.   As discussed above, there had never been any commingling of the Fund's property.  The Temple money was wired to the bank account number that had been inserted into the subscription agreement forms.  As has been explained above, the wrong bank account number had been inadvertently entered in the forms by our attorney's office during Linuxor's startup.   This caused no problem because all incoming investments were immediately transferred to the fund's brokerage account.   Also, all of the accrued interest acquired therein was scrupulously transferred as well.

194.   The oversight was rectified immediately when it was brought to the firm's attention.  A separate bank account was then opened in the name of Global LP.   All fund transactions since then have been done through this separate bank account.   Temple's investment earned $6000 in interest while awaiting investment in the pool on Dec. 1, 2003 as per his request.

195.   Temple's investment in the pool on Dec. 1, 2004 happened to be well timed in that the Linuxor pool was near its all-time low at that time and its value rose thereafter not only for Temple but for McCarthey as well.

### Plaintiff's Contention 26

In July 2004, Defendants closed all trading positions and sent the McCarthey pool participants approximately $4 million, which was the amount remaining in their investment after Defendants' market losses.

### Response to Plaintiff's Contention 26

196.  In this contention, the CFTC acknowledges that the losses in the Fund were "market losses;" no money was ever misappropriated from the investors.  As noted above, (1) the NFA pressed for a too-rapid liquidation of the Fund in less than 20 days, which exacerbated the losses, and (2) the relatively low leverage of the Fund's accounts prevented the total loss of principal that has befallen many other hedge funds and investment banks since that time.

### Plaintiff's Contention 27

The McCarthey pool participants lost approximately $7.3 million of the investment in Linuxor Pool.

### Response to Plaintiff's Contention 27

197.  I was greatly disturbed that Linuxor was unsuccessful and that McCarthey lost several million dollars.  However, he has nine figures in assets, and he knew exactly the risks he was taking.  After the recent financial events such as the demise of Bear Stearns, Carlyle Group, Citigroup hedge funds, Amaranth and the collapse of major hedge funds, I can at least say that McCarthey, having insisted on high-risk bets, was fortunate to recover 35% of his funds.  It can be argued that I, by keeping the leverage of the pool's positions well below 50%, managed to avoid total market losses for my investors.

### Plaintiff's Contention 28

Following the liquidation of the McCarthey pool participants' investment in the pool, $80,000 still remained in the pool's bank account at Chase Bank, $20,000 of which Shah had wired to his wife, Jennifer J. Verger, who was not employed by LAM.

### Response to Plaintiff's Contention 28

198.  The money remaining with Linuxor after the liquidation of the fund was not part of the pool but was in the LAM account. All of this money was owed to Linuxor and me for past due allowable expenses and management fees. The $20,000 wired to my wife was drawn from the LAM account, not the fund, and was part of the money that Linuxor owed to me. I forwarded it to my wife, as I was perfectly entitled to do, to help meet normal living costs.

### CONCLUSION

199.  I respectfully ask this Court to determine that I did not cheat or defraud Linuxor's investors.

Dated:  New York, New York
        July 8, 2008



_____
                Abbas A. Shah